## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

--------------------------------------------------------X

NADINE RANADE,

      Plaintiff,

  v.

BT AMERICAS, INC.,

      Defendant.

--------------------------------------------------------X

Case No.: 1:12-cv-1039 (LO)(TCB)

ECF

---

## DEFENDANT'S RULE 56.1 STATEMENT

---

   Pursuant to Local Civil Rule 56.1, Defendant BT Americas Inc. ("BT" or "Company") respectfully submits this statement of facts as to which it contends there is no genuine, material dispute ("Statement").

**A.**  **Background and Parties**

   1.  In March 2007, Plaintiff began working for BT as a contract worker through an employment agency, Manpower Associates.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 31:25-32:12; 251:12-22); Guerrasio Decl. Ex. 3).[1]

   2.  In March 2008, Plaintiff was offered full-time employment by BT.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 34:5-8); Guerrasio Decl. Ex. 4).

---

[1] This Statement is supported by references to the attached admissible, record evidence, which comprises the testimony and exhibits from Plaintiff's July 11, 2013 deposition— attached to the declaration of Edna D. Guerrasio, Esq. and cited as "Guerrasio Decl. Pl. Tr. __/Guerrasio Decl. Pl. Dep. Ex. __"; the testimony and exhibits from the August 1, 2013 deposition of Vance Pearson—cited by Pearson Tr. __/Pearson Dep. Ex. _"; and the August 12, 2013 sworn declaration of Vance Pearson—cited as "Pearson Dec. ¶ _,".

3.      As of March 10, 2008, Plaintiff was a full-time BT employee.  She was hired as a Consultant and worked out of BT's Reston, VA office.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 38:20-25); Guerrasio Decl. Ex. 4; Guerrasio Decl. Ex. 1(Pl. Tr. 46:11-18; 47:2-4)).

4.      Upon Plaintiff's hire, she was supervised by Brent Bennett. (Guerrasio Decl. Ex. 1 (Pl. Tr. 48:14-17); Guerrasio Decl. Ex. 4).

5.      Within one year of her hire as a full-time employee, Plaintiff was promoted to the position of Senior Consultant. (Guerrasio Decl. Ex. 1 (Pl. Tr. 48:11-13)).

6.      As a Senior Consultant, Plaintiff's responsibilities included providing a professional and high technical level of consultancy, design, development, integration and support services to BT clients, as well as a professional level of soft skills, including effective communication. (Pearson Decl. ¶ 27, BT 000025-26; Guerrasio Decl. Ex. 1 (Pl. Tr. 107:20-108:3)).

7.      In the fall of 2008, Jayne Charlton, former BT Managing Consultant, became Plaintiff's direct supervisor.  (Pearson Dec. ¶ 5; Guerrasio Decl. Ex. 1 (Pl. Tr. 49:1-19)).

8.      In March 2009, Plaintiff received an annual, overall performance rating of "Very Good" for performance year 2008-2009.  The review was completed and delivered to Plaintiff by Charlton. (Guerrasio Decl. Ex. 1 (Pl. Tr. 90:18-91:100; Guerrasio Decl. Ex. 5).

9.      Similarly, or the first and second quarters of 2009, Plaintiff received performance ratings of "Very Good."  The reviews were completed and delivered to Plaintiff by Charlton. (Guerrasio Decl. Ex. 1 (Pl. Tr. 92:2-9; 92:10-93:5); Guerrasio Decl. Ex. 5).

10.     In 2009, Plaintiff applied for a promotion to Principal.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 108:20-24); Pearson Decl. ¶ 6).

11.     The promotion application required her to assemble a comprehensive write-up detailing her prior work history, as well as supportive feedback from BT clients.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 108:20-24); Pearson Decl. ¶ 7).

12.     Because Plaintiff's application lacked sufficiently positive feedback from clients as well as exposure to a national account, her application was deferred.  (Guerrasio Decl. Ex. 6, pg. 3; Guerrasio Decl. Ex. 1 (Pl. Tr. 114:21-115:2); Pearson Decl. ¶ 8).

**B.     Transformation Team, P&G Project**

13.     In August 2009, Plaintiff was placed by her supervisor, Charlton, on the Proctor & Gamble (P&G), Transformation Project, in Mehoopany, Pennsylvania.  (Guerrasio Decl. Ex. 7, pg 3).

14.     P&G was and has since been one of BT's largest client accounts in the United States. (Guerrasio Decl. Ex. 1 (Pl. Tr. 169:23-170:1); Pearson Tr. 42:9-10).

15.     Plaintiff was the project manager ("PM") for the Mehoopany Project.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 122:16-20)).

16.     As the PM, Plaintiff was responsible for participating in team calls and hosting a kick-off meeting with the client to initiate the project. (Guerrasio Decl. Ex. 1 (Pl. Tr. 124:1-2); Pearson Decl. ¶ 13, BT 000075).

17.     A "get-acquainted" call was scheduled for August 4, 2009 for all Mehoopany Project team members.  (Pearson Decl. ¶ 13, BT000075).

18.     Plaintiff accepted the call invitation but failed to participate in the call or to notify any of her colleagues that she would not be in attendance.  (Pearson Decl. ¶ 13, BT000075).

19.     Plaintiff scheduled a kick-off meeting for the Mehoopany Project on August 20, 2009.  Plaintiff had failed to invite the Site Lead from P&G, Karen Oravitz, and held the meeting without her.  (Pearson Decl. ¶ 13, BT000075).

20.     When the Site Lead learned of the meeting that she was not invited to, she "was furious" and sent an email to Plaintiff expressing her frustration. (Pearson Decl. ¶ 13, BT000075).

21.     As a result of not being included in the kick-off meeting, the Site Lead made BT comply with new and additional project guidelines to ensure that P&G was closely kept up to date on the projects progress.  (Pearson Decl. ¶ 13, BT000075).

22.     Plaintiff attended the first site survey meeting an hour and a half late. Accordingly, the site survey began "poorly" with "no coordination," a "lack[] of proper documentation" and "no knowledge of [the] process."  One of the client's site survey team members had to take over and steer the meeting in the right direction.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 126:3-9); Pearson Decl. ¶ 13, BT000075-76).

23.     Following the site survey meeting, on Monday Oct. 26, 2009, BT received a call from the Site Lead during which time she expressed her perception that "things were not going well." (Pearson Decl. ¶ 13, BT00076).

24.     The Site Lead listed the following deficiencies in Plaintiff's performance:  "lack of organization, coordination PM skills," "[p]oor communication skills," "[i]nternal communications from other BT team members [who] were concerned and sent [Plaintiff a] coaching email" to underscore the importance of how to appropriately present in front of clients. (Pearson Decl. ¶ 13, BT00076).

25.     As the project progressed, Plaintiff continued to "show up late or not at all for team calls" and failed to "send in weekly reports," as required.  (Pearson Decl. ¶ 13, BT000076).

26.     On October 29, 2009, Steven Kurtz, BT's Engagement Manager for the P&G Account, advised Charlton that given Plaintiff's continued poor performance on the

Transformation Team for the Mehoopany Project, P&G would be requesting Plaintiff's removal from the account.  (Pearson Decl. ¶ 14, BT000065).

27.     Charlton communicated the client's removal request to Plaintiff.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 127:4-14); Guerrasio Decl. Ex. 8).

28.     Plaintiff admitted that she was "removed" from the account due to a "personality" or "relationship" issue, (Guerrasio Decl. Ex. 1 (Pl. Tr. 127:15-23; 152:11-13)), and that the client was "unhappy" with her performance.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 139:9-16; 148:4-149:5)).

29.     Despite being told not to have any further contact with the Mehoopany Project team, on October 30, 2009, Plaintiff contacted the Transformation North America Workstream Manager "to take issue with her release" from the account, a phone call the client was "not happy" to receive. (Pearson Decl. ¶ 14, BT000065).

30.     Accordingly, that evening, Charlton sent Plaintiff an email stating, "Please do not have any further communication email or phone with anyone at P&G re: the potential issue/conflict/misperception re: Transformation Team."  (Guerrasio Decl. Ex. 8).

31.     Plaintiff admitted that this email was a "big deal" and "very upsetting" to her. (Guerrasio Decl. Ex. 1 (Pl. Tr. 131:13-15)).

32.     On November 2, 2009, Kurtz followed-up on his prior communication with Charlton to express P&G's continued displeasure with Plaintiff's conduct and to formally request her removal from the account.  (Pearson Decl. ¶ 14, BT000065).

33.     In the Nov. 2, 2009 email, Kurtz also relayed the client's concern that "there [had] been actions taken by [Plaintiff] against the account in which the Transformation team is going to document as behavioral/performance issues."  (Pearson Decl. ¶ 14, BT000065-66).

34.     "For example, [] there was a kick off call scheduled for today regarding the project [Plaintiff] was going to work for the last 30 days and unfortunately, [Plaintiff] did not

attend the call which is causing the project lead for this effort to be upset."  (Pearson Decl. ¶ 14,
BT000065-66).

35.     The next evening, November 3, 2009, Charlton spoke with Plaintiff over the
phone and sent a follow-up email asking her to "please 'stand down'" and asked that she "not
have any further communications (email or phone) with anyone on the P&G project, especially
the client."  (Guerrasio Decl. Ex. 8).

36.     In the same email communication and in an effort to "coach" Plaintiff through the
removal, Charlton suggested setting-up a conference call with BT's client engagement manager,
Joe Bush, so that Plaintiff could ask questions and gain clarity on the issues that prompted the
removal.  (Guerrasio Decl. Ex. 8).

37.     The following day, despite the explicit instruction from Charlton not to have any
communication with members of the Transformation team, Plaintiff contacted the client to
cancel a previously scheduled meeting.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 150:1-16); Guerrasio
Decl. Ex. 9).

38.     Accordingly, on November 4, 2009, Charlton informed Plaintiff through a
telephone conversation and in a follow-up email, that "all of [Plaintiff's] work, interactions and
communications with P&G" were "**discontinued effectively immediately**."  Plaintiff was "not
to contact anyone related to P&G via phone or email, including casual/social 'good-byes or
thank yous.'" (Guerrasio Decl. Ex. 9) (emphasis in original).

39.     Per a follow-up email from Kurtz, Plaintiff's access to P&G's account systems
was removed immediately.  (Pearson Decl. ¶ 15).

40.     Plaintiff admits that her removal from the Transformation Project in Mehoopany
Pennsylvania was due to the client being "extremely dissatisfied with [her] performance,"

namely Plaintiff "not performing to [the client's] expectations." (Guerrasio Decl. Ex. 1 (Pl. Tr. 148:4-149:9)).

41.     Plaintiff's abrupt removal from the P&G account also prompted the Principal Review Board to deny her then-deferred application for a promotion. (Guerrasio Decl. Ex. 6; Pearson Decl. ¶ 10).

42.     The Chairman of the Principal Review Board instructed Charlton that Plaintiff should wait to re-submit her application so that she could distance herself from the P&G situation and build client support from subsequent projects. (Pearson Decl. ¶ 11).

**C.     Declining Performance and Placement on Unilever Account**

43.     In December 2009, one month after her removal from the Transformation Project on the P&G account, Plaintiff received a performance rating of "Good" for the 2009 third quarter performance review.  The review was completed and delivered to Plaintiff by Charlton (Guerrasio Decl. Ex. 1 (Pl. Tr. 93:6:17); Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 16 , BT000199-200).

44.     Similarly, in March 2010, Plaintiff received an annual, overall performance rating of "Good." The review was completed and delivered by Charlton.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 93:18-95:7; 95:17); Guerrasio Decl. Ex. 7).

45.     In the performance review, Charlton noted that there were "a few items relating to soft skills with communication and relationship building that [Plaintiff's] Mgr would like her to take to consider, self-analyze, accept and apply to ensure [a] more solid case for Principal promotion, in addition to working a more strategic, global program." (Guerrasio Decl. Ex. 1 (Pl. Tr. 97:6-98:10); Guerrasio Decl. Ex. 7).

46.      Plaintiff admittedly "wasn't very good" with soft skills, including "relationship building," and acting "politically savvy" with clients (Guerrasio Decl. Ex. 1 (Pl. Tr. 101-9-17;

103:21-9)), skills that were, "always relevant in [her] profession because [she did] interact with the customers and other colleagues." (Guerrasio Decl. Ex. 1 (Pl. Tr. 107:20-108:3)).

47.     In March 2010, when Plaintiff received the denial of the principal promotion and her 2009-10 annual performance review, she was staffed by Charlton on the "Billing Audit by TNX" project for Unilever ("The Unilever Proejct"), one of BT's largest clients internationally. (Guerrasio Decl. Ex. 7, pg 4; Guerrasio Decl. Ex. 2 (Pearson Tr. 42:9-10)).

48.     Plaintiff was the project manager for the Unilever Project and was responsible for managing the audit demands for the North America and Latin America regions. (Guerrasio Decl. Ex. 7, pg 4).

49.     The timeline for the project was from December 2009 thru December 2010. (Guerrasio Decl. Ex. 7, pg 4).

50.     BT's account director for the Unilever project was Afshin Sepheri, who was "very active" and "present" at "meetings and stuff." (Guerrasio Decl. Ex. 1 (Pl. Tr. 71:7-12)). Desmond Kerr and Debra Gessel were the account managers for the Unilever account manager. (Guerrasio Decl. Ex. 1 (Pl. Tr. 73:8-24); Guerrasio Decl. Ex. 6).

51.     By the Summer of 2010, Charlton had received negative feedback from Unilever through Sepheri and Kerr, regarding Plaintiff's performance on the account. (Guerrasio Decl. Ex. 6, pg. 3).

52.     Specifically, Plaintiff had a poor demeanor when working with team members, lacked effective communication skills, was often absent without explanation and discussed personal matters inappropriate for the workplace. (Guerrasio Decl. Ex. 2 (Pearson Tr. 29:16-21; 31:7-9; 39:8-21)).

53.     In August 2010, Unilever informed Kerr and Afshin that given Plaintiff's performance issues, the client wanted Plaintiff removed from the Unilever Project four months

prior to the termination of her engagement, which was scheduled to run until December 31, 2010. (Guerrasio Decl. Ex. 6, pg 3).

54.     On August 26, 2010 Charlton conducted a conference call with Plaintiff to notify her of the client's "negative" impression of her performance and four-month premature exit from the project.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 171:13-17; 172:4-11); Guerrasio Decl. Ex. 6, pg 3). Plaintiff acknowledges that Charlton spoke to her about her performance issues, namely, the client's "negative perception" and her lack of "soft skills."  (Guerrasio Decl. Ex. 1 (Pl. Tr. 181:5-182:1)).

55.     Although Unilever had requested Plaintiff's early removal in August 2010, by Fall 2010, the client decided that compliance with its fast-approaching project deadline required that Plaintiff be kept on the engagement through the December 31 deadline, even though they were highly dissatisfied with her work.  (Pearson Decl. ¶ 19, BT 000165).

56.     Given that this was the second client to request Plaintiff's removal from a project in one year, Charlton in consultation with her supervisor, Terry Schneider, and BT's Human Resources, Stephanie Schlichtling, made the decision to place Plaintiff on a Performance Improvement Plan ("PIP").  (Guerrasio Decl. Ex. 2 (Pearson Tr.28:7-22)).

**D.     Plaintiff is Placed on Performance Improvement Plan**

57.     At BT, PIPs are management tools used only when the manager believes that the employee has the ability to succeed in his or her position, but needs additional coaching to reach such success.  (Guerrasio Decl. Ex. 2 (Pearson Tr. 26:5-12; 28:3-6; 44:20-45:7)).

58.     Charlton began drafting the PIP on September 7, 2010.  (Pearson Decl. ¶ 17, BT 000092).

59.     Charlton shared a draft of the PIP with her supervisor, Schneider, and Stephanie Schlichting, Human Resources, on September 10, 2010.   (Pearson Decl. ¶ 17, BT 000092).

60.     The PIP was scheduled to last 90 days and contained specific objectives that

Plaintiff was required to fulfill in order to successfully complete it. (Guerrasio Decl. Ex. 6).

61.     Charlton delivered the PIP to Plaintiff on September 14, 2010.  (Guerrasio Decl.

Ex. 1 (Pl. Tr. 178:4-17); Guerrasio Decl. Ex. 6).

62.     The PIP outlined eight coaching sessions Charlton had conducted with Plaintiff

from September 28, 2009 to September 7, 2010.  The sessions included topics such as "feedback

from principal review board," "communication issues and premature removal from P&G,"

"performance on Unilever" and "negative feedback rec'd from [Unilever MC] re: 4 month

premature exit."  (Guerrasio Decl. Ex. 6, pg 3).

63.     The PIP noted the following areas of Plaintiff's employment that needed

improvement:

- "[F]ollowing professional, effective communications protocol and "chain of command with her HR Mgr, Account MC, Project Team, other Key Stake holders and Client."
- "Speak[ing] too freely and 'out of turn' with other Managers or associates about time off, potential/desired job changes or opptys [sic], or other training or career aspirations that should be kept primary [sic] between her and her HR Mgr."
- "Failing to follow "direct coaching instruction or advice designed to more effectively manage/resolve/mitigate/minimize situations that arise.  In other words, she goes against her HR MC's direction."
- "Failing to "plan or communicate ahead about time off with HR Mgr, and she sporadically takes sick time or days off without advance notice or any upfront, direct notification to HR MC, ACC MC and Internal/External Client or reasonable responsiveness to voice and email msgs."

(Guerrasio Decl. Ex. 6, pg. 3).

64.     Per its terms, completion of the PIP was a requirement of Plaintiff's continued BT

employment.  (Guerrasio Decl. Ex. 6, pg. 1).

65.     Plaintiff also understood that per the terms of the PIP, Plaintiff "must receive

ongoing, positive, constructive feedback from clients, Account MC and Project Team Members

to build positive, sustainable relationships" and within three years of the date of the PIP, could

not be "asked to leave an internal or external client project prematurely due to her performance,

capabilities, personality conflict, or communication style," otherwise, her employment would be

terminated.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 220:1-222:2); Guerrasio Decl. Ex. 6, pg 4).

     66.    The PIP was scheduled to last until December 14, 2010, however it was extended

to accommodate Plaintiff's time off under the FMLA as well as intervening vacations and

holidays.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 212:5-19); Guerrasio Decl. Ex. 6, pg 1; Pearson Decl.

¶¶ 18 (BT 000104), 19 (BT 000163); Guerrasio Decl. Ex. 2 (Pearson Tr. 25:11-17)).

     67.    Plaintiff completed the PIP on January 14, 2011.  (Guerrasio Decl. Ex. 1 (Pl. Tr.

Tr. 212:20-21); Pearson Decl. ¶ 19, BT 000162-173).

     68.    At the conclusion of the PIP, Plaintiff acknowledged that as a result of the

coaching process, she had "bec[ome] more confident about [herself] professionally and about

[her] skills," she had "developed a lot of new skills by training in developing customer

relationships, negotiation and conflict resolution," and she had "improved [her] communication

skills and became a better listener."  She also "thank[ed]" Charlton for her guidance.  (Pearson

Decl. ¶ 19, BT 000170).

     69.    On January 24, 2011, Plaintiff received an email confirming her completion of the

PIP and reminding her that pursuant to BT's Performance Improvement Policy #2:03, any future

backsliding to her previous levels of poor performance would have the potential to result in

termination of her employment.  (Pearson Decl. ¶ 19, BT 000162-173).

     70.    Pursuant to BT policy, Plaintiff would not be granted the opportunity to

participate in another PIP.  (Pearson Decl. ¶ 19, BT 000162-173; Guerrasio Decl. Ex. 2 (Pearson

Tr. 63:22-64:4)).

71.     Plaintiff received a Development Needed rating on her 2010 second quarter performance review, which covered the time period July 1, 2010 through September 30, 2010. (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 20, BT 000197-198).

72.     In the review Charlton expressly noted "the feedback rec'd" from Plaintiff's "project key stakeholders and from Mgmt observations" "indicates a need for improvement in communications protocol and in building sustainable relationships."  Charlton also noted Plaintiff's need to improve "perceptions" and her "reputation."  (Pearson Decl. ¶ 20, BT 000197-198).

73.     Plaintiff acknowledged that Charlton had addressed her "need to improve [her] communications protocol and build sustainable relationships," as well as her "soft skills." (Guerrasio Decl. Ex. 1 (Pl. Tr. 192:1-11)).

74.     Plaintiff also acknowledged that this was the "third [performance] review in a row" in which "perception and soft skills" were addressed.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 120:21-24)).

75.     Plaintiff further acknowledged that Charlton "work[ed] with her more on business and soft skills, specifically to improve communication and relationships, as well as to broaden her network and improve perceptions and reputation," however, was Plaintiff never able to understand what the perceptions were  (Guerrasio Decl. Ex. 1 (Pl. Tr. 197:3-15; 198:9-16)).

76.     Plaintiff believed her position to be a "technical" position.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 199:19-200:2)).

77.     Nevertheless, Plaintiff acknowledged that despite the fact that her position was a "technical" position, when a client did not value her soft-skills to the point where she was asked to step-off an account, it "impact[ed] the relationship between the client and BT."  (Guerrasio Decl. Ex. 1 (Pl. Tr. 200:2-18)).

E.     **Plaintiff's Work on Capital Group Account**

78.     During the last two months of the PIP, Plaintiff was assigned by Charlton to a new assignment as the Project Manager for the Capital Group account.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 229:18-22); Guerrasio Decl. Ex. 6).

79.     The project began on November 29, 2010.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 229:18-22); Guerrasio Decl. Ex. 6).

80.     David Upton was the account manager for BT and worked with Plaintiff on the Capital Group project. (Guerrasio Decl. Ex. 1 (Pl. Tr. 68:9-69:7)).

81.     In addition, Charlton had asked and arranged for another BT manager, Gayle, to mentor Plaintiff while working on the Capital Group account.  (Guerrasio Decl. Ex. 2 (Pearson Tr. 69:17-21)).

82.     The initial feedback Charlton received concerning Plaintiff's performance on the Capital Group account was positive.  (Pearson Decl. ¶ 19, BT000169).

83.     However, as time progressed, Plaintiff's work performance began to backslide. (Guerrasio Decl. Ex.10; Pearson Decl. ¶ 21, BT 000155).

84.      In March 2011 Upton, as the Account Manager, conveyed the following criticisms that he had received from the client concerning Plaintiff's performance:

- "Some things [Plaintiff] did quite well, such as her 'next step plan,' and other things were enough of an issue that she was asked to finish up the initial project, **but the client specifically asked David [Upton] not to bring her back for the ongoing project work**. In the end, the client said they liked some of the 'product' she delivered, but not the PM;

- Issues with the PM style (the 'HOW'), such as challenges prioritizing project activities and discerning which are higher significance or urgency;

- Communication/conversation challenges;

- Work effort was inconsistent in quality – she seemed very good at the beginning, but her momentum diminished during the course of the project;

- Nadine seemed to be distracted by other things and thus re-asking the same questions and not up-to-date on latest info or decisions, etc.  This was apparent to both the client and the BT project team;

- Didn't know EDM well, and although she tried to learn it quickly for the CO meeting, much of the docs had to be renamed on the eCEB file by the lead consultant and [Upton];

- When preparing for closeout, Nadine began trying to 'sell' herself to the client for the next projects.  At that point, the client told David that if they were going to move forward with BT, then **they wanted a different PM**."

(Guerrasio Decl. Ex. 1 (Pl. Tr. 69:12-20, 232:2-17, 233:12-23); Guerrasio Decl. Ex.10).

85.    The client stated that "in the end … they liked some of the 'product' she delivered, but not the PM." (Guerrasio Decl. Ex. 1 (Pl. Tr. 233:12-23); Guerrasio Decl. Ex.10).

86.    In addition to the feedback cited above, Upton had previously informed Charlton that he himself had observed Plaintiff taking personal phone calls and acting "a bit scattered" while at the client site.  Stating to Charlton, "she might be planning a wedding or something." Upton also informed Charlton that he was "getting some pretty negative feedback from the BT team as of the last couple of weeks" concerning Plaintiff's job performance.  (Pearson Decl. ¶ 21, BT 000155).

87.    On March 14, 2011, Charlton conveyed this feedback to Plaintiff both over the phone and via email.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 230:22-233:23)).

88.     Plaintiff admitted that she was aware that the client did not want to work with her on any future projects.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 233:12-23; 236:3-13)).

**F.    Plaintiff's Termination:**

89.    Given that the performance deficiencies cited by Upton were the same performance issues that had been addressed in Plaintiff's PIP and that, now, another client had requested to have Plaintiff removed from all future projects with the client, Charlton, in

consultation with Human Resources and Schneider, made the decision to terminate Plaintiff's employment.  (Guerrasio Decl. Ex. 2 (Pearson Tr. 72:8-18; 74:11-12)).

90.     Plaintiff was notified on March 31, 2011, that her employment was being terminated effective April 1, 2011.  (Pearson Decl. ¶ 29, BT 000152).

**G.   Plaintiff's Request for FMLA Leave**

91.     On September 13, 2010, Plaintiff contacted BT's Human Resources personnel for the first time to request information concerning leave under the Family Medical Leave Act ("FMLA").  (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000254; Guerrasio Decl. Ex. 1 (Pl. Tr. 338:4-11)).

92.     On September 14, 2010, Jan Escalante, BT Human Resources, responded to Plaintiff's request and provided her with BTs FMLA policy as well as a FMLA Request and Certification of Health Care Provider form. (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000254).

93.     Escalante also referred Plaintiff to Cigna, BT's third party disability benefits carrier and regarding her request for leave.  (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000254-55).

94.     Plaintiff submitted the completed Certification of Health Care Provider to BT on September 22, 2010.  (Pearson Decl. ¶ 22, BT 000258).  The leave pertained to a neck injury that Plaintiff had previously sustained.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 268:4-20)).

95.     In connection with her neck and back injury, Plaintiff testified that she had attended physical therapy starting in July 2010.  She notified Charlton that she would need to attend physical therapy sessions at times, to which Charlton "agreed" and told Plaintiff, "go … get some help."  (Guerrasio Decl. Ex. 1 (Pl. Tr. 337:22-338:3)).

96.      September 2010 was the first time Plaintiff had submitted a request for leave pursuant to the FMLA and/or a certification of health care provider in support of her need for leave.  (Guerrasio Decl. Ex. 1 (Pl. Tr. 269:10-19)).

97.      The certification provided that Plaintiff could not sit "for a prolonged time" and needed to work on a "part-time" schedule. (Guerrasio Decl. Ex.11, pgs 2-3).

98.      The estimated part-time schedule proposed by her doctor was for four hours per day, five days per week, from September 20, 2010 through December 15, 2010. (Guerrasio Decl. Ex. 11, pg. 3).

99.      On September 23, 2010, Escalante sent Charlton an email asking if the part-time schedule proposed by Plaintiff's physician was a schedule BT could accommodate. (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000259).

100.      On September 24, 2010, Charlton advised Escalante that BT could accommodate the four-hour part-time schedule proposed by Plaintiff's doctor.  (Guerrasio Decl. Ex. 5; Pearson Decl. ¶¶ 22 (BT 000262-263, 264), 23 (BT 000126-127)).

101.      On September 27, 2010, the next business day, Escalante called Plaintiff to advise her of BT's approval of the four-hour schedule.  (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000264).

102.      Plaintiff's part-time schedule was set as 8 a.m. to 12 p.m.  (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22, BT 000266, 268, 269).

103.      Plaintiff understood that she was not to work more than four hours per day. (Pearson Decl. ¶ 22, BT 000273).

104.      BT required that Plaintiff work a block four-hour schedule, as opposed to four hours flex through-out the day so that BT could ensure that Plaintiff was sticking to the four-hour restriction, BT could properly manage Plaintiff's workload, and to ensure compliance with her

16

physician's instructions. (Guerrasio Decl. Ex. 1 (Pl. Tr. 281:12-24); Pearson Decl. ¶ 22, BT 000273).

105.    As Charlton explained in an email to Plaintiff, BT could not permit her to work "4hrs per day haphazardly as flex time per day.  This is not manageable for the business, PT FMLA or your Dr. care.  Sorry, but we will have to discuss further to determine where the disconnect is and resolve."  Since Plaintiff worked primarily from home, oversight of her time was difficult to begin with.  (Pearson Decl. ¶¶ 25 (BT 000139-140), 22, (BT 000270-71)).

106.    On September 27, 2010, Charlton learned from Debra Gessel, Account Manager, that the client account Plaintiff was currently working on, Unilever, needed a project manager that could work at any hour and according to their schedule, in order to meet their deliverables deadline. (Pearson Decl. ¶¶ 22 (BT 000264-65), 24 (BT 000129-130)).

107.    According to Gessel, Plaintiff "working 8am to noon each day [was] not sufficient coverage for the [client's] activities through November 30[th], since that schedule would leave her unavailable to participate in meetings and calls should the need arise.  (Pearson Decl. ¶¶ 25 (BT 000142)).

108.    Charlton, Escalante and Gessel continued to have discussions to determine whether BT and Unilever could reach an agreement on an acceptable four-hour schedule for Plaintiff. (Pearson Decl. ¶ 25, BT 000139-147).

109.    On September 29, 2010, Escalante called Plaintiff and reminded her that she was "not to work more than 4 hours per day."  (Pearson Decl. ¶ 22, BT 000266).

110.    On September 30, 2010, Plaintiff sent Escalante an email confirming her hours of work for the time period of September 20, 2010 through October 1, 2010.  In the email she provided the following work schedule:

- 9/20 – full day work
- 9/21 – full day work

17

- 9/22 – sick full day
- 9/23 – full sick day
- 9/24 – full day sick
- 9/25 – sat
- 9/26 – sun
- 9/27 – full day sick
- 9/28 – full day sick
- 9/29 – only 4 hrs work
- 9/30 – only 4 hrs work
- 10/1 – only 4 hrs work

111.    At the bottom of the same email Plaintiff acknowledged as follows: "Note: I will work 4 hr flex time per day and will not exceed more than 4 hrs." (Pearson Decl. ¶ 22, BT 000266-67).

112.    That same day, September 30, 2010, Plaintiff, Charlton and Escalante had a conference call to discuss the four-hour work schedule and Plaintiff's concern that she cannot participate in meetings scheduled outside the four-hour window. Escalante advised Plaintiff to "continue working the 8 a.m. to 12 p.m. schedule" and to contact Escalante if any problems arose.  (Pearson Decl. ¶ 22, BT 000278).

113.    Escalante noted that both Plaintiff and Charlton confirmed that they "understood" Escalante's instructions.  (Pearson Decl. ¶ 22, BT 000278).

114.    On October 4, 2010, Escalante sent Plaintiff an email (copying Charlton) in which she confirmed, "BT is accommodating your restrictions as set forth by your physician effective 9/20/10 through 12/15/10 by having you work from 8:00 a.m. to 12:00 p.m., Monday through Friday.  If you find that there is a problem with this accommodation, please let me know." (Pearson Decl. ¶ 22, BT 000285).

115.    On October 4, 2010, Plaintiff sent Escalante a second email detailing her time for the period of September 16, 2010 to October 1, 2010, Plaintiff confirmed that she had been accommodated with the four hour leave schedule and stated that, "I will have my Doctor provide

an updated documentation by tomorrow stating that my part time work will be effective 9/29." (Pearson Decl. ¶ 22, BT 000288; Guerrasio Decl. Ex. 1 (Pl. Tr. 324:21-325:25)).

116.    On October 5, 2010, Escalante emailed Plaintiff confirming that BT had "accommodated [her] restriction of working four hours per day from 09/20/10 through today, 10/05/10." However, because the client account that Plaintiff was working on could not support a four-hour block schedule, as of the following day, October 6, 2010, BT could no longer accommodate the restrictions and presented Plaintiff with the following alternative leave options: (1) take continuous, full-time FMLA leave; or (2) speak with her physician about having the restriction lifted and return to work full-time.   (Pearson Decl. ¶ 22, BT 000292-93).

117.    Plaintiff testified that a third option was available to her, being placed "on the bench." (Guerrasio Decl. Ex. 1 (Pl. Tr. 294:17-24)). "On the bench" refers to the paid time period when a consultant is not actively engaged in a client project. Generally consultants are placed on the bench in between projects. (Guerrasio Decl. Ex. 1 (Pl. Tr. 237:7-19)).

118.    On October 6, 2010, Plaintiff presented BT with a doctor's note lifting the four-hour restriction and certifying her ability to return to work for 8 hours per day without any medical restrictions. (Pearson Decl. ¶¶ 22 (BT 000302), 26 (BT 000148)).

119.    As of October 6, 2010, Plaintiff was restored to full-time employment status. (Pearson Decl. ¶ 22, BT 000302).

120.    After October 6, 2010, Plaintiff's need for leave pursuant to the FMLA or any other disability law was never raised by herself or anyone else at BT. (Guerrasio Decl. Ex. 1 (Pl. Tr. 330:11-331-6); Pearson Decl. ¶ 12).

**H.**    **Plaintiff's EEOC Charge Against BT**

121.    On February 10, 2012, Plaintiff dual-filed with the EEOC and the Farifax County Human Rights Commission, a charge of discrimination ("Charge") against BT. (Guerrasio Decl. Ex. 12; Plaintiff's Production 000087-90).

122.    On the Charge form that Plaintiff filled out, she checked the boxes for "national origin," "sex" and "disability" under the "classification of complaint" heading. (Guerrasio Decl. Ex. 12; Plaintiff's Production 000089).

123.    In the narrative as to why Plaintiff brought the Charge against BT she wrote, "I believe I am being discriminated against because of my sex, national origin and disability." (Guerrasio Decl. Ex. 12; Plaintiff's Production 000090).

**I.**    **Plaintiff's Litigation Against BT**

124.    Plaintiff filed suit in this Court on September 12, 2012, in which she alleges a single claim of violations of the FMLA against BT. (Guerrasio Decl. Ex. 13).

125.    As part of litigation discovery, Plaintiff was deposed on July 11, 2013. (Guerrasio Decl. Ex. 1 (Pl. Tr. 7:1-13)).

126.    When Plaintiff was asked if believed that she had been discriminated against based on her gender, she responded, "I believe because of my illness … I don't know. It could be. It could be anything, because [] based on gender I was denied promotion also." (Guerrasio Decl. Ex. 1 (Pl. Tr. 263:15-22)).

127.    When pressed on the subject Plaintiff explained, "I can't think [it is] gender-related in an – in any way. Anyone can get sick. It's not gender-related." (Guerrasio Decl. Ex. 1 (Pl. Tr. 267:7-9)).

128.    When asked if Charlton discriminated against her based on her ethnicity, Plaintiff responded, "could be.  I mean it's just an assumption."  (Guerrasio Decl. Ex. 1 (Pl. Tr. 267:10-19)).


Dated: August 20, 2013                    PROSKAUER ROSE LLP

                                          By: */s/ Connie Bertram*

                                          Connie N. Bertram
                                          Virginia State Bar No. 31713
                                          Daniel J. Davis
                                          Virginia State Bar No. 65385
                                          1001 Pennsylvania Ave., N.W.,
                                          Suite 400 South
                                          Washington, DC  20004
                                          Telephone:  (202) 416-6800
                                          Fax:  (202) 416-6899

                                          *Attorneys for Defendant*
                                          *BT Americas Inc.*