**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

|  |  |  |
|---|---|---|
| NADINE RANADE, | ) | |
| | ) | |
| Plaintiff, | ) | Civ. Action No. 1:12cv1039 (LO)(TCB) |
| | ) | |
| v. | ) | |
| | ) | |
| BT AMERICAS INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>**DECLARATION OF EDNA D. GUERRASIO**</u>

I, Edna D. Guerrasio, declare, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I am associated with the law firm of Proskauer Rose LLP, attorneys for Defendant BT Americas Inc. ("Defendant") in the above-reference action.  I am fully familiar with the facts set forth herein.  I submit this declaration in support of Defendant's motion for summary judgment.

2.      Attached hereto as **Exhibit 1** is a true and correct copy of excerpts of the deposition transcript of Plaintiff Nadine Ranade ("Plaintiff") taken on July 11, 2013 ("Pl. Tr.").

3.      Attached hereto as **Exhibit 2** is a true and correct copy of excerpts of the deposition transcript of Vance Pearson taken on August 1, 2013 ("Pearson Tr.").

4.      Attached hereto as **Exhibit 3** is a true and correct copy of Plaintiff's Employment Application, which was identified by Plaintiff and marked as Exhibit 1 at Plaintiff's deposition.

5.      Attached hereto as **Exhibit 4** is a true and correct copy of Plaintiff's offer of employment, dated February 22, 2008, which was identified by Plaintiff and marked as Exhibit 2 at Plaintiff's deposition.

6.      Attached hereto as **Exhibit 5** is a true and correct copy of Plaintiff's Performance Document History, which was identified by Plaintiff and marked as Exhibit 3 at Plaintiff's deposition.

7.      Attached hereto as **Exhibit 6** is a true and correct copy of Plaintiff's Performance Improvement Plan, which was identified by Plaintiff and marked as Exhibit 10 at Plaintiff's deposition.

8.      Attached hereto as **Exhibit 7** is a true and correct copy of Plaintiff's performance review from March 31, 2010, which was identified by Plaintiff and marked as Exhibit 4 at Plaintiff's deposition.

9.      Attached hereto as **Exhibit 8** is a true and correct copy of an email communication, dated November 3, 2009, which was identified by Plaintiff and marked as Exhibit 5 at Plaintiff's deposition.

10.      Attached hereto as **Exhibit 9** is a true and correct copy of an email communication, dated November 4, 2009, which was identified by Plaintiff and marked as Exhibit 6 at Plaintiff's deposition.

11.     Attached hereto as **Exhibit 10** is a true and correct copy of an email communication, dated March 14, 2011, which was identified by Plaintiff and marked as Exhibit 13 at Plaintiff's deposition.

12.     Attached hereto as **Exhibit 11** is a true and correct copy of Plaintiff's certification of healthcare provider, which was identified by Plaintiff and marked as Exhibit 17 at Plaintiff's deposition.

13.     Attached hereto as **Exhibit 12** is a true and correct copy of a letter communication from the Fairfax County Human Rights Commission enclosing Plaintiff's agency charge, dated November 19, 2012, which was identified by Plaintiff and marked as Exhibit 31 at Plaintiff's deposition.

14.     Attached hereto as **Exhibit 13** is a true and correct copy of Plaintiff's Complaint, dated September 12, 2012, which was identified by Plaintiff and marked as Exhibit 16 at Plaintiff's deposition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

EDNA D. GUERRASIO

Dated: Newark, New Jersey
          August 20, 2013

# Exhibit 1

Page 1

1            THE UNITES STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF VIRGINIA
2               ALEXANDRIA DIVISION

3

4   NADINE RANADE              :
                              :
5           PLAINTIFF          :
                              :
6   V.                        : Civil Action No.
                              :    1:12cv1039
7                             :
    BT AMERICAS INC.          :
8                             :
            DEFENDANT          :
9

10

11           The Video Deposition of NADINE RANADE,

12   was taken on Thursday, July 11, 2013, commencing

13   at 9:32 a.m., at the Offices Proskauer Rose,

14   1001 Pennsylvania Avenue NW, Washington, D.C.,

15   before Ryan K. Black, Notary Public, Registered

16   Professional Reporter.

17

18

19

20

21

22

23

24

25   Job No. NJ1698437

26

1       APPEARANCES:

2

3            LAW OFFICE OF ANNETTE RUBIN

             BY:   ANNETTE RUBIN, ESQ.

4            18 Liberty Street, SW

             Leesburg, Virginia  20175

5            akr@annetterubin.com

             703.777.0034

6

             Representing Nadine Ranade

7

8

9            PROSKAUER ROSE LLP

             BY:   JEREMY M. BROWN, ESQ.

10          One Newark Center

             Newark, New Jersey  07102

11          jbrown@proskauer.com

             973.274.8185

12

             Representing BT Americas Inc.

13

14

15      ALSO PRESENT:

16            Kim Johnson, Legal Videographer

17

18

19

20

21

22

23

24

25

Page 31

1 residencies, so you have to attend those in

2 person.  And I -- I've done two so far.  They

3 require, um, three or four, I believe.

4   Q. And how long are those residencies in

5 Minnesota?

6   A. Not necessarily -- they hold in

7 different locations --

8   Q. Oh?

9   A. -- internationally or domestically.

10   So it can last to 10 days.  The

11 shortest one is four business days, so four to

12 ten days.

13   Q. Okay.  And do you have -- you have a

14 PMP license in Virginia; is that right?

15   A. Yes.

16   Q. Okay.  Anywhere else at that --

17   A. It's an international organization, --

18   Q. Okay.

19   A. -- and it's recognized

20 internationally.

21   Q. Okay.

22   A. They are professional certifications.

23   Q. The -- when did you start working at

24 BT?

25   A. As an employee, I started working

1    March of 2008; however, I did work at BT for a

2    year, which was starting early 2007.  I can't

3    remember exact month.  Early 2007.  I worked for

4    a year as a -- a consultant.

5         Q.   Okay.  You -- you were -- were you

6    working for Manpower at the time?

7         A.   Yes.  Yes.

8         Q.   Okay.  And as a -- okay.  And -- and

9    they were your employer, correct?

10        A.   Manpower was my employer.

11        Q.   And they referred you to BT?

12        A.   Yes.

13        Q.   Okay.

14        A.   They -- they -- you know, they had

15   sent me to a few interviews.  And, you know,

16   they gave me an offer over there.

17        Q.   What was the role that you had at BT

18   when you were a consultant?

19        A.   My title was senior consultant.  I was

20   doing project/program management.  I would say

21   project management, primarily.

22        Q.   Okay.  And did you report to anyone?

23        A.   Yes.

24        Q.   Who did you --

25        A.   I --

Page 34

1    That's --
2         Q.   And that entire year you worked you
3    were a consultant, correct?
4         A.   Yes.
5         Q.   Okay.  And then in February or March
6    of 2008, you were offered a full-time position
7    at BT?
8         A.   Yes.
9         Q.   Okay.
10        A.   They were very pleased with my work,
11   at least that's what my supervisor said.  And
12   they said we would like you to come and join our
13   company.
14        Q.   And who was that who said that?
15        A.   Okay.  Hmm.  I -- um, I don't
16   remember, because I don't remember the
17   supervisor's name who -- who went through
18   conversion of me from consultant to employee.
19   I don't remember that.  I apologize, but I don't
20   have recollection of the manager's name.
21        Q.   Okay.
22        A.   There was one manager before my -- the
23   last manager was Brent.  But I don't remember
24   the one before that.
25        Q.   Okay.  As a consultant --

Page 38

1        for identification as Company 1, --

2              A.   Mm-hmm.

3              Q.   -- which is a multiple-page document

4        -- a four-page document, --

5              A.   Mm-hmm.

6              Q.   -- entitled application for

7        employment.

8                   Do you see that?

9              A.   Mm-hmm.

10             Q.   Yes?

11             A.   Yes.

12             Q.   And is this your handwriting on this

13       document?

14             A.   Yes.  Yes, it is.  Yes.

15             Q.   And on Page 4 of this document, --

16             A.   Mm-hmm.

17             Q.   -- is that your signature next to the

18       date February 22nd, 2008?

19             A.   Yes, it is.

20             Q.   Okay.  On the bottom of Page 1,

21       you were seeking a position as a consultant,

22       correct?

23             A.   Mm-hmm.

24             Q.   Yes?  I need you to say yes or no.

25             A.   Yes.  Oh, sorry.  Yes.

Page 46

1    notice?

2          A.    Without notice?  I'm not -- I thought

3    we were required to give some sort of formal

4    notification.

5          Q.    Okay.  Your status as an at-will

6    employee --

7          A.    Mm-hmm.

8          Q.    -- remained at will throughout the

9    entire employment at BT, correct?

10          A.    Yes.

11          Q.    Okay.  When working -- when you began

12    work in March of 2008 at BT --

13          A.    Mm-hmm.

14          Q.    -- as a full-time employee, --

15          A.    Mm-hmm.

16          Q.    -- did you work from home and in the

17    office, or a combination of both?

18          A.    Combination of both.

19          Q.    Okay.

20          A.    It's, um -- they -- they.

21          Q.    So I -- I'm going to stop you there --

22          A.    Mm-hmm.

23          Q.    -- and just -- I want to focus on the

24    2008 period, March of 2008 into 2008.  Did you

25    have an office?

Page 47

1           A.    Yes.   Actually, the first year we --

2           Q.    And where was your office?

3           A.    It was on the third floor in Commerce

4     Park Building in Reston.   And, actually, I -- I

5     worked more -- all -- the entire year from

6     office, that -- of 2009, yeah.

7           Q.    Okay.   And that -- and just to be

8     clear, that was five days a week you were

9     reporting --

10          A.    Five days a week --

11          Q.    Let me finish, please.   Please.

12          A.    Sorry.

13          Q.    That was five days a week that you

14    reported to -- to work in the Reston, Virginia,

15    office?

16          A.    Yeah.   For first year.

17          Q.    Okay.   And did you have a cubicle?

18    Did you have a -- an office with a door?   What

19    was the physical --

20          A.    It's just a cubicle.

21          Q.    Cubicle?

22          A.    Mm-hmm.

23          Q.    Okay.   In 2009, did you continue to

24    report to the Reston, Virginia, office every day

25    for work?

Page 48

 1            A.   Um, it changed.   Um, because, um, I
 2       worked, I think, three and two -- like, three
 3       days from home -- or three days virtually, two
 4       days in office.   Like that.   Telework.
 5            Q.   And what was your position at BT at
 6       this time, your job title?
 7            A.   What year?
 8            Q.   2008 and 2009.
 9            A.   In --
10            Q.   Well, let's start 2008.
11            A.   2008 I was hired as a consultant.   I
12       was promoted to a senior consultant in 2009, and
13       I don't remember what month.
14            Q.   Okay.   In 2008 --
15            A.   Mm-hmm.
16            Q.   -- who did you report to directly?
17            A.   Brent.
18            Q.   Okay.   And in a certain -- within a
19       few months --
20            A.   Mm-hmm.
21            Q.   -- of your start of employment, you
22       began reporting to Jayne Charlton; is that
23       right?
24            A.   No, not a few months.   I -- I -- I
25       don't remember exactly what time frame, but --

Page 49

1          Q.    Would it refresh your recollection

2    if I told you that Jayne Charlton was your

3    supervisor effective October 2008?  Does that

4    sound right?

5               And I can show you a document, but if

6    that refreshes your recollection, that's fine.

7    If it doesn't, we'll move on.

8          A.    Yeah.  She -- she was hired.  I don't

9    remember -- yeah.  Maybe.  But I don't remember

10   the exact time.

11         Q.    But it was -- was it in 2008 that

12   she began -- became your direct supervisor?

13         A.    Probably.  I'm not a hundred percent

14   sure what year -- what time frame.

15         Q.    Okay.

16         A.    Yeah.  Most likely.  I -- I do

17   remember distinctly it's -- at the beginning of

18   2009 she was.  I believe maybe towards the end

19   of 2008 she might have joined.

20         Q.    Okay.  And who promoted you; in other

21   words, who at BT was the decision-maker, as far

22   as you understood it?

23         A.    The decision-maker, I believe,

24   is -- is actually not my immediate supervisor.

25   It's usually the second-level manager.  And that

Page 68

1        managing the relationship with Capital Group?

2             A.   Um, you know, it -- the -- the real

3        man -- account manager was -- I believe his name

4        was -- there was another person from the sales

5        side, Rick.  I -- um, I apologize.  I don't have

6        his name.  But the sales account manager was

7        someone else who was responsible for having that

8        relationship with the client.

9             Q.   So what was David Upton's --

10            A.   David Upton.

11            Q.   -- role as an account manager with the

12       Capital Group?

13            A.   He actually assumed sort of client

14       relationship management role, because the sales

15       manager was busy or something.  But that's how

16       he came across.

17            Q.   So was it -- I mean, for your

18       purposes in this, --

19            A.   Mm-hmm.

20            Q.   -- it would be fair to say --

21            A.   Mm-hmm.

22            Q.   -- that David Upton was in charge of

23       this relationship with the Capital Group?

24            A.   Right.  With the Capital Group, yes.

25       Yeah.

Page 69

1        Q.    And so while you're on the technical

2   side, --

3        A.    Mm-hmm.

4        Q.    -- he was part of the big-picture

5   relationship between BT and Capital Group.   Is

6   that fair to say?

7        A.    That is correct.

8        Q.    He was the guy in charge?   Is that

9   -- is that fair for your -- in other words

10   -- let -- let me withdraw that question.

11        A.    Mm-hmm.

12        Q.    If the client was happy, unhappy --

13        A.    Mm-hmm.

14        Q.    -- with how things were going in the

15   relationship, --

16        A.    Mm-hmm --

17        Q.    -- is it your understanding that, for

18   example, the Capital Group would communicate

19   with David Upton?

20        A.    Yes.   That is my understanding.   And I

21   would have expected David to come and

22   communicate it to me.

23        Q.    Okay.   But you didn't -- you didn't

24   have a direct reporting relationship --

25        A.    With David Upton.

1    being an account manager, was Sepheri -- how do

2    you pronounce it?

3        A.   He -- he was --

4        Q.   How do -- how do you say his last

5    name?

6        A.   Sepheri.

7        Q.   Was Mr. Sepheri the account manager

8    for Unilever as far as --

9        A.   He's account director, actually,

10   Mr. Sepheri.  And he was directly responsible

11   and very active, actually.  He was very present

12   and, you know, around at meetings and stuff.

13           It was very unclear at Capital Group,

14   which was a very short-term, eight to ten-week

15   engagement with Capital Group, and there were

16   two managers there.  Um, I -- I hate myself

17   because I can't remember the other account

18   manager's name.  And David Upton was there, as

19   well, but the other person was also an account

20   manager.

21       Q.   Okay.  So there were two account

22   managers on Capital Group.  Is that what you're

23   saying?

24       A.   Yeah.  Yeah.

25       Q.   And --

Page 73

1          the role of program manager/account manager, who

2          Afshin depended a hundred percent on, Debra.

3               Q.    Is that Debra Gessell?

4               A.    Yes.  I'm so glad you remembered the

5          name.  Thank you.

6               Q.    Okay.

7               A.    I'm struggling with her name.

8               Q.    And so as far as you were concerned,

9          for the work you did on Unilever, and we're

10         going to get into that later, --

11              A.    Yeah.

12              Q.    -- the person in charge was

13         Mr. Sepheri; is that right?

14              A.    Yes.  Yes.

15              Q.    And there was also Debra Gessell?

16              A.    Yes.

17              Q.    She also had a -- a -- a managing role

18         with this client relationship; is that right?

19              A.    Yes.  Yes.

20              Q.    Okay.  And -- and so --

21              A.    Um, actually, the -- directly, Afshin

22         was responsible, and -- yeah.

23              Q.    Okay.  And so was Debra?

24              A.    Um, yes.  Yeah.

25              Q.    Okay.  Anyone else, that you can think

1      see --

2           A.   Yes.

3           Q.   -- that it has a Bates number with a

4      37 in the lower right corner?

5           A.   Yes.

6           Q.   And do you see that there's a printout

7      date of March 31st, 2011?

8           A.   Oh, yes.  I do see that.  Mm-hmm.

9           Q.   Okay.  Is this the document that you

10     printed from BT's system?

11          A.   Yes.

12          Q.   Okay.  And you printed this after you

13     were discharged, correct, --

14          A.   Yeah.

15          Q.   -- that you were notified that you

16     were being terminated?

17          A.   Yes.

18          Q.   Okay.  According to this document, --

19          A.   Mm-hmm.

20          Q.   -- you received a performance rating

21     of very good --

22          A.   Mm-hmm.

23          Q.   -- on your annual performance rating

24     for the time period of April 1, 2008, --

25          A.   Mm-hmm.

Page 91

1          Q.   -- through March 31st, 2009; is that
2     correct?
3          A.   Yes.
4          Q.   Okay.  And is it correct that at the
5     end of this period --
6          A.   Mm-hmm.
7          Q.   -- when this review was provided, --
8          A.   Mm-hmm.
9          Q.   -- Jayne Charlton was your supervisor?
10         A.   Yes.
11         Q.   For the time period April of '09 to
12    April of '10, March 31st of '10, --
13         A.   Mm-hmm.
14         Q.   -- you received four quarterly
15    performance reviews, correct?
16         A.   Mm-hmm.
17         Q.   And, again, those were all performed
18    by -- and given to you by Jayne Charlton?
19         A.   Yes.
20         Q.   And during that period --
21         A.   Mm-hmm.
22         Q.   -- that I'm talking about, the April
23    of '09 to March of '10, --
24         A.   Mm-hmm.
25         Q.   -- Jayne Charlton was your supervisor?

Page 92

1          A.    Correct.

2          Q.    The first quarter --

3          A.    Mm-hmm.

4          Q.    -- performance review, April 1st of

5     '09 to September 30th of '09, --

6          A.    Mm-hmm.

7          Q.    I apologize.  April 1st of '09 to June

8     30th of '09, you received a rating of very good?

9          A.    Correct.

10         Q.    Okay.  For July 1st of '09 --

11         A.    Mm-hmm.

12         Q.    -- to September 30th of '09, which is

13    the second quarterly performance review, --

14         A.    Right.

15         Q.    -- you received a rating of very good,

16    right?

17         A.    Yeah.  It's kind of hard to read, but

18    I -- yeah.

19         Q.    Can you read it?  I know it's hard to

20    read.

21         A.    September '09, you said?

22         Q.    No.  No, I didn't.

23         A.    Hmm.

24         Q.    I said July 1st of '09 --

25         A.    Mm-hmm.

Page 93

1          Q.    -- through September 30th of '09.

2          A.    Yeah.   That's correct.

3          Q.    Okay.   And Jayne Charlton was your

4    supervisor then?

5          A.    That's correct.

6          Q.    And then for the third quarter, --

7          A.    Mm-hmm.

8          Q.    -- October 1st of '09 --

9          A.    Mm-hmm.

10         Q.    -- through December 31st of '09, the

11   third quarterly performance review, --

12         A.    Mm-hmm.

13         Q.    -- you received a rating of good?

14         A.    That's correct.

15         Q.    And, again, that was Jayne Charlton,

16   right?

17         A.    That's correct.

18         Q.    For the year-end, --

19         A.    Mm-hmm.

20         Q.    -- which we just went through, --

21         A.    Mm-hmm.

22         Q.    -- you had an overall rating or a

23   year-end rating, I should say, of good, do you

24   see that, from April '09 through March 31st of

25   '10?

1          A.    Where do you see that?

2                Jayne?

3          Q.    The third line down.  April -- I

4    apologize.  Not the third line down.  The fourth

5    line --

6          A.    Yeah, it says --

7          Q.    The fourth from the bottom, --

8          A.    Yeah.

9          Q.    -- April 1st, 2009, to March 31st,

10   2010, --

11         A.    Mm-hmm.

12         Q.    -- Jayne Charlton rated you for your

13   annual review as G, good.  Do you see that?

14         A.    Yeah.

15         Q.    Okay.

16         A.    The dates, however, are showing June

17   of '09 to December of '09, and I -- I don't

18   understand where they came up with those dates,

19   though, in the dates column, against good.

20               It makes no sense.

21         Q.    I don't know what you're -- where are

22   you referring to?

23         A.    Umm.

24         Q.    Show me where you're referring to.

25               MS. RUBIN:  Well, show him.

Page 95

1           THE WITNESS:  Well, this -- I can't

2      read properly, though.  It it's so hazy, though.

3      This looks like this --

4      BY MR. BROWN:

5           Q.   April 1st, '09, to March 31st, '10?

6           A.   Yeah.  That's correct.  Yeah.  That's

7      annual.

8           Q.   Okay.  You can just put that aside for

9      a second, if you would.

10          A.   Okay.

11          MR. BROWN:  Now, I'll show you what

12     we're going to mark as Company 4.

13          (Deposition Exhibit No. 4, Ms.

14     Ranade's performance review from April 1st of

15     '09 to March 31st of 2010, was marked.)

16     BY MR. BROWN:

17          Q.   Do you see that this is your annual

18     performance review from April 1st of '09 to

19     March 31st of 2010?

20          A.   Yeah.

21          Q.   And do you see that the author is

22     Jayne Charlton?

23          A.   Yes.

24          Q.   Okay.  Do you recall receiving this

25     review?

Page 97

1      below the G, the good rating, --

2           A.    Mm-hmm.

3           Q.    -- and refer you specifically to the

4      last two sentences.   And I'm going to read them.

5           A.    Mm-hmm.

6           Q.    Quote, there are a few items relating

7      to soft skills with communication --

8           A.    Mm-hmm.

9           Q.    -- and relationship building that

10     Nadine's manager would like her to take, to

11     consider, --

12          A.    Mm-hmm.

13          Q.    -- self-analyze, accept and apply, --

14          A.    Mm-hmm.

15          Q.    -- to ensure a more solid case for

16     principal promotion, --

17          A.    Mm-hmm.

18          Q.    -- in addition to working a more

19     strategic global program.

20          A.    Mm-hmm.

21          Q.    Nadine is a great team player and can

22     be a great leader, as well.

23                Do you see that?

24          A.    Yeah.

25          Q.    Okay.   And do you remember or do you

Page 98

1    recall Jayne Charlton talking to you --

2         A.   Yes.

3         Q.   -- about -- let me finish -- about the

4    areas of your performance that she wanted you to

5    improve upon?

6         A.   She --

7         Q.   My question is, do you recall Jayne

8    Charlton discussing with you areas of your job

9    performance that you could improve upon?

10        A.   She talked about the soft skills, yes.

11        Q.   Okay.  What did she say with regard to

12   soft skills?

13        A.   This -- this came in as a result --

14   cause I had applied for a principal promotion.

15   And I was turned down, and I asked specifically,

16   Jayne, why was I declined?  And she came back

17   and she said, you need to improve on your soft

18   skills.

19             And then she requested me to conduct

20   train -- we used to have knowledge sessions

21   with -- with other engineers, and she asked me

22   to conduct -- to do research and -- and put a

23   presentation together about soft skills.

24             And I did a lot of research, read a

25   few books, and put together a one-hour knowledge

1    know, she -- there were just negative vibes.  I

2    tried very hard to build a relationship with

3    Barbara because, with certain client and program

4    management relationship, sometimes you build a

5    relationship with that individual to make them

6    comfortable in terms of them trusting you, you

7    know, professionally and stuff.  And so -- so I

8    would -- I even went to the length of asking

9    her, do you want to have lunch and let's talk

10   and stuff.  You know, and I wasn't very good at

11   those things because I felt I have to do my

12   work, deliver the project, and be done with it.

13        Q.    So when you say you were not good at

14   those things, what are the things that you were

15   referring to that you were not good at?

16        A.    I would say, like, relationship

17   building in terms of, like, you know, being

18   a little more political in terms of, you know

19   -- so I tried, and it didn't work with Barbara.

20   But then I came back, and -- and I told my

21   colleagues the whole story, and they said it

22   would have never worked with Barbara, because

23   they had some other experiences.

24        Q.    Who else had similar experiences with

25   Barbara?

Page 103

1    wrong way, Nadine.  So you have to work towards

2    changing that perception.

3              That's one thing -- she very

4    specifically said that to me.  So I'm, like,

5    Jayne, you have to help me.  Teach that as a

6    supportive manager.  And then she was quiet,

7    so --

8         Q.   Well, was one of the ways to help

9    you in this perception and with relationship

10   building asking you to put together and do

11   research on a -- a training on soft skills?

12        A.   Yeah.  Yeah.

13        Q.   Okay.  And did doing that research

14   -- sorry.  Did -- doing that research and

15   putting that PowerPoint together and doing the

16   training, was that educational for you?

17        A.   Yes.  I did read a lot of management

18   books and stuff and -- and learned some key

19   things and -- which I'm applying now.  Yeah, I'm

20   always learning.

21        Q.   Okay.  One of the things also that

22   you said you were not good at was that you

23   could -- I think you used the words you could

24   have been better politically, or words to that

25   effect, and I can -- we can go back and look at

Page 107

```
 1            Q.   And one of the reasons she said no --
 2            A.   Mm-hmm.
 3            Q.   -- was relating to these soft skills,
 4      wasn't it?
 5            A.   Right.  But being a principal,
 6      it's not -- it's irrelevant, because it's a
 7      technical, you know, level.
 8            Q.   So is a principal a promotion?
 9            A.   Yeah.  Just like consultant to senior
10      consultant.
11            Q.   You'd still be in the same --
12            A.   Technical pool.
13            Q.   The same technical pool; --
14            A.   Yes.
15            Q.   -- is that correct?
16            A.   You're just a little more -- like,
17      okay, you have more knowledge -- or, you know,
18      you're a little more knowledgeable or expert in
19      project management, program management now.
20            Q.   Right.  But -- and so it's your view
21      that --
22            A.   Mm-hmm.
23            Q.   -- improving those soft skills and
24      having those soft skills is not relevant to
25      being promoted to principal?
```

Page 108

1          A.    It's always relevant in my

2     profession because you do interact with the

3     customers and other colleagues.  I think at any

4     point in anyone's career soft skills are

5     relevant; however, I feel it's not their -- it's

6     not the it thing.

7          Q.    Okay.  But Jayne disagreed with you,

8     right?  She -- isn't it your understanding that

9     Jayne --

10         A.    Yeah.  Mm-hmm.

11         Q.    -- thought it was highly relevant to

12    whether you were going to be promoted or not?

13         A.    She never came across and gave me

14    that this was the only reason about soft skills

15    that that's holding me back.  But that was the

16    only reason she gave me.

17         Q.    Well, what about your -- you applied

18    -- let me withdraw that.

19         A.    Mm-hmm.

20         Q.    You applied and submitted a

21    document -- a lengthy document in support of

22    your request to be promoted to principal in or

23    around September of 2009, correct?

24         A.    Yes.

25         Q.    Okay.  The time period that you

Page 114

1            So October, November, December,

2    January, February, five months went by, and she

3    said, no.  Terry said, wait, you know?  And then

4    in March I re -- re-presented again the

5    presentation.  She never -- did she show up to

6    that one?  No, she didn't show up that to --

7         Q.   You presented again?

8         A.   Yeah.  In March.

9         Q.   Okay.  We're going to take a -- we're

10   to go off the record for a moment.

11        A.   I'm not a hundred percent --

12        Q.   Stop.  Stop.  Stop.

13            THE VIDEOGRAPHER:  This is the end of

14   Tape 1 of the videotape deposition of Nadine

15   Ranade.  We're off the record at 11:40.

16            (Recess taken.)

17            THE VIDEOGRAPHER:  Here begins Tape 2

18   in the videotape deposition of Nadine Ranade.

19   Back on the record at 11:44.

20   BY MR. BROWN:

21        Q.   So Ms. Ranade, the -- you presented,

22   you believe, sometime in September of --

23        A.   Mm-hmm.

24        Q.   -- of 2009 to be a principal, correct?

25        A.   Yes.  That's right.

Page 115

1     Q. And it was deferred?

2     A. Yes.

3     Q. Okay.  And it was deferred until March

4  of 2010; --

5     A. Yes.

6     Q. -- is that correct?

7     A. Yes.

8     Q. Okay.  And both Ms. Charlton and

9  Terry --

10     A. Mm-hmm.

11     Q. -- told you to wait.  Is -- is that

12  accurate?  I -- don't let me put words in your

13  mouth.  I want to understand.  Is that acc -- is

14  that accurate, or is -- is it inaccurate?

15     A. Yes.  They kept -- the -- the normal

16  turnaround time after deferment --

17     Q. Please.  Please.

18     MS. RUBIN:  She's trying to answer.

19     MR. BROWN:  I know she's trying to

20  answer.  She's answering a question I didn't

21  ask.

22  BY MR. BROWN:

23     Q. Were you told -- were you told --

24     A. To wait?

25     Q. -- to wait?

Page 122

1    me.

2           Q.    Whether they should have or not, --

3           A.    Mm-hmm.

4           Q.    -- is it your understanding --

5           A.    No, it's not.

6           Q.    Okay.  Do you recall -- this -- this

7    was -- the Procter & Gamble assignment was

8    in, and I might mispronounce this, Mehoopany,

9    Pennsylvania.  Is that -- is that right?

10          A.    No.

11                MR. BROWN:  I'll give you the spelling

12   later.

13                THE REPORTER:  Okay.

14                THE WITNESS:  No.

15   BY MR. BROWN:

16          Q.    Okay.  What was the role on the

17   project?

18          A.    I was doing project management slash

19   -- yeah, project management, providing different

20   services for various sites.

21                There were many sites.  Multiple

22   projects, actually, that I was overseeing.

23          Q.    Do you -- do you recall a

24   get-acquainted conference call that you

25   failed to attend?

Page 124

1    practice -- a professional practice, I set up,

2    regularly, kickoff meetings for every project.

3         Q.   Do you know someone named Karen

4    Oravitz, O-r-a-v-i-t-z?

5         A.   I don't remember the last name.  There

6    was someone named Karen.  I think --

7         Q.   Was she the site leader from Procter &

8    Gamble?

9         A.   Yes.  Yes.  I do remember, because

10   she's the one who had given us a tour of the

11   plant when I visited the site.

12        Q.   Do you recall setting up a kickoff

13   meeting for the Procter & Gamble project and

14   failing to invite the Procter & Gamble site

15   leader Karen?

16        A.   No, I don't recall that.

17        Q.   And do you recall that issue at all

18   of Karen, the Procter & Gamble site leader,

19   being extremely upset with you for being -- for

20   failing to be invited to the kickoff meeting?

21        A.   I don't recall that.  I apologize.

22   It's been such a long time.  However, after any

23   of the kickoff -- kickoff calls, we usually

24   visit the site.  And I remember meeting Karen,

25   and she was very, very, very amicable, very

Page 126

1    your answer is, but answer the question I've

2    asked.

3        A.    I do recall being late in reaching to

4    the plant, because I couldn't find the plant,

5    where it was.

6        Q.    Do you recall that you were there an

7    hour-and-a-half late?

8        A.    I don't know how long, but I was -- I

9    did arrive late.  And I had called from my cell

10   phone and informed the site that I'm lost, I'm

11   trying to find your location.  And she said,

12   okay, we are here.  You know, as soon as you get

13   here, just give us a call.

14       Q.    And do you recall how soon after that

15   meeting you were not renewed on this project?

16       A.    No, I don't recall the date and time

17   frames.

18       Q.    Okay.  Do you recall in the fall of

19   2009 --

20       A.    Mm-hmm.

21       Q.    -- being given 30 days' notice that

22   you were going to be removed from the Procter &

23   Gamble project?

24       A.    November?  You're saying in November I

25   was notified?

Page 127

1          Q.    I said fall of 2009.

2          A.    I don't remember the exact time

3    frames, yeah.

4          Q.    Okay.  But do you remember in --

5          A.    Jayne did.

6          Q.    -- in or around the --

7          A.    Yeah.

8          Q.    -- towards the end of 2009 being given

9    30 days' notice that you were going to be

10   removed from the project?

11         A.    Jayne said, yeah, we are going to

12   -- you know, we are going to take you off P&G,

13   you're not going to be renewed on that, and

14   you're going to move on to Unilever account.

15         Q.    Okay.  And did -- and was it ever

16   reflected to you -- relayed to you, I should

17   say, that the reason for your removal and not

18   being renewed on the project was because of

19   personality conflicts between you and the

20   Procter & Gamble site manager?

21         A.    No.  No.  It was Barbara.  It was

22   communicated as personality issue -- I mean,

23   relationship issue with Barbara.

24         Q.    After you were notified --

25         A.    Mm-hmm.

Page 131

1          A.    Yeah.  And there -- I had asked Jayne

2     to -- to do a meeting with Steve Kurtz, and

3     there was no follow-up by her.

4          Q.    Have you ever received an e-mail from

5     anyone in your entire career, --

6          A.    Mm-hmm.

7          Q.    -- other than this one, --

8          A.    Mm-hmm.

9          Q.    -- telling you not to have any further

10    communication, by e-mail or phone, with a

11    client?

12         A.    Not that I recall, no.

13         Q.    Okay.  Was this a big deal?

14         A.    Yeah.  It -- it -- it was very

15    upsetting.  And I asked Jayne, and I requested

16    -- I said, Jayne, I want to understand the

17    issue.  Can you please arrange a call with Steve

18    Kurtz so we can openly discuss the matter?  She

19    never --

20         Q.    Who is Steve Kurtz?

21         A.    He's the account manager.

22         Q.    At BT?

23         A.    Yeah.  BT -- to P&G.

24         Q.    And who's Joe Busch?

25         A.    I think he's director.  I'm not sure.

Page 139

1     project, --

2          A.    Yeah.

3          Q.    -- you were told -- you were told --

4          A.    That I was late.

5          Q.    -- you were off this project, right?

6     You just said that.  They were taking you off

7     this account.  Yes?

8          A.    Yes.

9          Q.    And my questions, and I'm not asking

10    about P&G in general, I'm asking about this

11    project, --

12         A.    Yes.  Mehoopany project.

13         Q.    -- do you have any understanding that

14    P&G didn't want you on this project anymore

15    because of your performance?

16         A.    On Mehoopany, yeah.  I guess.  I -- it

17    was never clarified to me anywhere in the

18    e-mails.

19         Q.    I'm not asking you about e-mails.

20         A.    Yeah.

21         Q.    I'm asking you, do you have an

22    understanding that Procter & Gamble didn't want

23    you working on this project because they didn't

24    think you were doing a good job?

25         A.    No.  I don't have that understanding.

Page 148

1    BY MR. BROWN:

2        Q.    Have you reviewed this document?

3        A.    Not fully, but I browsed through it.

4        Q.    Okay.  Does it refresh your

5    recollection, --

6        A.    Mm-hmm.

7        Q.    -- now, that Procter & Gamble was

8    extremely dissatisfied with your performance on

9    this project --

10       A.    I --

11       Q.    -- that you had significant

12   communication and miscommunications with the

13   client and internally at BT, and that you were

14   being removed from the account?  Does this

15   refresh your recollection in any way about the

16   significance of the performance deficiencies on

17   this project?

18       A.    I just want to reiterate what you said

19   first.

20           About my performance on Procter &

21   Gamble account is -- as a Procter & Gamble being

22   dissatisfied is incorrect.

23           On Mehoopany project, I agree with.  I

24   see that, that, you know, Karen had some issues

25   regarding me missing her on the kickoff meeting

Page 149

1    and arriving late at the site, and changing the

2    vendor, which was not my call.  It's actually

3    Barbara's call.  So --

4         Q.   Right.  But the perception was by the

5    client that you were not --

6         A.   Right.  By Karen.

7         Q.   -- that you were not performing to

8    their expectations, right?

9         A.   That is what I understand from this.

10        Q.   And there were some -- also, does it

11   refresh your recollection that notwithstanding

12   being directed not to have communications with

13   Procter & Gamble on this project that you did so

14   anyway?

15        A.   I -- no, I followed through with what

16   -- if you see the let -- as a formal reminder

17   and do not contact anyone via phone and

18   e-mail -- wait.  Sorry.  If you see, finally,

19   the last paragraph, --

20        Q.   Mm-hmm.

21        A.   -- it says, I heard your perspective

22   that the only person you contacted contacted P&G

23   after I asked you not to.  After noon Karen

24   -- you contacted Karen to let her know you were

25   cancelling the meeting.

Page 150

1          Q.    So you contacted Procter & Gamble you

2     were told not to?

3          A.    To cancel the meeting.

4          Q.    Right.  Which led to lots of questions

5     being asked, right?  You see that?

6          A.    Right.

7          Q.    As a result of sending a meeting

8     cancellation, --

9          A.    Yeah.

10          Q.    -- right, there was many questions

11     asked?

12          A.    Why am I cancelling the meeting?

13          Q.    Right.  And that's -- was that one of

14     the reasons that you were told not to have any

15     communications with Procter & Gamble --

16          A.    Okay.

17          Q.    -- about this?

18          A.    Let me --

19          Q.    You know what, I'm going to move on.

20          A.    Yeah.

21          Q.    The -- the -- you were told at the

22     end here, as a formal reminder, underscored, not

23     to contact anyone related to P&G via phone or

24     e-mail, including casual/social, quote, goodbyes

25     or thank yous, closed quote.

Page 152

1      shocked.  And I -- I was -- I said, Jayne, I've

2      never come across something like this in my

3      professional environment.  Because if I'm --

4      even prior to that I worked on, you know,

5      Bristol account and Pepsi account and stuff.

6      and they also changed project managers annually.

7      And I -- you know, they said, okay, the last day

8      on the account is so -- this date of November

9      30th or December 31st.  And there's a gradual

10     transition of --

11              Q.   But there wasn't here, right?  You

12     were taken off the account.

13              A.   No.  I was taken off the account.  And

14     I had meetings scheduled, so as a professional

15     courtesy I have to inform that I'm cancelling

16     the meetings.

17              Q.   But that was not appreciated by your

18     boss, right?

19              A.   Yeah.

20              Q.   Because she told you, don't have any

21     communication, don't e-mail, don't do anything?

22              A.   That she would use against me, that

23     you had a meeting scheduled you didn't show up

24     to.

25              Q.   So you took it on yourself --

1      unsatisfactory?

2           A.    I'm not sure.

3                Actually, I'm not sure if

4      unsatisfactory is the lowest.  I don't know all

5      the ratings because their ratings keep changing

6      all the time.

7           Q.    Mm-hmm.  Let's talk about the Unilever

8      account.

9           A.    Yes.

10          Q.    Can you remind me who the account

11     manager was on the Unilever account?

12          A.    My account -- Afshin Sepheri.

13          Q.    Afshin?

14          A.    Afshin.

15          Q.    Okay.  And who else?

16          A.    The next person in line, my direct

17     contact, Debra.  This is BT -- on the BT side,

18     not on the client side.

19          Q.    Mm-hmm.  And who was on the client

20     side?

21          A.    Hamid.  Hamid.  I forget the last

22     name.  I apologize.  I don't -- I can --

23          Q.    By the way, Procter & Gamble -- are

24     you -- do you have any understanding of whether

25     that's a top account of British Telecom, of BT?

1     A.   They're all top accounts, actually.

2 Um, I think one of their topmost accounts was

3 Pepsi.

4     Q.   Mm-hmm.

5     A.   And then Bristol Myers Squibb was

6 slightly less than Pepsi, and then Unilever and

7 -- and P&G.

8     Q.   One of the top accounts at BT, right?

9     A.   Unilever?

10    Q.   Yeah.  Unilever.  One of the most

11 important accounts at BT, wouldn't you say,

12 while you were there?

13    A.   I don't have comparison to -- to -- to

14 agree with you on that, because I don't know all

15 the financial facts of all accounts.

16    Q.   Okay.  Do you recall what the project

17 for Unilever was?  I mean, what -- what the name

18 of it was?  Like, when we were talking about

19 Procter & Gamble, it was Mehoopany.  What

20 -- what Unilever account or project were you

21 working on?

22    A.   There were several.  I -- I can't

23 -- I'm trying to recall now.  I established a

24 brand new data center for them in Montreal,

25 Canada, which involved, actually, building a

Page 171

1    data center from scratch working with the

2    construction --

3         Q.   So Montreal.  What else?

4         A.   Worked with -- I believe I set up, you

5    know, for teleconferencing systems in several

6    countries.  I don't remember all the countries I

7    set up the systems.

8              So, um, I really don't remember all

9    the sites, but they were international

10   locations.

11        Q.   Okay.

12        A.   Um --

13        Q.   Do you recall being told in September

14   of 2010 that you were going to be removed from

15   the account prior to the natural expiration

16   date?

17        A.   Yes.  That was --

18        Q.   Wait.  All I asked was do you

19   remember.  Do you remember?

20        A.   Yes.  My manager mentioned that.

21        Q.   Okay.

22        A.   Yes.

23        Q.   And do you remember being told

24   that you were being removed because of their

25   perception of you having negative behaviors,

Page 172

1    their perception?  I'm not asking you whether

2    you agree.

3            A.    Mm-hmm.

4            Q.    My question to you is, do you recall

5    that Unilever --

6            A.    Mm-hmm.

7            Q.    -- wanted you removed from the account

8    prior to the end of the contract period because

9    they perceived you negatively?

10           A.    She might have mentioned that to

11   me, --

12           Q.    Okay.

13           A.    -- mm-hmm.

14                 It has to be if you're being removed

15   from some account.  Could be something that they

16   don't like.

17           Q.    Mm-hmm.

18                 What was it that they didn't like

19   about your performance?

20           A.    They didn't want me to work part

21   time on the account.  They needed -- they

22   specifically stated they want full time -- the

23   account manager, which is Debra.  There was a

24   conference call done between me, Jayne Charlton

25   and Debra.  And I -- my doctor had advised me to

Page 181

1          A.    Mm-hmm.

2          Q.    -- in the weeks prior to your getting

3     the PIP, --

4          A.    Mm-hmm.

5          Q.    -- isn't it true that you sat

6     down with Jayne and she talked to you about a

7     perception of unprofessionalism that was out

8     there?  Not that you agreed with it, or even

9     that she agreed with it, but that there was a

10     perception out there among clients and others at

11     BT --

12          A.    Mm-hmm.

13          Q.    -- that you were a poor communicator?

14     Do you remember those conversations?

15          A.    She has talked to me about only

16     two issues throughout, you know, this

17     whole -- perception and soft skills.

18               There's no other performance-related

19     matter that ever came up.

20          Q.    Isn't it true that you had that

21     conversation or a conversation with you --

22          A.    Perception?

23          Q.    -- about that issue well before

24     getting this PIP in September of 2010?

25          A.    She has talked to me about having a

1 perception -- a negative perception.

2    So I asked her, can you please be

3 specific who, when, what, so I can work with

4 that individual.  That was never clarified to

5 me.

6   Q.   Okay.  And that conversation took

7 place when?

8   A.   I don't remember the time frame of

9 that conversation.

10   Q.   Was that conversation in or around

11 August of 2010?

12   A.   It's possible.

13   Q.   Okay.  When you received the PIP, --

14   A.   Mm-hmm.

15   Q.   -- that wasn't a -- you had been told

16 it was coming.  Isn't that also correct?

17   A.   No.

18   Q.   It was a surprise to you?

19   A.   It was a surprise to me.  She called

20 me in the conference room --

21   Q.   Mm-hmm?

22   A.   -- and she says, here's what it is.

23 I'm going to put you on this.  And I said,

24 Jayne, I don't -- I don't understand.  I have

25 delivered more projects on any of the accounts.

Page 192

1      Q.    That the feedback that she received

2  from key stakeholders and management is that you

3  need to improve your communications protocol and

4  build sustainable relationships?

5      A.    I see it written here.  I do want to

6  speak -- say a few words about that, But --

7      Q.    Do you -- my question was --

8      A.    Mm-hmm.

9      Q.    -- do you recall Jayne addressing that

10  with you?

11      A.    Yes.   That's part of the soft skills.

12      Q.    Okay.   The next bullet says, based

13  on ongoing concerns of consistent themes and

14  discussions with MDOVP and HR Accenture, --

15      A.    Mm-hmm.

16      Q.    -- Nadine was placed on a documented,

17  detailed PIP --

18      A.    Mm-hmm.

19      Q.    -- 9/14/10, and is working closely

20  with her HRMC for the next 90 to 120 days to

21  ensure desired improvement.

22          Do you see that?

23      A.    That is in -- totally inaccurate.

24  I don't even know who was the HRMC during that

25  time.  No one ever contacted me, except for one

1      for some help with some internal projects, so I

2      volunteered for that.

3           Q.   Jayne writes next, Nadine's MC is

4      working with her more on business and soft

5      skills, specifically to improve communication

6      and relationships, as well as to broaden her

7      network and improve perceptions and reputation.

8                You see that?

9           A.   Yes.

10          Q.   And is that accurate?

11          A.   The statement written here, yes, I

12     see it, and it's -- it's accurately read and

13     written here.  But I don't know what -- those

14     perceptions and reputation and how it came

15     about.  That's my problem.  I really don't know.

16          Q.   Okay.  And do you think that your

17     failure to know how you were perceived --

18          A.   Mm-hmm.

19          Q.   -- is your fault or is it someone

20     at BT?  In other words, your failure to have

21     an understanding of how you're perceived,

22     who -- who do you attribute that fault to?

23          A.   I feel that there should be some -- in

24     BT some sort of beyond just your manager.  If

25     you're working with external clients, there

Page 198

1    should be, like, a survey done quarterly with

2    the clients that they can, very objectively,

3    provide feedback on -- on the people who are

4    working on the account, rather than just your

5    administrative manager in this case, which is

6    just Jayne giving feedback, which was never

7    conducted, so I really would never understand

8    what the perception is.

9         Q.   So when she said you have to improve

10   perceptions and reputation, --

11        A.   Right.

12        Q.   -- what do you -- do you have any

13   understanding of what she meant by that?

14             None?  You have no understanding of

15   what she meant by that?

16        A.   No.  No.  I asked her many times,

17   Jayne, what --

18        Q.   But this wasn't the first time this

19   had come about, right?  This is something that's

20   been going on for over a year.

21        A.   No.  It's been related to very

22   specific people, you know, like Barbara in the

23   case of P&G.

24        Q.   What about with the client?

25        A.   Which client?  I never received

1    any kind of even verbal conversation with

2    the client.  They were always giving me great --

3    great reviews.  If you see in writing, I have

4    quoted them with -- when they gave me reviews --

5         Q.    You believe that --

6         A.    I'm not saying I'm a hundred percent

7    perfect.

8         Q.    -- your being taken off these accounts

9    was your being perceived as being a good

10   performer?

11        A.    No.  I'm -- I'm saying that if there

12   was something really succinct, aside from, you

13   know, the -- the issue with Mehoopany plant in,

14   you know, being late, or missing this person at

15   the kickoff meeting because I didn't have the

16   list complete, I have not found anything, except

17   for the issue of perception and the soft skill,

18   from my manager telling me that I have bad

19   performance.  She raves about my technical and

20   delivery and professional, --

21        Q.    Right.  So this is about soft skills.

22        A.    -- which is what they hired me for.

23        Q.    They hired you for --

24        A.    To do my job.

25        Q.    And do you think that soft skills are

1        part of your job?

2            A.   It's -- it's -- as a technical person,

3        it is -- I mean, as a manager, it is much higher

4        degree value, but as a technical much less.

5            Q.   If a client values you technically, --

6            A.   Mm-hmm.

7            Q.   -- your technical skills, --

8            A.   Right.

9            Q.   -- but doesn't value your soft

10       skills, --

11           A.   Yeah.

12           Q.   -- to the point where they've asked

13       you to step off and get off the account, --

14           A.   Mm-hmm.

15           Q.   -- that certainly impacts the

16       relationship between the client and BT, doesn't

17       it?

18           A.   I agree.  I agree.  If you're working

19       directly with a client on a daily basis, these

20       soft skills do matter; however, I have never

21       received any kind of feedback from the client,

22       I wish --

23           Q.   Well, this is your boss -- I'm

24       interrupting you, I know, --

25           A.   Yeah.

Page 212

```
 1        why you were being put on a PIP?
 2              A.   No.   Those were the messages she gave
 3        me.
 4              Q.   Mm-hmm.
 5                   The PIP --
 6              A.   Mm-hmm.
 7              Q.   -- was to last how long?
 8              A.   Um, I believe three months -- no,
 9        September, October, November, December
10        -- yeah.
11              Q.   Three months?
12              A.   Yeah, I believe so.   Ninety days.
13              Q.   Ninety days?
14                   Was it extended?
15              A.   Yeah.   It was extended due to I took
16        two weeks off for something.   There was --
17              Q.   A vacation, right?
18              A.   Yeah.   Two weeks off in between, so it
19        was extended into later on.
20              Q.   Okay.   Did you complete the PIP?
21              A.   Yes.
22              Q.   Okay.   And -- and what, if anything,
23        did you do to improve your performance to meet
24        the expectations on the -- that were set out in
25        the PIP?
```

1      would, to turn to Page 4 of this document.

2              A.   Mm-hmm.  Yes.

3              Q.   I apologize.  Page 3.  Page 3.

4                   Are you on Page 3?

5              A.   I'm on page -- you said four.  Yeah,

6      three now.

7              Q.   On the bottom of Page 3 it says,

8      specific areas for improvement.

9              A.   Mm-hmm.

10             Q.   And it reads, Nadine seems to have

11     an issue consistently following professional,

12     effective communications protocol and, quote,

13     chain of command, closed quote, with her HR

14     manager, account MC, project team and other

15     key stakeholders and client.

16             A.   Mm-hmm.

17             Q.   And it says, she speaks too freely

18     and out of turn with other managers or

19     associates about time off, potential desired

20     job changes or opportunities or other training

21     or career aspirations that should be kept

22     primary between her and her manager.

23                  At a minimum, her HRMC should be the

24     very first she discusses with to determine the

25     appropriate nature, relevance and any potential

Page 220

1     Q.   Okay.  And, specifically, a condition

2     of your successful completion of the PIP is that

3     you would not be asked to leave an internal or

4     external client project prematurely due to

5     performance, capabilities, personality conflict

6     or communication style for the next three years.

7          Do you recall that?

8     A.   For the next three years?  I -- yeah,

9     this is just -- Jayne wrote this up.

10    Q.   Yeah.  That's what -- that's correct?

11    A.   This is what Jayne wrote.

12    Q.   You see on Page 4 it says --

13    A.   I don't -- I don't --

14    Q.   Well, turn to Page 4.

15    A.   Yes.

16    Q.   All in bold --

17    A.   Mm-hmm.

18    Q.   -- it starts with, Nadine cannot.  Do

19    you see that?

20         It says, Nadine cannot be asked to

21    leave an internal or external client project --

22    A.   Mm-hmm.

23    Q.   -- prematurely --

24    A.   Mm-hmm.

25    Q.   -- due to per performance, --

Page 221

1          A.   Mm-hmm.

2          Q.   -- capabilities, personality conflict

3     or communication style for the next three

4     years --

5          A.   Right.

6          Q.   -- through September of 2013.

7          A.   Mm-hmm.  Right.  Yes.

8          Q.   Do you see that?

9          A.   Yes, I see that.

10         Q.   And was that presented to you when the

11    PIP was presented?

12         A.   Yes.

13         Q.   And did you understand that if --

14         A.   Yes.

15         Q.   Let me finish.

16              Did you understand that if you

17    were asked to leave an internal or external

18    project --

19         A.   Mm-hmm.

20         Q.   -- because of your performance,

21    capabilities or personality conflict or

22    communication style, --

23         A.   Mm-hmm.

24         Q.   -- you would be terminated?

25         A.   After I successfully complete the PIP?

Page 222

1          Q.    After.

2          A.    Yes.

3          Q.    Okay.  And you successfully completed

4    the PIP, right?

5          A.    Yes.

6          Q.    And so after that time, --

7          A.    Mm-hmm.

8          Q.    -- the -- the clock starts ticking on

9    the three years, right?

10         A.    That's right.

11         Q.    Okay.  You were also notified, were

12   you not, --

13         A.    Mm-hmm.

14         Q.    -- in the PIP, that if there was any

15   backsliding --

16         A.    What's backsliding?

17         Q.    If you -- if your performance went

18   -- reverted back to the way it was --

19         A.    Mm-hmm.

20         Q.    -- before you completed the PIP,

21   that your employment would be terminated without

22   another PIP; isn't that right?

23         A.    Where are you reading that?

24         Q.    I'm not reading that anywhere.

25         A.    Yeah.  I don't -- I don't recall that.

Page 230

1    10th.

2              Q.    Of 2011?

3              A.    Of 2011, yes.

4              Q.    I'll show you an e-mail from Jayne

5    Charlton to you --

6              A.    Mm-hmm.

7              Q.    -- dated March 14th, 2011.

8                    (Deposition Exhibit No. 13, an e-mail

9    from Jayne Charlton Nadine Ranade dated March

10   14, 2011, was marked.)

11                   THE REPORTER:  Oh, I'm sorry.  That

12   was Number 13.

13   BY MR. BROWN:

14             Q.    Looking at what has been marked

15   for identification -- identification as Company

16   13, which is an e-mail from Jayne Charlton to

17   yourself dated March 14th, 2011, at 2:52 p.m.

18   Now, will you take a moment and review this and

19   tell me if you recall receiving this?

20             A.    Yeah, I did -- I kind of remember this

21   one, yeah.

22             Q.    Mm-hmm.  And what, if any -- did you

23   -- did you have any -- well, tell me what you

24   recall about the phone conversation, if

25   anything, before you got this e-mail.

Page 231

1          A.    Phone conversation?

2          Q.    Mm-hmm.

3          A.    There was none.

4          Q.    Well, do you see in the first line

5     it says, this is a follow-up to our phone

6     conversation today --

7          A.    Oh, today.

8          Q.    -- where we received the feedback from

9     David Upton --

10          A.    Mm-hmm.

11          Q.    -- and the client, Capital Group, on

12     your PM delivery performance December through

13     February?

14          A.    Yeah.  It's the same day.  She

15     probably called me because they were --

16          Q.    Well, let me interrupt you.  You said

17     probably called you --

18          A.    Yeah.  I don't remember back then.

19          Q.    Let me -- please.  What I'm asking

20     you is, do you recall a phone conversation

21     where Ms. Charlton delivered what appears to

22     be a pretty serious message to you about your

23     performance?

24          A.    I don't recall the content of

25     conversation.  But as it's written in this

Page 232

1    document here, she must have called me.

2        Q.   Okay.  Do you recall reaching out to

3    or communicating with David Upton about this

4    feedback?

5        A.   I didn't have enough time because they

6    dismissed me right away.

7        Q.   Okay.  You were dismissed right after

8    this, correct?

9        A.   Mm-hmm.

10        Q.   Okay.  I'm sorry.  Just for the

11    record, yes?

12        A.   Yes.  They -- they dismissed me right

13    after.

14        Q.   Okay.  Do you recall being advised

15    that Capital Group didn't want you working with

16    them any longer?

17        A.   Yeah.  Jayne told me that they don't

18    want you as a PM --

19        Q.   Mm-hmm.

20        A.   -- over there; however, our

21    engagement had terminated by February 10th.

22    So I successfully completed and delivered the

23    project, and then they had returned business.

24    Because of my work, BT got an extensive project

25    with Capital Group.

Page 233

1   Q.   Do you think that you were successful

2   in working with this client?

3   A.   I delivered the product.

4   Q.   Mm-hmm.

5   A.   And as --

6   Q.   But do you believe you were successful

7   in working with this client?

8   A.   For the job I did, yes; however, they

9   were looking for a more senior program manager

10  when they gave return business to BT.  So they

11  specifically said we don't want this PM.

12  Q.   And that -- the PM that they

13  specifically didn't want was you?

14  A.   That's what it says in here.

15  Q.   I know it's what it says in there,

16  but do you recall that being communicated to

17  you, that the client wanted to continue working

18  with BT but just not you?

19  A.   That's what Jayne came and told me, --

20  Q.   Mm-hmm.

21  A.   -- that they don't want me --

22  Q.   Do you --

23  A.   -- back.

24  Q.   Was it communicated -- but you -- but

25  you still view your performance with this client

Page 236

1  takes a long time to build a solid relationship

2  with any client.

3        Q.   You understand, don't you, after

4  reading this, --

5        A.   Mm-hmm.

6        Q.   -- and maybe your memory is refreshed

7  on this, --

8        A.   Mm-hmm.

9        Q.   -- that they no longer wanted you

10  working with them, --

11        A.   That's correct.

12        Q.   -- right?

13        A.   Yeah.

14        Q.   Okay.  And how soon after this was

15  communicated to you, what were -- what we're

16  talking about right now with Capital Group, were

17  you --

18        A.   Mm-hmm.

19        Q.   I'm not done.

20              -- were you fired?

21        A.   They let me go within a -- they told

22  -- they informed me by March 28th or 27th -- I

23  don't remember exact date, but it was between a

24  week, ten days.

25        Q.   Okay.  Now, between the time period

Page 237

1          that you're no longer working on the Capital

2          account --

3                    A.    Mm-hmm.   Mm-hmm.

4                    Q.    -- and the termination of your

5          employment, --

6                    A.    Yes.

7                    Q.    -- you had been placed on the bench;

8          is that right?

9                    A.    Yes.

10                   Q.    And what does being on the bench mean?

11                   A.    That you -- that your manager is

12         finding another project for you during that time

13         frame.

14                   Q.    You don't have a -- an assignment at

15         that point?

16                   A.    You don't have an assignment.

17                   Q.    Okay.   And are you being paid at that

18         time?

19                   A.    Yes.

20                   Q.    Okay.   When you were benched, --

21                   A.    Mm-hmm.

22                   Q.    -- or, I should say, prior to being

23         benched, --

24                   A.    Mm-hmm.

25                   Q.    -- do you recall Jayne Charlton

Page 251

1        one or two months.  And then I went on my -- on

2        my own -- my own.  I went on my own after that,

3        and we went and got our own policy.

4            Q.   Okay.  And so that -- so during that

5        period of unemployment --

6            A.   Mm-hmm.

7            Q.   -- between BT and AT&T, did you have

8        health insurance?

9            A.   Mm-hmm.

10           Q.   Yes?

11           A.   Yes.  Yes.

12           Q.   Okay.  Prior to working at AT&T, you

13       were a consultant with Manpower, correct?

14           A.   Yes.

15           Q.   And the assignment with Manpower

16       included the BT consultancy, correct?  In other

17       words, BT is -- Manpower assigned you to BT?

18           A.   As a client?

19           Q.   Yes.

20           A.   Mm-hmm.

21           Q.   Correct?

22           A.   Yep.

23           Q.   Did Manpower -- prior to going to BT,

24       had you worked for Manpower and gone to any

25       other client to work?

Page 263

1          A.    She denied that.

2          Q.    -- believe that you were discriminated

3    against in any manner during your employment

4    with BT based on your gender?

5          A.    That's -- I believe --

6          Q.    It's a -- it's a -- I don't know

7    what you're about to say, but it's kind of a

8    straightforward question.  It's either a yes or

9    a no.

10              MS. RUBIN:  Well, you asked her what

11    she believes, and she was just saying, I

12    believe.

13              MR. BROWN:  Does she believe it.

14    BY MR. BROWN:

15          Q.    Okay.  What do you believe?  Do you

16    believe you were discriminated based on your

17    gender?

18          A.    I believe because of my illness.

19          Q.    Oh, so not based on your gender?

20          A.    I don't know.  It could be.  It could

21    be anything, because I -- I -- I -- based on

22    gender I was denied promotion also.  Because

23    there was another group member, Mark, who was

24    much less educated and inexperienced, and a

25    number of years less senior to me, who was given

Page 267

1    Charlton discriminated against you based on your

2    being a woman?

3        A.   I really -- I -- I can't speak for

4    that right now.

5        Q.   What does -- what do you mean you

6    can't speak for that?

7        A.   I can't think that is it

8    gender-related in an -- in any way.  Anyone

9    can get sick.  It's not gender-related.

10       Q.   Okay.  Do you believe that Jayne

11   Charlton discriminated against you based on any

12   other characteristic, your age -- your --

13       A.   Ethnic background?

14       Q.   -- ethnic background, your -- anything

15   like that?

16       A.   Could be.

17       Q.   Could be?

18       A.   Yeah.  Could be.  I mean, it's just an

19   assumption.

20       Q.   Okay.  Now, let's talk about the leave

21   issue, when I take a quick break.  I need to use

22   the washroom.

23            THE VIDEOGRAPHER:  We're off the

24   record at 2:56.

25            (Recess taken.)

Page 268

1                THE VIDEOGRAPHER:  We are back on the

2        record at 2:58.

3        BY MR. BROWN:

4                Q.   Okay.  Ms. Ranade, --

5                A.   Mm-hmm.

6                Q.   -- you first -- you provided medical

7        documentation from your physician restricting

8        your work time to four hours a day at -- in

9        -- on September 23rd, 2010.  Is that your best

10       recollection?

11               A.   Around that time, yes.

12               Q.   Okay.  And that doctor's

13       certification --

14               A.   Mm-hmm.

15               Q.   -- related to the neck injury that you

16       had; is that correct?

17               A.   Mm-hmm.

18               Q.   Please, I know we may be getting

19       tired, but you've got to be verbal.

20               A.   Yeah.  Yes.

21               Q.   Okay.  And that doctor's note --

22               A.   Mm-hmm.

23               Q.   -- certification that you submitted,

24       that was the first doctor's certification you

25       had presented to BT, correct?

Page 269

1        A.   No.   Um, I believe I presented -- when

2     I went to doctor's office first time, I gave my

3     manager notification about that.   And I also

4     gave her notification starting in August that I

5     have -- my doctor's told me to do some physical

6     therapy.   I'm suffering.

7        Q.   Okay.   So let me be -- be clear in my

8     question.

9        A.   Mm-hmm.

10        Q.   The doctors don't -- that I'm

11     referring to dated September 23rd, 2010, --

12        A.   Mm-hmm.

13        Q.   -- was that the first doctor's note

14     that you had presented to BT of -- requesting

15     that you be --

16        A.   Leave.

17        Q.   Requesting leave and that you

18     accommodated in any way?

19        A.   Yes.

20        Q.   Okay.   And -- and what was the request

21     for the accommodation?

22        A.   To cut down my hours and put me on

23     part-time leave.

24        Q.   Okay.   And, in particular, --

25        A.   Mm-hmm.

Page 275

1     submitted a certification --

2          A.   Mm-hmm.

3          Q.   Give me a second here.

4               Your doctor certified you to return to

5     work without restriction; isn't that correct?

6          A.   I'm not sure.  I -- I don't recall

7     that.

8          Q.   When you -- you did -- you did after a

9     certain point begin working full time again for

10    BT.

11         A.   I never stopped working full time

12    because my manager didn't allow me.

13         Q.   Okay.  And did you do that against

14    doctor's orders?

15         A.   Yeah.  I needed a job.

16         Q.   Your doctor didn't provide a medical

17    certification saying that you were fit to return

18    to work without any restrictions on October 5th,

19    2010?

20         A.   I'm not sure.

21         Q.   That -- one second, please.  On

22    October 6th, 2010, your doctor provided -- did

23    your doctor provide a note lifting all medical

24    restrictions?

25         A.   I don't know.

Page 281

1          Q.    Who said that?

2          A.    Was it Jayne or -- or -- yeah, this

3     is not manageable for the business or something.

4     This is Jayne Charlton.

5          Q.    Mm-hmm.  So she's -- it's your

6     understanding that Jayne --

7          A.    Said no.

8          Q.    -- said no to the four hours being --

9          A.    Flexed hours.

10          Q.    -- the Flex?

11          A.    Yes.

12          Q.    But, rather, the four hours needed to

13     be in a block of time, correct, --

14          A.    Yeah.  She --

15          Q.    -- like 8 a.m. to 12?

16          A.    And the client didn't agree to that.

17          Q.    Let me -- let me -- please.

18          A.    Yes.  Yeah.

19          Q.    Jayne had said that it would have to

20     be a block of time, correct, --

21          A.    Yeah.

22          Q.    -- in order for her to help manage

23     you, correct?

24          A.    Right.

25          Q.    Okay.  And so -- and -- and that had

Page 294

1    constraint about working four hours was as a

2    result of a denial of me working four hours

3    flextime, which was not -- my client was not

4    accommodating that, neither was my manager.  She

5    had turned it down.

6    BY MR. BROWN:

7         Q.    The flex time?

8         A.    Yeah.  She --

9         Q.    But the block time, --

10        A.    The block time, I would have lost my

11   job, she -- she blatantly said, because I don't

12   have any other account for you to work on.

13        Q.    But would you have been put on the

14   bench?

15        A.    The bench time is only, like, 30 to 60

16   days, and then you are fired.

17        Q.    So could you have been put on the

18   bench?

19        A.    Well, if I was put on -- yeah, I could

20   have -- she could have put me on bench.

21        Q.    And could there have been a position

22   that opened while you were on the bench that

23   could have accommodated a four-hour block?

24        A.    Yes.

25        Q.    Now, let me ask you this, --

1      working.  And I proposed to my manager that

2      -- allow me to do four hours' flex time so that

3      I can stay on the account and still, you know,

4      have time to heal.  However, she came back and

5      she said, you can only do four hours' block time

6      and not flex time.  So that was turned down on

7      September 30th.

8          Q.   Okay.  So we're talking -- there were

9      three days that you --

10         A.   Mm-hmm.

11         Q.   -- worked more than four hours, --

12         A.   Mm-hmm.

13         Q.   -- right?

14         A.   I have no idea what -- what's the

15     actual time submittal.  This is just a proposal

16     in the e-mail.

17         Q.   As it relates to the 29th, 30th and

18     the 1st only, right?

19         A.   Yeah.  It's a proposal.  Yeah.  it's

20     just a -- an actual time --

21         Q.   Let's be clear.  Only the 29th, the

22     30th --

23         A.   Three days.

24         Q.   -- and the 1st is what we're talking

25     about?

Page 326

1      Q.    -- on September -- beginning September

2    29th?

3      A.    I -- I sent that e-mail because I

4    don't know what day of the week it is when

5    I -- your time is due, because I have to tell

6    them that this is what I'm -- I need to input my

7    time as.

8           So I said, I'll be doing 9/29 four

9    hours' workday and four hours' leave; however,

10   all this changed because of, you know, this

11   -- my manager not allowing me to do that.

12           So it never got updated.  It never got

13   changed, and all this turnabout during that same

14   week of 9/27 through, you know, 10/1 was just to

15   try and understand what leave I have, what days

16   I could use.  And we are allowed, actually, some

17   days allocated as professional development.  And

18   I did conduct a lot of professional development

19   sessions, and I can provide the proof of that,

20   and it's all related to that.

21           There's certain number of hours

22   you're allocated which you can change and you

23   can allocate any day of the week to that

24   category of -- of billing.

25           That's professional development.  So

Page 330

1           A.   Mm-hmm.  It should be 2010.

2                MS. RUBIN:   2010.

3      BY MR. BROWN:

4           Q.   Please.  Please.  The second sentence

5      reads, Ranade sought treatments from a physician

6      and advised her employer of her medical

7      difficulties and course of treatment in the

8      July/August 2011 time frame.

9                Should the 2011 be 2010?

10          A.   Yes.

11          Q.   Okay.  After October 6th, 2010, --

12          A.   Mm-hmm.

13          Q.   -- upon your working full time --

14          A.   Mm-hmm.

15          Q.   -- with no medical restrictions, was

16     the issue of leave ever raised by Jayne

17     Charlton?

18          A.   No.

19          Q.   Was the issue of leave raised by any

20     manager of BT after October 6th?

21          A.   No.

22          Q.   Okay.  Was the issue of leave raised

23     by anyone at BT?

24          A.   Not at -- I don't believe in that

25     -- this was an issue only between myself and

Page 331

1    Jayne or anyone else was privy of that, you
2    know, and --
3        Q.   Okay.  I just wanted to know if it was
4    mentioned by anyone at BT ever again after
5    October 6th?
6        A.   I don't recall.
7        Q.   Okay.  Okay.  I -- I believe you
8    mentioned the name earlier Patricia Carter?
9        A.   Yeah.
10       Q.   Who is -- who is that?
11       A.   I believe she's HR person.  I -- I
12   might have -- I might be wrong.  So please don't
13   quote me on that.  I -- I really -- you know, I
14   have no recollection.  There's so many people.
15       Q.   Okay.  Do you have any recollection of
16   any interactions you may have had with Patricia
17   Carter?
18       A.   I -- I did -- approached her for
19   something.  I can't remember what, though.  I
20   just -- her name stayed with me for some reason,
21   but I don't recall what I had approached her
22   for.
23       Q.   Okay.  I'll show you next in order.
24            THE REPORTER:  That is Number 26.
25            MR. BROWN:  Thank you.

Page 337

1          A.    Because I was working on that account

2    at that time, so it was her and Jayne, yeah,

3    basically.

4          Q.    Okay.  Other than the conversations

5    that you testified to related to -- between you

6    and Jayne Charlton about leave, --

7          A.    Mm-hmm.

8          Q.    -- did you have any discussion with

9    Jayne Charlton about your physical condition,

10   about your neck?

11         A.    I did describe to her my situation,

12   and I explained to her exactly what my problem

13   is.  And -- and that's about it.

14         Q.    And when did you have that

15   conversation with her?

16         A.    The first time I had it was in July

17   because that's when I knew I -- I need help.

18   It -- it was bothering me that much.

19         Q.    Okay.  And what do you recall telling

20   her and what do you recall, if anything, she

21   said to you?

22         A.    I just told her that I have this

23   issue, and, um, it's hurting a lot, and I need

24   to go take some help -- get some help.  And I

25   think she -- she agreed with me.  And

Page 339

1      um -- that was not the time Jayne was around, I
2      believe.  It was my previous manager.
3              Q.    What?  In 2008?
4              A.    Yeah.  Yeah.  I think it was 2008.  I
5      can't remember.  It was a -- and -- and -- and
6      -- and I explained, I said I might have to work
7      from home.  I'm okay, but I'm going to be lying
8      down, and I can still work on my computer.  And
9      I think they were okay with that, so I didn't
10     ask for any leave.
11             Q.    Was that related to your neck?
12             A.    No.  No.  It was just a personal
13     matter, gynecological issue.  And I actually
14     worked from home --
15             Q.    Mm-hmm.
16             A.    -- for a few weeks and worked full
17     time, and I was okay then.
18             Q.    Okay.  Other than the July 2010
19     conversation with Jayne where you talked about
20     your neck and she agreed with you, were there
21     any other conversations you had with Jayne about
22     your neck condition, your medical condition,
23     related to your neck?
24             A.    Just starting that time frame a few
25     times, you know, I conversed with her, but no

# Exhibit 2

```
1                    UNITED STATES DISTRICT COURT

2              FOR THE EASTERN DISTRICT OF VIRGINIA

3                        ALEXANDRIA DIVISION

4       _____

5       NADINE RANADE,                        )

                          Plaintiff,          )

6       vs.                                    ) CASE NUMBER

7       BT AMERICAS, INC.,                     ) 1:12 CV1039

                          Defendant.           )

8       _____)

9

10

11                        VANCE G. PEARSON,

12                       Leesburg, Virginia

13                     Thursday, August 1, 2013

14

15      called for examination by counsel on behalf of the

16      Plaintiff, Nadine Ranade, Pursuant to Notice taken in

17      the Offices of Annette K. Rubin, 18 Liberty Street

18      Southwest, Leesburg, Virginia 20175, at approximately

19      10:00 a.m., before Janie Arriaga, a certified Verbatim

20      Reporter, and a Notary Public in and for the

21      Commonwealth of Virginia when there were present on

22      behalf of the respective parties.
```

```
 1    APPEARANCES:

 2                    On behalf of Plaintiff:

 3                    ANNETTE K. RUBIN, ESQUIRE

 4                    Law Offices of Annette K. Rubin

 5                    18 Liberty Street Southwest

 6                    Leesburg, Virginia 20175

 7                    akr@annetterubin.com

 8

 9

10

11

12                    On behalf of Defendant:

13                    EDNA D. GUERRASIO, ESQUIRE

14                    Proskauer Rose LLP

15                    One Newark Center

16                    Newark, New Jersey 07102

17                    eguerrasio@proskauer.com

18

19

20

21

22
```

1      to have them resolve those problems so that they can be

2      successful.

3          Q    If an employee makes progress, can the

4      monitoring period be terminated or suspended?

5          A    We do not recommend that.  We recommend that

6      you do the complete time frame.

7          Q    Other than being monitored, is there anything

8      different about an employee who -- we'll just say PIP

9      because that begs us to say PIP.  Is there anything

10     different about that employee's status or their job

11     security or their responsibilities or duties while in a

12     PIP?

13             MS. GUERRASIO:  Objection.  You can answer.

14         A    There is nothing different with them.  If they

15     fail to meet the terms and conditions of the PIP, their

16     employment may be terminated, but there's nothing

17     different with their status.  They continue to do the

18     same work as they had previously.

19     BY MS. RUBIN:

20         Q    How is that different from a probation period?

21             MS. GUERRASIO:  Objection.

22     BY MS. RUBIN:

1      Q     How is a monitoring period different from a

2    probation period?

3      A     We don't have a probation period.  We don't do

4    PIPs unless we feel like the employee has the

5    capabilities to be successful, and we write these so

6    that they are achievable and people can succeed in them.

7      Q     Who was the manager responsible for placing

8    Ms. Ranade on this PIP?

9      A     Jayne Charlton.

10     Q     Anyone else?

11     A     I believe she did it.

12     Q     Do you know whether she consulted with anyone

13   prior to placing Ms. Ranade on this PIP?

14     A     She worked with the employee relations team,

15   with Stephanie Schlichting, to write the PIP.  She was

16   in contact with her manager, Terry Schneider, which is

17   general practice that the second line manager also be

18   aware of it.  And she -- those are the two people she

19   would have dealt with on it.

20     Q     But the decision maker with respect to placing

21   Ms. Ranade on the PIP was Jayne Charlton?

22     A     Correct.

1       Q    And it was within her authority to do so given

2  her position?

3       A    Absolutely.

4       Q    With respect to the PIP have you had an

5  opportunity to review this document prior to today?

6       A    Yes.

7       Q    This particular --

8       A    Yes.

9       Q    Okay.  I want to see if I can narrow and

10 define the areas of performance that needed improvement.

11 Was Ms. Ranade -- this is about -- or tell me what were

12 the areas of performance that were noted as being

13 specifically in need of improvement.

14      A    May I look at the document?

15      Q    Please.

16      A    The majority of the areas that she needed

17 improvement were her soft skills.

18      Q    How do you define soft skills in that context?

19      A    One of the areas was her communication, her

20 communications with her team members, with her

21 management, and with her clients.

22      Q    Can you tell me are there any specific

1        Q     Was that before or after?

2        A     Unilever?

3        Q     Yes.

4        A     She went to Unilever, I believe, before she

5    was on the PIP.

6        Q     Okay.

7        A     And part of the problems were Nadine brought a

8    lot of her personal life to the office and discussed it

9    with coworkers and her clients.

10       Q     What do you mean "personal life"?  What kinds

11   of things are you talking about or was she talking about

12   apparently?

13       A     Apparently she was talking about -- I don't --

14   I wasn't there.  I don't know.  But they said just her

15   personal life, her children, her events in her life;

16   things like that.

17       Q     So bringing too much personal information into

18   the workplace?

19       A     Right.

20       Q     Is that a fair characterization?

21       A     That's a fair characterization.

22       Q     Is that a problem that occurred on this one

1       A     There were hundreds of projects on that

2    account.

3       Q     Do you know how many she was involved in,

4    Nadine?

5       A     I do not.

6       Q     Do you know how many projects existed on the

7    Unilever account?

8       A     I don't, but there were multiple.  But

9    Unilever and P and G are two of our largest clients with

10   BT Americas and BT PLC.  So our whole corporation.

11      Q     So at the time the PIP is instituted in

12   September of 2010, Nadine had been asked to be removed

13   from two contracts; is that right?

14      A     Correct.

15      Q     One P and G at the project at Mehoopany?

16      A     Yes.

17      Q     And another Unilever.  Where was that project

18   physically located?

19      A     I don't know.  The Unilever account is in the

20   Northeast, but I don't know exactly -- since she's a

21   homeworker, she may have worked on that just virtually.

22   I don't know where the actual project was.

```
1        A    She began as a contractor through Manpower, so

2    she was a temporary employee, and then she was brought

3    on as a permanent employee.

4        Q    In about 2008.  Does that sound right?

5        A    I thought she was brought on in 2009.

6        Q    Okay.

7        A    I think she began as a contractor in '08, and

8    came in '09.

9        Q    And then after that she came in as a BT

10   employee, she was promoted; is that right?

11       A    Yes.  She came in as a consultant, and she was

12   promoted to a senior consultant.

13       Q    In placing someone on a PIP -- and this is

14   from a management perspective.  In placing someone on a

15   PIP, do you consider the other aspects of their

16   performance, how long they've been with the company and

17   what their performance has been otherwise?

18       A    No.  People are placed on a PIP because their

19   performance has deteriorated for some reason.  This is

20   to get people back on track.  That is the main goal of a

21   PIP, is to turn someone around.  It may be for a number

22   of reasons as to why their performance is not up to par,
```

1    but this is to get people back on track.  We put people

2    on PIP because we believe they can be successful.  If we

3    don't believe they can be successful, we exit them from

4    the business.

5          So this is a tool.  And we have had great

6    success with turning people around, because their

7    performance has lacked and moved them forward.

8          Q    Did Nadine successfully complete the PIP?

9          A    She did.

10         Q    Are there any negative consequences of having

11   been placed on a PIP?

12         A    No.

13         Q    How does that affect someone's ability to be

14   promoted?

15         A    If they successfully complete the PIP, they

16   certainly would be considered for a promotion within a

17   period of time should an opportunity become available.

18         Q    Would having been placed on a PIP at some

19   point during your employment be a negative factor in

20   evaluating the promotion?

21         A    It depends on the timing.  I mean, if you were

22   placed on a PIP and then you went on and had a very

1          A     For misconduct?

2          Q     For performance.

3          A     For performance.   That is different at BT than

4     discipline.

5          Q     Tell me what the differences are.

6          A     Differences for discipline is misconduct, and

7     performance is performance.   So we would -- for

8     performance, you would have talked to your manager, been

9     told that there is a problem.   If you did not improve in

10    these areas, you would have been placed on a performance

11    improvement plan.   If you do not succeed at the

12    performance improvement plan, you may be terminated.

13         Q     Are there alternatives to termination that a

14    BT manager can consider, such as a demotion or something

15    less severe than a termination?

16         A     We don't do demotions, so we wouldn't -- say,

17    myself, Vance, you're a senior HR manager, we're

18    demoting you to an HR manager.   We don't do that.

19         Q     Would BT have a policy with respect to

20    performance issues for -- are there rules about when a

21    person completes a PIP, what are the criteria as a

22    matter of policy?   Could a person be placed on a second

1       PIP or terminated and does the manager have that

2       flexibility to make that decision?

3              MS. RUBIN:  Objection.

4       A       We don't have second PIPs.

5   BY MS. RUBIN:

6       Q     Is there anything short of termination that a

7       manager can do to correct -- well, I'm going to abandon

8       that question, abandon ship on that question.

9              Can I assume that it's BT policy that the

10      management wants to support its employees and to make

11      reasonable efforts to support them and retain employees

12      they consider to be valuable?

13             MS. GUERRASIO:  Objection.  You can answer.

14      A       Yes.

15  BY MS. RUBIN:

16      Q     And that's kind of a corporate philosophy as

17      opposed to a formal policy written down somewhere or how

18      would you describe that idea in terms of BT culture?

19      A       Our managers definitely want to support our

20      employees and make them successful.

21      Q     Is it incumbent on a manager to make an effort

22      to help an employee to succeed if they're having

```
 1        Q     Would that have been up to Jayne Charlton to

 2    find another project or to match Nadine with a different

 3    project?

 4        A     Yes.

 5              MS. RUBIN:  Let's go off the record, please.

 6                    (Brief recess held.)

 7    BY MS. RUBIN:

 8        Q     We were talking before we broke about the

 9    reasons for Ms. Ranade's termination from BT.  If you

10    could give me the official reasons, summary, BT's

11    position on why Ms. Ranade was terminated?

12              MS. GUERRASIO:  Objection.

13        A     She was terminated for her performance.

14    BY MS. RUBIN:

15        Q     What were the specifics of the performance

16    deficiencies that caused her termination?

17        A     This was the third account she was asked to be

18    removed from.

19        Q     So the two that we've already talked about,

20    and then Capital Group with Dave Upton?

21        A     Correct.

22        Q     So after the Capital Group project, after she
```

1    date to you?

2        A    Yes.  That's what Jayne remembered it as.

3        Q    2011, the same year?

4        A    Yes.

5        Q    So if the termination is to be effective April

6    1, when would the decision to terminate have been made?

7        A    Shortly before that time period.  Probably

8    within the week.

9        Q    Within one week?

10       A    Uh-huh.

11       Q    Would there have been a conversation with the

12   employee relations team person during that week, between

13   the time the decision was made and it was carried out?

14       A    Yes.  And Jayne also spoke with her manager,

15   Terry Schneider.

16       Q    Anyone else?

17       A    I believe she spoke to me about it.

18       Q    At the time?

19       A    Uh-huh.

20       Q    Anyone else?

21       A    Not that I'm aware.  Those are the --

22   Stephanie Schlichting.

# Exhibit 3

`Feb 22 08 02:45p



EXHIBIT



BT INS

## APPLICATION FOR EMPLOYMENT

BT INS does not discriminate in hiring or employment on the basis of race, color, religion, disability, national origin, age, or any other characteristic prohibited by law. No question is intended to secure information to be used for such discrimination.

This application is effective for 6 months from the date of completion. If you are still available for employment after that time, please reapply.

Please type or print using blue or black ink. THANK YOU!

### GENERAL INFORMATION

Date **2/22/08**          Social Security Number **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**

Name **Ranade**          **Nadine**          **Tandon**
       Last                    First                    Middle

Present Address **2524 Walnut Leaf Lane, Herndon VA 20171**
                 Street                    City          State          Zip

Home Phone (703) **955-7441**          Alternate Phone (703) **501-6439**

Business Phone (703) **755-6192**          Best time to be reached **9-5 p.m**

Do you have the legal right to work in the United States?          ☒ Yes  ☐ No

Are you at least 18 years of age?          ☒ Yes  ☐ No

Have you ever been convicted of a felony?          ☐ Yes  ☒ No  If yes, please give date(s) _____
Explain

Do you have any relatives employed by BT or its subsidiary companies? ☐ Yes  ☒ No          If yes, please list:

| Name | Relationship | Position | Company |
|------|--------------|----------|---------|
| Name | Relationship | Position | Company |

### EMPLOYMENT DESIRED

Position **Consultant**          ☒ Full Time ☐ Part Time          Salary Desired **120,000.00**

Date Available **3/10/08**

Have you ever been employed by BT INS? ☐ Yes ☒ No     If yes, please give dates _____
Have you applied for employment at BT INS within the last 6 months? ☐ Yes ☐ No
If yes, please give date of last application _____ Position applied for _____

How were you referred to BT INS? ☒ Employee*  ☐ Private Employment Agency**  ☐ Advertisement
                                 ☐ School  ☐ State Employment Agency  ☐ Other

*Name of Employee **Brent Bennett**
**Name of Recruiter **Chris McCoy**

Updated 04/16/07                                                                 1

## EMPLOYMENT DESIRED CON'T

If required, are you willing to:

TRAVEL? ☒ Yes ☐ No
RELOCATE? ☒ Yes ☐ No
WORK OVERTIME? ☐ Yes ☒ No

Are you currently under a non-disclosure/non-compete agreement? ☐ Yes ☒ No

If yes, with what company? _____ For what period of time? _____

## EDUCATION

| | City, State | Dates Attended | Major/Minor | Degree Earned |
|---|---|---|---|---|
| High School: | Lyndhurst, NJ | 9/80 – 5/81 | N/A | High School Diploma |
| College/University | New Jersey Institute of Technology, Newark, NJ | 9/85 – 5/87 | Computer Science | B.S. |
| Graduate School | City University of New York, Brooklyn College, New York | 9/88 – 6/7/90 | Computer Science | M.A. |
| Other School | | | | |

Academic honors, honorary societies and scholarships
_Dean's List._

Professional Certification /Licensing (include # and State of issue)
PMP – 0225 094113 , State of VA

## SKILLS

Please list any additional business/professional skills in which you are proficient that enable you to perform effectively in the job for which you are applying. Include skills in equipment operation, computer programs and applications.
Project Management
General Management , Technical management

## FOREIGN LANGUAGES

Please indicate your level of competence in the following languages:

| Competency | ENGLISH | FRENCH | GERMAN | JAPANESE | SPANISH | OTHER |
|---|---|---|---|---|---|---|
| Limited | | | | | | (Hindi) |
| Phone Capable | | | | | | |
| Fluent | X | | | | | X |

## WORK HISTORY (INCLUDING MILITARY EXPERIENCE)

Please complete in full. "See Resume" is insufficient.   While a resume may be attached and considered part of this application, all of the blanks on this form should be filled in to the extent of available information.

Employer __Manpower Professional__ Job Title __Consultant__ Phone __1-888-839-4199__ x15

Address __857 Elkridge Landing Rd., Linthicum, MD, 21090__

Dates of Employment:   From __4/17/07__ to __3/10/08__

Starting Salary __$65.00__ per __hr.__     Final Salary __$65.00__ per __hr.__

Supervisor's Name __Mark Sterling__     Title __Manger__

Reason for Leaving __I took a better opportunity for my career.__

Describe Duties __Project mgt.__

May we contact this employer? [X] Yes   [ ] No

Employer __IBM__ Job Title __Service Delivery Mgr/Program Mgr__ Phone __1-800-IBM-4You__

Address __200 Laurel Ave., Middletown, NJ 07048__

Dates of Employment:   From __7/2000__ to __11/2002__

Starting Salary __96,000__ per __yr.__     Final Salary __98,000__ per __yr.__

Supervisor's Name __Bill Lacaso__     Title __Division Mgr.__

Reason for Leaving __Downsized__

Describe Duties __Manage a large team of systems engineers and testers. Oversee end to end project management as well as delivery of the product.__

May we contact this employer? [X] Yes   [ ] No

New Name - COLLABERA    4 Sys 4

Employer __Global Consulting, Inc.__ Job Title __Consultant__ Phone __973-889-5200__

Address __25 Airport Rd., Morristown, NJ 07960__

Dates of Employment:   From __2/2003__ to __9/2004__

Starting Salary __$55.00__ per __hr.__     Final Salary __$55.00__ per __hr.__

Supervisor's Name __Mohit Malkhani__     Title __Mgr__

Reason for Leaving __Downsized__

Describe Duties __Project management and Systems Engineering__

May we contact this employer? [X] Yes   [ ] No

Updated 04/15/07

3

## PROFESSIONAL/WORK REFERENCES

Include at least two previous or current work associates, customers, vendors or others not listed on the previous page who may be contacted at this time. If you have been self-employed, please provide the names of professional/business references.

1. Name ___Scott Medeiros___   Telephone _703-755-6371_
How does this person know you? ___Supervisor___

2. Name ___Mark Sterling___   Telephone _1-888-832-4199 x/5_
How does this person know you? ___Manager___

3. Name ___Mohit Malkhani___   Telephone _973-889-5200_
How does this person know you? ___Manager___

4. Name ___Bill Lasaso___   Telephone _1-800-IBM-4-You_
How does this person know you? ___Supervisor___

Are any of your employment and/or educational records under another name(s)? [X] Yes [ ] No
If yes, please state name(s) ___Nidhi Tandon   (maiden name)___

## CERTIFICATION AND AGREEMENT

I certify that the information contained in this application for employment and any oral or written information that I have furnished separately during the course of pre-employment interviews or otherwise, is and shall be true and correct. I understand that any misrepresentation or omission of a fact in my application may be grounds for refusal to hire or for dismissal if I am employed.

I understand that BT INS employs in the United States only those individuals authorized to work in the United States and I will produce the required documents demonstrating my authorization.

I understand that as part of the procedure for processing my application, BT INS may conduct a background investigation, which may review information regarding my employment history, experience, education, felony convictions, credit, Department of Motor Vehicles records, and any other information I have given. I authorize the release of information relating to these inquiries and release all parties from all liability for any damages that may result from furnishing this information.

I understand and agree that BT INS policies and procedures do not create obligation or rights relating to employment, and that they may be amended at its sole discretion at any time. I also understand and agree that my employment with BT INS is at will and as such, my employment, benefits, or compensation can be modified or terminated, with or without cause or reason and with or without prior notice, at any time, at the option of either BT INS or myself. No agreements or assurances contrary to the above will be valid unless in writing and signed by a representative of BT INS who is authorized to sign such an agreement.

I have read this application carefully and completely, and fully understand and agree with it:

_____        _2/22/08_
Signature of Applicant                              Date

# Exhibit 4



February 22, 2008

Nadine T. Ranade
2524 Walnut Leaf Lane
Herndon, VA 20171

Dear Nadine,

On behalf of BT INS, I am pleased to extend you this offer of employment. The details of your offer are as follows:

Title:              Consultant
Reporting To:       Brent Bennett
Location:           Leesburg, VA
Base Salary:        $4,615.38. Bi-Weekly ($120,000.00 Annually)
Start Date:         March 10, 2008

Your base salary in this exempt position will be annualized and paid bi-weekly, from which legally required deductions will be taken.

In keeping with federal requirements, this offer of employment is made contingent upon you providing BT INS with acceptable documentation establishing both identity and employment authorization, regardless of national origin or citizen status. This offer of employment is also contingent upon the successful results of a background check as a requirement of employment. Failure to pass this requirement may result in the rescission of this offer. Refusal to allow a background check will result in rescission of this offer. If you are placed on the payroll before we receive the successful results of this background check and/or without the evaluation and verification process being completed, unsatisfactory results in either area will require termination of your employment.

By accepting this offer, you agree that (1) no trade secret or proprietary information belonging to any previous employer will be disclosed or used by you at BT INS, and that no such information, whether in the form of documents, software, drawings, etc., will be retained by you or brought with you to BT INS, and (2) you have brought to BT INS's attention and have provided a copy of any agreement which may impact your future employment at BT INS, including non-disclosure, non-competition, invention assignment agreements or agreements containing future work restrictions.

We offer an array of benefits, which include Comprehensive medical, Prescription, Dental and Vision Care coverage, Life and Accident Insurance, and Time-Off Benefits.

We have an exciting and challenging time ahead of us Nadine, and I know that you will make a substantial contribution to our future success. I look forward to your acceptance of this offer and your first day at BT INS.

Please note that while this letter confirms the details of your employment, it does not in any way represent an assurance of employment for any length of time. Your employment with BT INS is at-will, and can be

---

**Human Resources**

**BT INS**
1600 Memorex Dr.
Suite 200
Santa Clara, CA
95050

tel      408-330-2700
fax      413-803-3013
e-mail   AskHR@ins.com


http://bt.ins.com



EXHIBIT
2
7/11/13

p. 6

Feb 22 08 02:46p



terminated at any time by you or the Company, for any reason, with or without notice, and with or without cause.

Please print this letter, sign your name and initial where indicated to confirm your acceptance and your first day of employment. **Fax the signed letter and all other required documents to 413-803-3013 and keep the original signed copy for your records.** This offer of employment expires in three business days so please fax the following forms within the specified time; 1) Signed Offer Letter (two pages), 2) Background Verification Release Form (two pages), and 3) Confidential Information and Invention Assignment Agreement (six pages).

If you have any questions, please contact Chris McCoy at 610-304-0528.

Sincerely,                                         I accept this offer of employment to begin
                                                  work on 3/10/2008. _____(Initial)

*Mark Corgan*

Mark Corgan                                       Nadine T. Ranade
VP Mid-Atlantic Operations
                                                  Date: _____2/22/08_____

**Human Resources**

**BT INS**
1600 Memorex Dr.
Suite 200
Santa Clara, CA
95050

tel      408-330-2700
fax     413-803-3013
e-mail   AskHR@ins.com

http://bt.ins.com

# Exhibit 5

Review Selection Component.                                                    Page 1 of 1

New Window | Help | Customize Page |

## Performance Document History

Nadine Ranade
Listed below are your completed and cancelled performance documents

| EIN | Employee Last Name | First Name | CHC | Country | Document Type | Begin Date | End Date | Job Title | Status | UNI | Manager Last Name | First Name | Levelled Rating |
|-----|--------------------|-----------|-----|---------|---------------|-----------|----------|-----------|--------|-----|-------------------|-----------|-----------------|
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt Agt | 12/01/2010 | 12/31/2010 | Lead: DDOS | Completed | 604168242 | Charlton | Jayne | DN - Development Needed |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 07/01/2010 | 09/30/2010 | Lead: DDOS | Completed | 604168242 | Charlton | Jayne | DN - Development Needed |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Personal Objectives | 04/01/2010 | 03/31/2011 | Lead: DDOS | Cancelled | 604168244 | Charlton | Jayne | |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 04/01/2010 | 06/30/2010 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | AS - Achieves Standards |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 10/01/2009 | 12/31/2009 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | G - Good |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 07/01/2009 | 09/30/2009 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | VG - Very Good |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Personal Objectives | 04/01/2009 | 03/31/2010 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | G - Good |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Manager Objectives | 04/01/2009 | 03/31/2010 | Outsource/Acquisitn Employee-Mgr | Cancelled | 604168244 | Charlton | Jayne | |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 04/01/2009 | 06/30/2009 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | VG - Very Good |
| 603561502 | Ranade | Nadine | JGJ2 | United States | Custom PA Mgmt | 04/01/2009 | 03/31/2009 | Outsource/Acquisitn Employee-Mgr | Completed | 604168244 | Charlton | Jayne | VG - Very Good |



000037

# Exhibit 6





## PERFORMANCE IMPROVEMENT PLAN ('PIP')

| Individual's name : Nadine Ranade | EIN : 603561502 |
|---|---|
| Job title : Sr. Consultant | O.U.C : JGJ |
| Job family role: Professional Services | First line manager's name: Jayne Charlton |
| Performance plan start date : 9/14/10 | Monitoring period: (30, 45, 60, or 90 Days) 90 days |
| Plan End Date: 12/14/10 | Last full year APR rating: Good |
| *exception is the req't below thru Sept 2013 in Action Plan Item #1.* | Most current quarterly QPR rating (if applicable): Q1 - 'AS';  Q2 will be a 'Development  Needed' |

For the past 60 days you have not demonstrated the level of performance required of a professional project manager/senior consultant.   It is our intent to make you aware of the areas in which you are performing below expectations and give you an opportunity to address and correct these concerns so that you can become successful and have better opportunities to achieve desired career growth.

As outlined below, you are being placed on a **Performance Improvement Plan for the next 90 days.**
**It is expected that you will demonstrate immediate and sustained improvement in your performance as detailed in the objectives below.**

Failure to meet the objectives outlined in this Performance Improvement Plan, or if additional areas of unacceptable performance arise, you may be subject to additional action, up to and including termination of employment.

## A.  Update on performance gap previously identified and discussed

| Performance Standards Expected: (From Job Description, objectives, scorecards, values, leadership capabilities.)  Overview of what is expected within the role |
|---|
| • Revenue (project billing and cust utilization) <br> • Customer Focus with internal or external client projects and activities <br> • Collaboration <br> • Quality / Getting it Right the First Time / EDM / Status Reports /Time & Expense Reporting <br> • Presales Support/Driving new business <br> • Professional Development and Training <br> • Consistently live out the BT Behavioral Values (as outlined below) |

| What We Expect Of Each Other: | What This Means for us as Leaders: |
|---|---|
| TRUSTWORTHY | **We Will** <br> • Listen to others with respect and create an open environment <br> • Stand up for what we believe in <br> • Back up people who do the right thing <br> • Have personal integrity and ensure compliance with all legal and regulatory requirements <br> **We Won't** <br> • Resist feedback and avoid difficult conversations <br> • Let unacceptable behaviour go unchallenged <br> • Tell people what they want to hear |
| HELPFUL | **We Will** <br> • Take responsibility for creating a shared agenda with other leaders across BT <br> • Be generous in contributing to the success of others <br> • Encourage people to share lessons learned <br> • Know when and where to seek help <br> **We Won't** <br> • Encourage tribalism <br> • Work independently of the rest of BT <br> • Be possessive of resources |
| INSPIRING | **We Will** |

| | |
|---|---|
| | • Create a compelling vision for our part of the business<br>• Demonstrate depth and creativity of thought<br>• Challenge existing thinking and embrace new ideas from   everywhere and everyone<br>**We Won't**<br>• Assume the present predicts the future<br>• Be complacent or assume things cannot be improved<br>• Ignore or discourage new thinking |
| STRAIGHTFORWARD | **We Will**<br>• Create a compelling vision for our part of the business<br>• Demonstrate depth and creativity of thought<br>• Challenge existing thinking and embrace new ideas from   everywhere and everyone<br>**We Won't**<br>•, Focus on process at the expense of results<br>• Over-complicate messages and issues<br>• Let unnecessary rules get in the way of common sense |
| HEART | **We Will**<br>• Mobilise and energise people by making them feel they can make a difference<br>• set stretching targets to win today and in the future<br>• Give people freedom to apply their unique strengths<br>• Be passionate and confident in making the strategy a success<br>• Act as a role model in stretching our own capability<br>**We Won't**<br>• Fail to recognise or take credit for others' work<br>• Focus unduly on the negatives<br>• Make unrealistic demands on self and others |
| COACHING FOR PERFORMANCE | **We Will**<br>• Give fair, accurate and insightful feedback and instil a coaching culture<br>• Clearly differentiate between levels of performance<br>• Value diversity, encourage and leverage people's unique ability<br>• Enable people to accept and learn from mistakes<br>**We Won't**<br>• Blame others when things go wrong<br>• Discourage movement of people across boundaries<br>• Tell rather than ask; see no need to support & motivate people |
| BOTTOM LINE | **We Will**<br>• Drive 'profit, growth and value'<br>• Balance short-term efficiencies with long-term commercial growth<br>• Consider the cost and benefit to BT as a whole<br>• Encourage the use of quality practices to improve business performance<br>**We Won't**<br>• Focus exclusively on cost and budget<br>• Accept decisions without a clear commercial rationale<br>• Lack courage to stop things that are not commercially viable |
| DRIVE FOR RESULTS | **We Will**<br>• Galvanise action and a sense of urgency<br>• Take considered risks, use initiative and flexibility to deliver<br>• Meet commitments, drive initiatives through to completion<br>• Manage performance robustly and integrate resources to deliver effectively<br>• Take personal responsibility for getting things done<br>**We Won't**<br>• Accept poor or late delivery<br>• Be busy without being effective<br>• Lack confidence in the ability of others and try to do everything ourselves<br>• Avoid responsibility by hiding behind position or professional status |
| CUSTOMER CONNECTED | **We Will**<br>• Put customers at the centre of everything we do<br>• Understand customer needs and innovate to meet and exceed them<br>• Respond promptly to customer requirements and drive excellent service<br>**We Won't**<br>• Fail to integrate the customer perspective<br>• Tolerate poor customer service<br>• Allow bureaucracy to hinder delivery |
| PROFESSIONAL/TECHNICAL | • Demonstrates understanding of own work area and appropriate ethical considerations.<br>• Continuously improves professional and technical skills/knowledge. |

- Achieves objectives through the application of job-related knowledge.
- Demonstrates and applies awareness of functional and/or operational policies and procedures.
- Uses understanding of business structures and functions to achieve functional/operational objectives.

**Previous Training, Coaching and/or Instruction:** Description and date(s) of **previous** training, instruction, coaching or communications delivered to ensure your awareness of the required performance standards.

| Date | Contents |
|------|----------|
| 4/27/10 | Email to team about suggestions for VG ratings |
| 5/14/09 | Team email and meeting discussion re: new balanced bonus scorecard for BSG |
| 7/8/09 and 7/10/09 | Email w/BSG Objectives for performance and bonus |
| 7/15/09 | Team Meeting to discuss new BSG Objectives |
| 1/6/10 | Team Mtg discussion, emails, team coaching on perf req'ts for FY10 annual |
| 6/9/10 | Sample status reports |
| 6/24/10 | 1-1 with Nadine on Q1 perf prep |
| 7/22/10 | Email to team with updates to performance rating descriptions |
| 7/28/10 | Team Meeting to review changes and updates to ePerf, objectives, MA pipeline, MNC questions |

**Previous Discussions:** Dates and content of previous verbal and written communications related to your under performance

| Date | Contents |
|------|----------|
| 9/28/09 | Coaching around feedback from Principal Review Board decision deferment |
| 10/30/09 - 11/4/09 | Discussions/Coaching/Emails with Nadine about communication issues and premature removal from P&G re: Steve Kurtz/Joe Busch |
| 2/26/10 | Coaching around feedback from Principal Review Board "no" from Gary Monti |
| 3/10/10 | Nadine/Jayne lengthy FY10 perf discussion, candid feedback |
| 4/19/10 | Nadine/Jayne 1-1 |
| 7/30/10 | Met in office with Nadine for 1-1 re: Q1 perf rating, performance on Unilever, feedback rec'd about PT, back issue, communication protocol, and DMV letter she had Tivo write while I was on vacation.  Discussed potential oppty for World Bank that is delayed till at least Oct. Also addressed my concerns w/her vacation/sick time-off w/o notice. |
| 8/26/10 | Conf call with Nadine to address negative feedback rec'd from Dez Kerr (Unilever MC) and Afshin re: 4 month premature exit from Unilever. |
| 9/3/10 and 9/7/10 | Detailed Email Exchanges re: absences w/o advance notifications despite billing 40. |

**Specific Areas For Improvement:** Examples of unsatisfactory or missed deliverables and/or behaviors that have not met the requirements of the role.

Nadine seems to have an issue consistently following professional, effective communications protocol and 'chain of command' with her HR Mgr, Account MC, Project Team, other Key Stakeholders and Client.
- She speaks too freely and 'out of turn' with other Managers or associates about time off, potential/desired job changes or opptys, or other training or career aspirations that should be kept primary between her and her HR Mgr. At a minimum, her HR MC should be the very first she discusses with to determine the appropriate nature, relevance, and any potential negative impacts or perceptions of sharing with others.
- Nadine often does not follow direct coaching instruction or advice designed to more effectively manage/resolve/mitigate/minimize situations that arise. In other words, she goes against her HR MC's direction.

Nadine often does not plan or communicate ahead about time off with HR Mgr, and she sporadically takes sick time or days off without advance notice or any upfront, direct notification to HR MC, Acct MC and Internal/External Client or reasonable responsiveness to voice and email msgs.

Nadine is not providing weekly status reports to her MC/HR Mgr as requested on multiple occasions.

Nadine does not appear to have clear understanding or take ownership for how individual performance, time off, status reports links to (i.e. positively/negatively impacts) the business for objectives, revenue forecasting, revenue

| |
|---|
| attainment and customer loyalty. |
| Nadine's inconsistent or inappropriate communication behaviours have eroded trust, respect and rapport in key relationships with HR Mgr and other Key Stakeholders which needs to be rebuilt/ improved for more sustainable relationships and a stronger, more positive network with Mgmt, Project Team and Client(s).<br>• This has resulted in 3 early dismissal requests for her PM services in the past 2-3 years, which has greatly impacted forecasted and planned revenue, as well as Nadine's reputation. |

| |
|---|
| **Success Criteria/Expected Standards:** Specific actions and deliverables required to meet or exceed the requirements of the role. |
| Nadine is not to communicate her desires about time off, training or additional potential opptys, career aspirations, or other projects with anyone other than her HR MC (Jayne Charlton).  Once discussed with HR MC, Nadine may only share when deemed appropriate and relevant by her MC and following her specific, timely direction. |
| Nadine is expected to complete and submit weekly status reports that outline her client project work effort highlights for the past and anticipated for upcoming week, planned prof development, presales support, other planned accomplishments that demonstrate good use of any bench time (especially when at 50%).<br>• This planned use of bench time should be discussed and agreed to on a weekly basis with HR MC to ensure alignment of priorities.<br>• These should be recorded in detail on her weekly status report and PeopleSoft Time report and submitted accurately and timely EOB Fridays.<br>• Status Reports are due by noon on Fridays. |
| Nadine will not take off any unplanned, un-notified time (sick or vacation).<br>• Nadine will provide at least 2 weeks of notice for 1-5 days of vacation (if over 5 vac days requested, then 4-8 weeks advance notice is required).<br>• Nadine will directly notify her HR MC, Acct MC, and key Project/client contacts upfront by 8am for sick leave via phone and email msg.<br>• Nadine will provide a Dr.'s note about any requirement for ongoing physical therapy detailing her physical limitations, # of sessions and hrs per week required, etc.  If there is no longer a need for treatment, then Nadine will either provide a Dr. Note releasing her from care, or an email stating that she no longer require physical therapy for your back/neck pain issue. Nadine will do her best to schedule sessions during off hours, or hours/days less impacting to her client project billing.<br>• Nadine will provide upfront notification and valid justification on personal emergencies requiring quick time off. |
| **Nadine cannot be asked to leave an internal or external client project prematurely due to her performance, capabilities, personality conflict, or communication style for the next 3 years (thru Sept of 2013).** |
| Nadine will work with her HR MC Coach and/or mentor on professional, respectful communication protocol, consulting soft skills, such as building rapport, sustaining relationships, becoming trusted advisors. This may include training courses or self-study as deemed appropriate to encourage and accelerate the desired behavioural changes for future career growth and network expansion with her reputation. |

### B. Action Plan – Objectives of this Performance Improvement Plan

| | |
|---|---|
| **1. SPECIFIC** Exact Deliverable or Behavior Change: | Nadine must receive ongoing positive, constructive feedback from clients, Account MC and Project Team Members to **build positive, sustainable relationships** and not be asked to exit an account early for anything pertaining to her delivery capabilities, results, behaviors or communication style. |
| **MEASURED BY:** | • Verification thru ongoing feedback<br>• The ability to easily place her/have her accepted for suitable projects<br>• Client Satisfaction Surveys<br>• Fulfilment of contract engagement/SOW duration as expected as tracked in PeopleSoft |
| **ACHIEVED HOW:** (Ex: Process, Resources, Systems or colleagues/teams to be engaged to | • Nadine should be on-site with local client or project/account team as appropriate at least 2 days per week.<br>• Follow EDM as is applicable for engagement, including customer/project highlights in a weekly status report due to HR MC by noon Fridays<br>• Ensure thoughtful communication approaches. |

| achieve objective | • Work to minimize and eliminate risks.<br>• Accentuate value and positive impact by anticipating client needs/challenges and meeting them proactively.<br>• Training, coaching and mentoring with HR MC or other designated mentor or prof dev courses as mutually agreed to with MC.<br>• Fulfilment of contract engagement/SOW duration as expected. |
|---|---|
| REALISTIC (incremental steps) | Nadine will adhere to requests above and as directed by HR MC thru the duration of the PIP. |
| TIME BOUND (By what date?) | By 12/14/10; However, Nadine must not be asked to prematurely exit a billable internal or external client project due to her own performance, behaviours or capabilities thru Sept 2013. |

| 2. SPECIFIC Exact Deliverable or Behavior Change: | Nadine will consistently follow appropriate, professional, respectful and proactive **communication protocol** with her HR MC, Account MC, Project Team Stakeholders, and internal/external client(s). This includes notifying or discussing non-project items with HR MC first, proactive time off requests, following professional, respectful, courteous, and proper communication 'chain of command'. Not communicating 'out of turn' with higher levels or bypassing HR MC to get a different answer (grandstanding) to the same question. Not sharing non-project related information or aspirations with Account MC or Project Team, or Client that could be questionably perceived. |
|---|---|
| MEASURED BY: | • Verification thru random feedback.<br>• Designated mentoring completed and feedback obtained.<br>• Designated development training completed.<br>• HR MC observations |
| ACHIEVED HOW: (Ex: Process, Resources, Systems or colleagues/teams to be engaged to achieve objective | • Nadine will work with her HR MC Coach and/or mentor on professional, respectful communication protocol, consulting soft skills, such as building rapport, sustaining relationships, becoming trusted advisors.<br>• Nadine will complete training courses or self-study as deemed appropriate to encourage and accelerate the desired behavioural changes for future career growth and network expansion with her reputation.<br>• Nadine to work with HR MC to develop KQ on professional respectful communication protocol that builds trusted relationships and conduct to demonstrated internalized application of behavioural change.<br>• Broadening of network. |
| REALISTIC (incremental steps) | Nadine will adhere to requests above and as directed by HR MC thru the duration of the PIP. |
| TIME BOUND (By what date?) | By 12/14/10 |

| 3. SPECIFIC Exact Deliverable or Behavior Change: | Nadine needs to change her disregard or lack of clear understanding for how individual performance, time off, status reports links to (i.e. positively/negatively impacts) the business for objectives, revenue forecasting, revenue attainment and customer loyalty. |
|---|---|
| MEASURED BY: | • Verification thru random feedback<br>• Verification thru PeopleSoft and other Data Reports<br>• Track receipt of Status Reports in Outlook<br>• Track receipt of time of requests in Outlook<br>• Receipt of Dr. Note |
| ACHIEVED HOW: (Ex: Process, Resources, Systems or colleagues/teams to be engaged to achieve objective | • Nadine is expected to complete and submit weekly status reports that outline her client project work effort highlights for the past and anticipated for upcoming week, planned prof development, presales support, other planned accomplishments that demonstrate good use of any bench time (especially when at 50%). This planned use of bench time should be discussed and agreed to on a weekly basis with HR MC to ensure alignment of priorities. Weekly Status Reports submitted to HR MC by noon Fridays. |

| | |
|---|---|
| | • Accurate Time Sheets due in PeopleSoft by EOB Fridays<br>• Nadine will provide at least 2 weeks of notice for 1-5 days of vacation (if over 5 vac days requested, then 4-8 weeks advance notice is required).<br>• Nadine will directly notify her HR MC, Acct MC, and key Project/client contacts upfront by 8am for sick leave via phone and email msg.<br>• Nadine will provide a Dr.'s note about any requirement for ongoing physical therapy detailing her physical limitations, # of sessions and hrs per week required, etc. If there is no longer a need for treatment, then Nadine will either provide a Dr. Note releasing her from care, or an email stating that she is no longer require physical therapy for your back/neck pain issue. Nadine will do her best to schedule sessions during off hours, or hours/days less impacting to her client project billing.<br>• Nadine will provide upfront notification and valid justification on personal emergencies requiring quick time off. |
| **REALISTIC**<br>(incremental steps) | Nadine will adhere to requests above and as directed by HR MC thru the duration of the PIP. |
| **TIME BOUND**<br>(By what date?) | By 12/14/10 |

B.  **Manager Support:**  Specific actions your manager will take to assist you in meeting the expected standards.

| |
|---|
| Ongoing coaching and support, as well as very timely, specific, candid feedback.  We could role play out communications or relational scenarios. |

C.  Review meetings

| Review meetings * | Dates |
|---|---|
| Planned review 1:1 - | 9/14/10, bi-weekly |
| Planned review 1:1 - | |
| Planned review 1:1 – | |
| Monitoring end date | (Last date of achievement in section C) |

*Number and method of review meetings can vary according to particular circumstances of case and length of agreed monitoring period.

F. Individual's comments

| |
|---|
| |

This Performance Improvement Plan is an opportunity for you to work cooperatively with your manager towards resolving and improving issues of performance

This plan does not create, implicitly or explicitly, an employment contract, a guarantee of continued employment, nor any legal obligations on your part or the part of BT Americas, including all affiliated companies.. Neither your achievement of the agreed-upon goals, nor your best efforts at taking corrective action towards the agreed-upon goals, shall modify your status as an at-will employee. Your employment may be terminated or you may voluntarily terminate your employment at any time.

It is expected that you will demonstrate improvement in your performance as outlined above.  Your manager will review your performance with you according to the schedule provided above.  Upon successful completion of this plan, it is our expectation that you will continue to perform your job as

described above, that you will continue to meet the general expectations of your position, and that you will continue to be a valued employee of our company.

If you successfully complete the goals during the Performance Improvement Plan period, but return to an unacceptable level of performance after the Plan is complete, reissuance of a new Performance Improvement Plan may not occur and you could be subject to immediate action up to and including termination of employment.

Your manager will provide support to help you successfully complete the plan.

You should immediately notify management of any issues that arise during this Performance Improvement Plan that would interfere with your ability to meet the stated objectives.  BT US & Canada has an open door policy and you are encouraged to review the full contents of this plan and any questions that you may have with your management team.

Your signature below acknowledges that you have discussed this Performance Improvement Plan with your manager and that you have received a copy of the plan.

SIGNED: _____     SIGNED: _____
MANAGER NAME:                                        INDIVIDUAL NAME:

Date: _____

**Use the following section to document your progress against the plan objectives in your scheduled review meetings.**

**D. Achievement – Review of achievement against plan objectives**

| Review Date | Outcome Expected | Outcome Achieved | Comments |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

SIGNED: _____     SIGNED: _____
MANAGER NAME:                                        INDIVIDUAL NAME:

Date: _____

BT Group PIP template February 6 07                                                              7

# Exhibit 7

<u>Performance Document - Annual PR - Manager</u>
# Review

603561502, Nadine Ranade - Outsourc/Acqusitn Employee-Mgr
OUC: JKK5                  Country: United States
Annual PR - Manager: 04/01/2009 - 03/31/2010

| | |
|---|---|
| Author: Jayne Charlton | Role: Manager |
| Status: Completed | Due Date: 03/26/2010 |
| Approval: Not Required | |

The document status is Completed.

## Introduction

This review is to capture an employee's annual performance. Enter comments based on both what has been delivered and how it has been delivered.
  Before completing the APR, to ensure performance assessment is without unfair discrimination or bias, please make sure you are familiar with the BT group policy ("Managing Performance in BT Group") as well as BT's Equal Opportunity or local Diversity policy, where it exists.

## Overall Performance Rating

Please enter your rating and comments in the field below.

    Rating: G - Good

Comments: Nadine has had a good year, working diligently to overcome some challenges in Oct/Nov on P&G account and with the  2 deferrments of Principal title promotion. Nadine is highly intelligent and works exhaustively to meet high client demands while consistently increasing her knowledge, education and certs.  Nadine strongly desires to be the best at everything she sets out to do. Nadine has strong attributes and ambitions in security and internetworking technical arenas, coaching/mgmt, as well as interests in expanding her experience in presales and sales. Nadine is self-directed and carries her amazing desire for knowledge and career advancement to others in KQs. She took action on direction from John Herbert to help put her on better path with Principal case.  There are a few items relating to soft skills with communication and relationship building that Nadine's Mgr would like her to take to consider, self-analyze, accept and apply to ensure more solid case for Principal promotion, in addition to working a more strategic, global program.  Nadine is a great team player and can be a great leader as well.

FY10 Total Rev: $143,970
Training Hrs: 91 / 126%
Avg Util: 104%

Info below was pasted by Jayne Charlton on behalf of Nadine Ranade.
Nadine has made many successful contributions to the BMS and P&G accounts in the past couple of years.  Her successes on the previous accounts landed her an opportunity on the Unilever account starting this past December. Unilever is a seven-year agreement valued over $800M. This contract supports Unilever community of 174,000 employees working in over 60 countries worldwide.  Nadine has fulfilled several customer requests related to video conferencing service improvement, voice optimization and billing audit on this account. Nadine also worked on the P&G account for the past three quarters.  Proctor and Gamble is a five-year agreement valued at $650M that covers the Network Infrastructure Tower projects.  This contract supports the P&G community of 140,000 employees working in over 82 countries worldwide.  Nadine fulfilled several customer requests related to network infrastructure improvements, changes, and moves.  In addition to that she supported data

EXHIBIT

4

7/11/13   NB

center moves, site decommissioning and providing converged services. Some of the requests involved correcting erroneous VLAN creation, configuring and installing of Access points, VOIP call manager migration. These requests ranged $5000 to $100,000 in value. Nadine also provided coverage for another MC supporting the following projects: One project involved bringing several sites online with Starnet dialing capabilities. Another project involved data center move and providing converged services. Her efforts were instrumental in putting together a comprehensive project delivery schedule and get it accepted by the customer in a very short time even she was not involved in the project from the beginning. Nadine's work has been very much appreciated by the customer. On P&G Nadine worked on the transformation team working on LAN/WAN/IPT and wireless transformation projects. She worked on transforming one of the most critical and largest P&G sites in Mehoopany. In addition to that she was given the lead role for site decommissioning globally for the transformation team.

Nadine has continuously demonstrated strengths in planning, executing, tracking, and leading major network infrastructure projects. Her dedication and collaboration with teammates has resulted in recommendations towards process improvement and effective change management for the service delivery process. While working on the BMS project, I was faced with the challenge of managing a large decommissioning project without having any process in place. She took the opportunity to develop and document a process and shared it with other team members via KDocs. This later on was turned into the S3 portal which not only reduced cycle time in processing SR requests but was cost effective as well. My work in the past years has earned me the reputation of a knowledgeable, helpful, innovative individual who is frequently sought after to advise new consultants or aid in "first-of-a-kind" service offerings. Nadine also participated in the development of a new managed WAN Optimization service that will enable BT PS to expand their footprint and remain a competitive leader.

A brief description of P&G projects is given below:

P&G - NY Prestige Circuit Upgrade; 05/09-08/09
Working with the P&G and BT teams, she upgraded the circuit at the NY prestige office. This office was experiencing issues due to congestion on the WAN link. They were also adding 60 more users from Fekkai which would bring the utilization to 100%. This office needed to increase the bandwidth to a 20MB MPLS circuit, so she submitted the order for the circuit and updated customer about the progress of delivery. She also secured right resource to install WAN interface cards and memory cards in the existing router. This project was then successfully handed off to a transformation PM for closure.

P&G - Prudential Tower Decommissioning Survey; 06/09 -08/09
Nadine completed a site survey for this location to decommission the site as P&G currently leases Boston GO office space in the Prudential Tower. They moved all employees to the South Boston location in October of 2009. The business objective of this GSR is to plan our exit from the leased facility P&G is currently occupying in Boston at the Prudential Tower GO location. The customer needed to remove all our networking components and return the site to the landlord by Dec 31, 2009. She visited the site and documented all the assets at the site and tasks that need to take place to decommission the site. Then she submitted a comprehensive site survey report to the customer documenting the inventory of the phone & network equipment and related steps necessary to vacate the building. The results from this site survey resulted in a big O&R for BT.

P&G - F&HCIC Renaissance - Historic Wing Building Renovation 05/09-12/09
She led this project with an engineer and external vendor to setup voice/data and wireless services in the newly renovated Annex bldg. This building will have five floors and about 200 people on each floor with a wireless assessment required for each site as well. She worked with the customer to meet their objective of creating a collaborative and inspiring Work Environment, attracting and retaining the finest talent, and sustainability. The key requirements are:
LAN -- Provide the infrastructure and design for the new facility operation, including establishing service at the new facility with local suppliers. For dimensioning purposes,

average number of workstations per floor is 200.
Wireless LAN – Provide the assessment, design and infrastructure for the wireless service set-up. For this purpose, assessment should consider all 5 floors would be wireless enabled. For dimensioning purposes, average number of users per floor is 200.
Voice – Develop options for standard voice wiring, wireless voice technology and VOIP technology. Provide infrastructure and design of the facility operation, including establishing service at the new facility with local suppliers. Preferred option at this point remains to be VoIP (Soft phones) technology, but we shall count on the cost comparison for the other options as well. For dimensioning purposes, average number of users per floor is 200.

Document management services for printing, photocopying, scanning and faxing. Additional to multifunctional devices based service for the majority of users, a few stand alone printing equipment needs to be considered and contemplated for support. Provide design requirements for data and communication rooms for the building. Traditional Video Conferencing coordination with Facilities. Provide relocation services from current to temporary to definitive office spaces. Provide decommissioning, removal, and re-installation of current services as part of the building renovation, which will followed a phased approach. Americas Support Center to continue serving all site residents before, during, and after the renovation period.
P&G - O&R1014709_BOSTON_USA (184); 07/09-08/09
I provided coverage for another MC on this project for about 3 weeks.  This project involved providing LAN/WAN/IPT and WLAN services at the newly renovated South Boston Gillette facility.  During this duration she had several meetings with the Customer and BT team to put together an end-to-end implementation schedule.  she initiated the RFQ and approved the WLAN site survey order for this facility.  Since this was a critical LAN site, she also provided details to the construction manager for any questions such as an IDF closet will be constructed on the 6th, 7th and 8th floors.  A key prerequisite for successful WLAN network implementation was to get the WLAN site survey done in time.  My leadership ensured that the WLAN survey is scheduled in a timely manner, and the customer extended positive comments for my efforts during this timeframe.
P&G – Site Transformation Albany, GA; 08/09 – 11/09
Recently, she was requested to join the transformation team, and she is working on WAN upgrade for the site.  We are planning to bring in a 20MB primary MPLS circuit and a 10MB secondary MPLS circuit to the site along with a router at the site and some WAN interface cards and memory cards in order to eliminate all ISDN dial backup links and VPN tunnels. All voice circuits and EGP circuits terminated, and new MPLS circuits will be put in place. As the implementation leader, she will be collaborating with engineers and the site team and ordering: Primary 20MB and 10MB. 2 T1 interface cards, 2 T3 cards, CISCO 3845 router, 2 memory cards. power supply and cord, and one T3/E3 network module.
P&G – Site Transformation, Jackson, TN; 08/09 – 12/09
Also, she is currently leading on a WAN upgrade for this site as part of transformation project to bring in a 10MB primary MPLS circuit and a 5MB secondary MPLS circuit to the site.  All ISDN dial backup links and VPN tunnels to be eliminated.   Routers will be replaced to meet BT standards and all voice circuits and EGP circuits terminated, and new MPLS circuits will be put in place.  she will be ordering:  MPLS Circuits:  Primary 10MB and 5MB, Cisco 3845 router, 2 memory cards, power supply and cord,1 T3  network cards.


P&G – Site Transformation, Mehoopany, PA; 08/09 – 12/09
Another part of the transformation project she am leading involves WAN upgrade in the first phase and LAN transformation to follow.  Currently we plan to bring in a 25 MB primary MPLS circuit and a 10 MB secondary circuit. Five circuits will need to be decommissioned at the site.  New routers will be put in place to meeting BT standards with non-standard routing protocol.  Circuit bandwidth inconsistencies will be addressed at the time of WAN transformation.  The long term Control LAN solution is in development which will be used for control LAN security mechanism, and Out of Band management will be preserved. Also, there will be an IPT implementation, and she am leveraging Cisco certification for IPT implementation planning.  she will need to order:  Two MPLS T3's one primary and one secondary, 3-T3/E3 interface cards, , 2 CISCO 3845 router, 2 memory cards, power supply and cord, and WAN interface cards, flash memory, and network cable.

A brief description of Nadine's project's on the Unilever account is given below:

Unilever – Oval Office VC implementation 12/09 – 01/10
As part of the overall service improvement program for Unilever I project managed the
implementation of video conferencing services at the oval office in Englewood cliffs, NJ.
This was done in close collaboration with BTC.  This Video conferencing service provided
'multi-point' and 'point-to-point' video conferencing over public ISDN and IP networks. Most
point-to-point conferences tend to take place without involvement from BT with one site
dialing the other directly.  I managed the installation, testing and training tasks of this
service.  Worked closely with the client for proper project acceptance and closure.
Customer was very pleased with the service delivery and provided the following feedback:
"Based on the short time we have worked together implementing a very high profile video
conferencing solution in Englewood Cliffs Oval Office during the holiday, you jumped in to fill
the PM position of a project already well underway.
Without benefit of previous format or templates or input on previous cases from the BT team
who were out of the office for the Christmas Holiday, you created and delivered a testing
plan required for this change to be approved in a critical time crunch with success in order to
keep the project moving forward.  Since that time you have performed the PM
responsibilities by scheduling regular status meetings and reporting and responding in a
timely and professional manner." – Denise Clancy (Unilever)
Unilever – Voice Transformation 12/09 – 07/10
As part of the overall voice service improvement program I am working with the client to
implement BT One Voice or VoIP at 40 sites in various Latin American countries.  I will be
project managing all aspects of this project in terms of feasibility and capability analysis to
implement BT One Voice or VoIP, design, implementation, testing, training, turnover to life-
cycle management.
Unilever – Various Service Requests - 12/09 – 07/10
As part of the overall Unilever contract there are several service improvement and new
business requests that are currently being project managed by me.  One of them is Voice
Optimization where we are evaluating the bandwidth needs at each site and costs
associated with each vendor.  This exercise is being done to provide cost savings to the
customer by providing a better overall service plan.  There are other SR's that I am
managing which involve equipment replacement and site closures as well.


Unilever – Billing Audit by TNX - 12/09 – 12/10
I will be working with Unilever and TNX (a vendor hired by Unilever to do their billing audit).
BT needs to support all audit demands for regulatory reasons.  I will manage this project for
the North America and Latin American region on this contract.
Unilever – NA fixed voice optimization initiative - 12/09 – 07/10
I am managing North America's fixed voice optimization initiative which involves working
with various suppliers, BT legal, and other BT team members.  Legal had to be involved
because there were contacts written on behalf of BT which were invalid with various
suppliers.  We need to renegotiate these terms, clean up the inventory, and get the orders
back to original suppliers and bill the customer correctly.  It also involves assessing the
current needs of the customer based on us

**Comments:**  age and number of users and forecast proper bandwidth requirements for each site in North
America.  This is all being done to meet proper cost savings target for the customer and BT.
In addition to above contributions Nadine has worked on providing KQ's and training.
KQ contributions
Nadine conducted a total of five KQ's:


- KQ session on "Genesis" to train the Transformation team DPM.
- KQ session on "S3" portal for all the DPM's.
- KQ on site decommissioning.
- KQ  on "Implementing IPT on Cisco platform"
- KQ on "Introduction to CISSP".


Driving New Business:
Nadine contributed to the development of the new managed WAN Optimization offering
working with the ITPO COI team

Training
Nadine received her certificate and completed the training in Opnet's "Ace Live" and "IT Guru and SP Guru" network planning, monitoring and analysis.
Nadine has completed 91 hours of training during this year and she is required only 72hrs.
Spent 40 hrs preparing for and delivering 5 KQs.

How:
1. Inspiring
a. Nadine is clearly an inspiration to other team members in terms of her leadership skills. She has accomplished this by keeping the team on track to meet all the deliverables in a timely manner.

2. Straightforward
a. Team members who have worked with Nadine find her straightforward and dedicated.

3. Trustworthy
a. Nadine has an excellent track record for delivery and can be always trusted to get the job done.

4. Helpful
a. Nadine has offered to assist her co-workers in helping them understand how to approach their project. Nadine is always willing to help her peers and mentor other colleagues.

5. Heart
a. Nadine looks out for opportunities for costs savings for her customer. She is working with Unilever to provide cost savings for fixed voice services. On the P&G account she delivered on what she committed to the customer.
b. " Nadine worked diligently to provide a detailed report that lists all the assets and tasks that need to take place to decommission the site. Her work contributed towards making the decision to give the site decommissioning work to BT." - Mark Pollette (8/09)

6. Coaching for Performance
a. Nadine has conducted several KQ sessions on PMP in the past in order to coach and mentor other peers. Nadine is always willing to help her peers and mentor other colleagues.

7. Bottom Line
a. In past Nadine has worked closely with the account manager for the up-sale opportunities and is continuing to do so.

8. Drive for Results
Nadine is a results oriented individual and consistently strives to plan tasks carefully, resolve issues to customer's satisfaction. She is consistent in providing detail project status and reports for her projects. In a short time after joining Unilver she delivered a video conferencing service at a key customer site. She also took corrective measures to bring several customer requests back on track that were in red/late in their status as soon as she started working on the account. She received positive feedback not only from the customer but also BT senior management team.
a. "we need more proactive people like you at BT. Your input on the decommissioning process added a lot of value not only to the P&G account but BT as a whole. This was a critical process that needed support and you stepped in and went above and beyond the call of duty to support this effort. This enabled me/us to meet a critical contractual obligation around the disposition of assets. Your ability to see a problem and get the right parties together to address the issue and execute is a great value to BT." -- Shawn Bennett (09/09)

9. Customer Connected
a. Nadine stays on top of customer issues and this is reflected in the accuracy of her reports and statuses to the customer.
"She has excellent communication skills, demonstrates her strong passion for quality and is committed to her projects. She takes the time to listen to the customer and adjusts

according to their requests. Nadine has a great attitude and it comes across immediately when meeting with her. She is a true pleasure to work with and represents BT very well." – Mark Polette(8/09)

10. Professional and Technical
a. Nadine's feedback from her customer's indicates her high standards of professionalism and strong technical acumen.

## Contribution - "What"

Please enter your comments in the cell below

Comments: P&G
1st half FY10 Rev is $69,570; Util is 114%/102% for an avg util of 109.5%
Comments above were added from 01 Jul 2009 to 30 Sep 2009

Comments above were added from 01 Oct 2009 to 31 Dec 2009

## How - BT Capabilities

Inspiring

| Rating: | VG - Very Good |
|---|---|

Strength for work

| Rating: | VG - Very Good |
|---|---|

Trustworthy

| Rating: | GS - Generally Satisfactory |
|---|---|

Helpful

| Rating: | VG - Very Good |
|---|---|

Heart

| Rating: | VG - Very Good |
|---|---|

Passion for performance

| Rating: | GS - Generally Satisfactory |
|---|---|

Bottom Line

| Rating: | G - Good |
|---|---|

Drive for results

| Rating: | VG - Very Good |
|---|---|

Customer Complete

**Rating:**          G - Good

Professional and technical

**Rating:**          O - Outstanding

Please enter your comments in the field below

Comments: on track with client engagement and exceeds expectations of prof dev, working to develop new offerings, developing and delivering KQs.
Nadine is awaiting final response on a potential promotion to Principal Consultant.
Comments above were added from 01 Jul 2009 to 30 Sep 2009

Comments above were added from 01 Oct 2009 to 31 Dec 2009

## Employee Comments

Please enter your comments in the field below

Comments:

## Signatures

_____

Nadine Ranade / Date

_____

Jayne Charlton / Date

# Exhibit 8

**From:** Charlton, Jayne
**Sent:** Tuesday, November 03, 2009 6:02 PM
**To:** Ranade, Nadine
**Cc:** Schneider, Terry; Charlton, Jayne
**Subject:** RE: P&G Transformation potential conflict issue
**Importance:** High



Nadine:

Per our phone conversation this evening, I want to clearly re-iterate to please "stand down" (Joe's specific words), and do not have any further communication (email or phone) with anyone on the P&G project, especially the client, other than Barbara Dodd, Steve Kurtz or Joe Busch. If you need to interface with someone else about deliverables/action items/meetings, then Joe has asked that it be routed through Barbara. Barbara will also assist with items that need to be transitioned.

Also in the spirit of the best possible resolution and at your request, I asked Joe if we could have a conf call with you tomorrow to gain clarity on the issue, allow you a chance to ask questions, and take away lessons learned for your ongoing development. I also asked him to clarify your current reporting structure on P&G. I will let you know as soon as I get his response.

As I've said to you since our first conversation about this last Thursday, my desire is to help coach you

through this in the best possible way for your reputation and career. I would greatly appreciate your full compliance and cooperation on these directives as we work together to resolve this matter with the greatest degree of professionalism. Thank you.

Kind Regards,

Jayne Charlton, PMP

Jayne Charlton | Managing Consultant | Reston, VA | BT Professional Services | Mobile 1 571-236-3418 | Office 1 540-727-7987 | Email: Jayne.Charlton@ins.com

This electronic message contains information from BT INS, Inc, which may be privileged or confidential. The information is intended for use only by the individual(s) or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is strictly prohibited. If you have received this electronic message in error, please notify me by telephone or email (to the number or email address above) immediately.

Activity and use of the BT INS, Inc e-mail system is monitored to secure its effective operation and for other lawful business purposes. Communications using this system will also be monitored and may be recorded to secure effective operation and for other lawful business purposes.

BT INS Inc, 1600 Memorex Drive, Suite 200, Santa Clara California 95050-2842 United States

**From:** Charlton, Jayne
**Sent:** Friday, October 30, 2009 5:50 PM
**To:** Ranade, Nadine
**Subject:** P&G Transformation potential conflict issue

Nadine: Please do not have any further communication email or phone with anyone at P& re: the potential issue/conflict/misperception re: Transformation Team. If there are any issues, Steve Kurtz and Joe Busch will resolve with me and include you if/as necessary. Thanks.

Kind Regards,

Jayne Charlton, PMP

Jayne Charlton | Managing Consultant | Reston, VA | BT Professional Services | Mobile 1 571-236-3418 | Office 1 540-727-7987 | Email: Jayne.Charlton@ins.com

This electronic message contains information from BT INS, Inc, which may be privileged or confidential. The information is intended for use only by the individual(s) or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is strictly prohibited. If you have received this electronic message in error, please notify me by telephone or email (to the number or email address above) immediately.

Activity and use of the BT INS, Inc e-mail system is monitored to secure its effective operation and for other lawful business purposes. Communications using this system will also be monitored and may be recorded to secure effective operation and for other lawful business purposes.

BT INS Inc, 1600 Memorex Drive, Suite 200, Santa Clara California 95050-2842 United States

# Exhibit 9



EXHIBIT
6
7/11/13 CB

**From:** Charlton, Jayne
**Sent:** Wednesday, November 04, 2009 3:25 PM
**To:** Ranade, Nadine
**Cc:** Schneider, Terry; Kurtz, Steven; Busch, Joseph (Joe); Charlton, Jayne
**Subject:** P&G End Date 11/4 at noon
**Importance:** High

Nadine:

Per our discussion at noon today resulting from my conversation this morning with Joe Busch, Steve
Kurtz and Terry Schneider to review the issues, all of your work, interactions and communications with
P&G (clients, vendors and team players) are **discontinued effectively immediately**.

Any and all transition items should be documented by you and sent over to me via email today to be
handled at Steve Kurtz' discretion. I understand that your immediate concern is that Steve notifies
Robert Smith and Shannon Neimann that you will not be completing the quality deliverables that you
committed during your meeting yesterday morning, as well as Brad Argetsinger and Lennox Pitt to reset
expectations.

At your request, I am also documenting the following things and including them in this email as record
of your perspective; however, this is a closed issue and no further discussion will transpire. I hope I have

summarized the following 4 points accurately.

First, you confirmed agreement that during the transitioning of you to Mehoopany back in August that you missed including, Karen, a critical player in the Kickoff Mtg (whose name was not on the list and role was handled by Greg Berholtz), but felt the subsequent meetings brought things back on track. Issues got very elevated again at this site when there was a last minute decision to change the vendor from Intact to Compucom. You stated that you felt that this resulted in a lot of rework, confusion, poor planning, documentation and poor perception with the client and so you raised the concerns about this resulting in a poor Site Inspection Meeting.

Second, I confirm your email receipt of setting up a folder for and submitting all decommissioning documents over to Dan Prem on 10/8 to ensure thorough transition.

Third, I have heard your confusion about who you were reporting to and for which items as you thought you matrix reported to Barbara Dodd only for Mehoopany (until 10/27-29ish) while continuing to report to Brad and Lennox for other quality deliverables overlapping this timeframe (per verbal agreement at the onset in August between Sandi Johnson and Lennox were to be a 50-50 split of your time). You conveyed that prior to your understanding of any official transition to Robert Smith between 10/27 and 11/2 that you sent advance email communication of your time off for 11/2 to Brad (believing that from conversations with him at a meeting in Cincinnati 10/15 re: S3 portal work you were picking up and with the transition away from Mehoopany that he was your current prime reporting mgr). However, you mentioned responding around noon on 11/2 to a cell call from Robert Smith and felt you mutually agreed to move your first meeting with him to 11/3 a.m., which you attended and began actively working on his requested deliverables.

Finally, I heard your perspective that the only person you contacted on 10/30 at P&G after I asked you not to the afternoon of 10/29 was Karen to let her know that you were canceling a meeting that day re: Mehoopany and were transitioning off the project. As a result of sending a meeting cancellation, I believe you said several others questioned what was going on.

As a formal reminder, you are not to contact anyone related to P&G via phone or email, including casual/social "good-byes or thank yous". This will be handled by Steve Kurtz as appropriate, and I believe he has already contacted Jeff Jones and is in the process of notifying others as appropriate.

Your professionalism and discretion in exiting this account today is most appreciated. Thank you.

Kind Regards,

Jayne Charlton, PMP

Jayne Charlton | Managing Consultant | Reston, VA | BT Professional Services | Mobile 1 571-236-3418 | Office 1 540-727-7987 | Email: Jayne.Charlton@ins.com

This electronic message contains information from BT INS, Inc, which may be privileged or confidential. The information is intended for use only by the individual(s) or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is strictly prohibited. If you have received this electronic message in error, please notify me by telephone or email (to the number or email address above) immediately.

Activity and use of the BT INS, Inc e-mail system is monitored to secure its effective operation and for other lawful business purposes. Communications using this system will also be monitored

and may be recorded to secure effective operation and for other lawful business purposes.

BT INS Inc, 1600 Memorex Drive, Suite 200, Santa Clara California 95050-2842  United States

# Exhibit 10

| | |
|---|---|
| **From:** | jayne.e.charlton@bt.com |
| **Sent:** | Monday, March 14, 2011 2:52 PM |
| **To:** | IMCEAEX-_O=INS_OU=US_cn=Recipients_cn=ranade+5Fn@ngm.bt.com |
| **Cc:** | jayne.e.charlton@bt.com |
| **Subject:** | feedback from your PM work on Capital Group |
| **Importance:** | High |
| **Sensitivity:** | Confidential |

Nadine:

As a follow-up to our phone conversation today re:  feedback from David Upton and the client (Capital Group) on your PM delivery performance Dec thru Feb. 11.  Below are some the key points. I know this is hard feedback to receive as much as it is for me to deliver given that some of these items still align with things we addressed during your PIP.  I appreciate you giving this feedback some thought, but ask that you not further "push" David, the team or the client for more info. Thanks.

- Some things Nadine did quite well, such as her "next step plan", and other things were enough of an issue that she was asked to finish up the initial project, but the client specifically asked David not to bring her back for the ongoing project work.  In the end, the client said they liked some of the "product" she delivered, but not the PM.
- Issues with PM style (the "HOW"), such as challenges prioritizing project activities and discerning which are higher significance or urgency
- Communication/conversation challenges
- Work effort was inconsistent in quality – she seemed very good at the beginning, but her momentum diminished during the course of the project.
- Nadine seemed to be distracted by other things and thus re-asking the same questions and not up-to-date on latest info or decisions, etc.  This was apparent to both the client and the BT project team.
- Didn't know EDM well, and although she tried to learn it quickly for the CO meeting, much of the docs had to be renamed on the eCEB file by the lead consultant and David.
- When preparing for closeout, Nadine began trying to "sell" herself to the client for the next projects.  At that point, the client told David that if they were going to move forward with BT, then they wanted a different PM.  David asked to stop and told her that she was to finish up and move on.

Kind Regards,

Jayne Charlton, PMP

**Jayne Charlton | Managing Consultant | Reston, VA | BT Business Solutions Group | Mobile 1 571-236-3418 | Office 1 540-727-7987 | Email: jayne.charlton@usc-bt.com**

This electronic message contains information from BT INS, Inc, which may be privileged or confidential.  The information is intended for use only by the individual(s) or entity named above.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is strictly prohibited.  If you have received this electronic message in error, please notify me by telephone or email (to the number or email address above) immediately.

EXHIBIT
13
7/10/13   LB
PENGAD 800-631-6989

Activity and use of the BT INS, Inc  e-mail system is monitored to secure its effective
operation and for other lawful business purposes. Communications using this system will also be monitored
and may be recorded to secure effective operation and for other lawful business purposes.

BT INS Inc, 1600 Memorex Drive, Suite 200, Santa Clara California 95050-2842  United States

# Exhibit 11



EXHIBIT
17
7/11/13

Certification of Health Care Provider for
Employee's Serious Health Condition
(Family and Medical Leave Act)

**U.S. Department of Labor**
Employment Standards Administration
Wage and Hour Division



OMB Control Number: 1215-0181
Expires: 12/31/2011

## SECTION I:  For Completion by the EMPLOYER

**INSTRUCTIONS to the EMPLOYER:**  The Family and Medical Leave Act (FMLA) provides that an employer may require an employee seeking FMLA protections because of a need for leave due to a serious health condition to submit a medical certification issued by the employee's health care provider.  Please complete Section I before giving this form to your employee.  Your response is voluntary.  While you are not required to use this form, you may not ask the employee to provide more information than allowed under the FMLA regulations, 29 C.F.R. §§ 825.306-825.308.  Employers must generally maintain records and documents relating to medical certifications, recertifications, or medical histories of employees created for FMLA purposes as confidential medical records in separate files/records from the usual personnel files and in accordance with 29 C.F.R. § 1630.14(c)(1), if the Americans with Disabilities Act applies.

Employer name and contact:  _British Telecom_

Employee's job title:  _Sr. Program Mgr._   Regular work schedule:  _40 hr/wk_

Employee's essential job functions:  _work on Computer, attend call,_
_Finance meeting, visit Customers etc._

Check if job description is attached:  _____

## SECTION II:  For Completion by the EMPLOYEE

**INSTRUCTIONS to the EMPLOYEE:**  Please complete Section II before giving this form to your medical provider.  The FMLA permits an employer to require that you submit a timely, complete, and sufficient medical certification to support a request for FMLA leave due to your own serious health condition.  If requested by your employer, your response is required to obtain or retain the benefit of FMLA protections.  29 U.S.C. §§ 2613, 2614(c)(3).  Failure to provide a complete and sufficient medical certification may result in a denial of your FMLA request.  29 C.F.R. § 825.313.  Your employer must give you at least 15 calendar days to return this form.  29 C.F.R. § 825.305(b).

Your name:  _Nadine_   _T._   _Ranade_
        First        Middle        Last

## SECTION III:  For Completion by the HEALTH CARE PROVIDER

**INSTRUCTIONS to the HEALTH CARE PROVIDER:**  Your patient has requested leave under the FMLA.  Answer, fully and completely, all applicable parts.  Several questions seek a response as to the frequency or duration of a condition, treatment, etc.  Your answer should be your best estimate based upon your medical knowledge, experience, and examination of the patient.  Be as specific as you can; terms such as "lifetime," "unknown," or "indeterminate" may not be sufficient to determine FMLA coverage.  Limit your responses to the condition for which the employee is seeking leave.  Please be sure to sign the form on the last page.

Provider's name and business address:  _Dr. Vijaya L. Gorle, Leesburg V_

Type of practice / Medical specialty:  _Primary Care_

Telephone: (_703_) _951-1680_      Fax: (_703_) _961-1491_

000039

**PART A: MEDICAL FACTS**

Approximate date condition commenced: _June – July '10_

Probable duration of condition: _6 months_

Mark below as applicable:
Was the patient admitted for an overnight stay in a hospital, hospice, or residential medical care facility?
_X_ No ___ Yes. If so, dates of admission:

Date(s) you treated the patient for condition:

_8/28 , 9/14 , 9/17_

Will the patient need to have treatment visits at least twice per year due to the condition? ___No _X_ Yes.

Was medication, other than over-the-counter medication, prescribed? ___No _X_ Yes.

Was the patient referred to other health care provider(s) for evaluation or treatment (e.g., physical therapist)?
___No _X_ Yes. If so, state the nature of such treatments and expected duration of treatment:

_Jackson Clinics at Worldgate 7/1–9/15 ; 9/20–_

2. Is the medical condition pregnancy? _X_ No ___Yes. If so, expected delivery date: _____

3. Use the information provided by the employer in Section I to answer this question. If the employer fails to provide a list of the employee's essential functions or a job description, answer these questions based upon the employee's own description of his/her job functions.

Is the employee unable to perform any of his/her job functions due to the condition: ___ No _X_ Yes.

If so, identify the job functions the employee is unable to perform:

_Sitting for a prolonged time, blurry vision ; recommend_
_drive while taking medicine_

Describe other relevant medical facts, if any, related to the condition for which the employee seeks leave (such medical facts may include symptoms, diagnosis, or any regimen of continuing treatment such as the use of specialized equipment):

_recommended : Physical Therapy 2–3 times a week_
_Medication for pain_
_~~beg~~ referred to an orthopedist_
_wear a neck support collar_

000040

PART B: AMOUNT OF LEAVE NEEDED

5. Will the employee be incapacitated for a single continuous period of time due to his/her medical condition, including any time for treatment and recovery? ___ No _X_ Yes. ( partly due to med note )

If so, estimate the beginning and ending dates for the period of incapacity: __9/30 - 13/5__

6. Will the employee need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of the employee's medical condition? ___ No _X_ Yes.

If so, are the treatments or the reduced number of hours of work medically necessary? ___ No _X_ Yes.

Estimate treatment schedule, if any, including the dates of any scheduled appointments and the time required for each appointment, including any recovery period:

__twice a week till December__

Estimate the part-time or reduced work schedule the employee needs, if any:

__4__ hour(s) per day; __5__ days per week from __9/30__ through __12/5__

7. Will the condition cause episodic flare-ups periodically preventing the employee from performing his/her job functions? ___ No _X_ Yes.

Is it medically necessary for the employee to be absent from work during the flare-ups? ___ No _X_ Yes. If so, explain:

Based upon the patient's medical history and your knowledge of the medical condition, estimate the frequency of flare-ups and the duration of related incapacity that the patient may have over the next 6 months (e.g., 1 episode every 3 months lasting 1-2 days):

Frequency: _____ times per _____ week(s) _____ month(s) _Constant_

Duration: _____ hours or ___ day(s) per episode   _Constant_

ADDITIONAL INFORMATION: IDENTIFY QUESTION NUMBER WITH YOUR ADDITIONAL ANSWER

__~~6 Con~~ Patient has been suffering from constant pain for the past 8 months but she seeked medical assistance in June.__

Patient [illegible] and will f/u
with orthopedic physician & PT
and further course of [illegible]
will depend on the expert
consultants input.

[signature]

Signature of Health Care Provider

Date 9/21/10

**PAPERWORK REDUCTION ACT NOTICE AND PUBLIC BURDEN STATEMENT**

If required, it is mandatory for employers to retain a copy of this disclosure in their records for three years. 29 U.S.C. § 2616, 29 C.F.R. § 825.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. The Department of Labor estimates that it will take an average of 20 minutes for respondents to complete this collection of information, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. If you have any comments regarding this burden estimate or any other aspect of this collection information, including suggestions for reducing this burden, send them to the Administrator, Wage and Hour Division, U.S. Department of Labor, Room S-3502, 200 Constitution Ave., NW, Washington, DC 20210. **DO NOT SEND COMPLETED FORM TO THE DEPARTMENT OF LABOR; RETURN TO THE PATIENT.**

# Exhibit 12



# County of Fairfax, Virginia

To protect and enrich the quality of life for the people, neighborhoods and diverse communities of Fairfax County

EXHIBIT

31

PENGAD 800-631-6989

7/11/13

November 19, 2012


Ms. Nadine Ranade
2524 Walnut Leaf Lane
Herndon, Virginia 20171-4653

RE:   HRC #2012017E/EEOC #10D201200042C
      Ranade v. BT Americas Inc.

Dear Ms. Ranade:

The purpose of this letter is to notify you that your above-referenced complaint has been transferred from the U. S. Equal Employment Opportunity Commission (EEOC) to the Fairfax County Human Rights Commission (FCHRC) to complete the investigation. The case has been assigned to human rights specialist, **Nicole Rawlings**. In addition, the case has been given a new case number. Please use the new number in subsequent communications with this office.

Should you wish to provide any additional information to your case file, or if you have any questions regarding your case, you may contact **Nicole Rawlings** at (703) 324-2953 during normal business hours. Should you have any questions about the reassignment of this case, you may address your questions to **Annie Carroll**, compliance supervisor, at (703) 324-2953.

Please remember that it is your responsibility to notify this office of any change in your telephone number or address. Failure to do so may result in the dismissal of your complaint.

As a preliminary alternative that might lead to a quick and amicable resolution of your case, the Commission offers an alternative dispute resolution ("ADR") program in which you are invited to participate. The process used in the program is called Mediation, an informal process wherein interested opposing parties can elect to have an impartial, neutral third party (i.e., a mediator) mediate the complaint. During the mediation conference, the mediator, who has no vested interest in the outcome, assists opposing parties in reaching a completely voluntary, mutually satisfactory resolution of a complaint. If you choose to have your case mediated and the mediation is successful,

000087

Office of Human Rights and Equity Programs
12000 Government Center Parkway, Suite 318
Fairfax, Virginia 22035-0093
Phone: (703) 324-2953 ♦ Fax: (703) 324-3570
www.fairfaxcounty.gov/ohrep/

Ms. Nadine Ranade
November 19, 2012
Page 2

you will be required to withdraw your case from the Commission. If mediation is unsuccessful, or if either party declines to participate and your complaint remains with the Commission, a full investigation of your allegations will be conducted and a finding issued.

If you are interested in having your case mediated under the auspices of the Commission's ADR program, please sign and return the enclosed *Agreement to Mediate* form to the attention of the human rights specialist assigned to your case by **December 3, 2012**. After you and the respondent have returned the forms, one of our agency mediators will contact you to schedule a mediation session. For a more detailed description about our mediation process, please review the enclosed *Mediation Facts Sheet*. If you have further questions about the ADR program, please contact Michael Simms, at (703) 324-2953.

If at this time you elect not to participate in the ADR program, the Commission, nevertheless, encourages the parties to resolve this complaint on terms that are mutually agreeable. The Commission's investigation of the complaint will continue unless the Commission is advised in writing that the matter has been resolved between the parties.

If you should need any type of special accommodation or auxiliary aid, please notify the Human Rights Commission immediately. Arrangements will be made to accommodation your needs.

Thank you for your assistance and cooperation in this matter.

Sincerely,

Kenneth L. Saunders
Director

nr2012017E.eeocreassignc

cc:    Ms. Annette Kay Rubin,
       Attorney-at-Law
       18 Liberty Street SW
       Leesburg, VA 20175-2713



# County of Fairfax, Virginia

To protect and enrich the quality of life for the people, neighborhoods and diverse communities of Fairfax County

HRC #  2012017E
EEOC #  10D201200042C

**COMPLAINANT:**

NAME: Ms. Nadine Ranade                      PHONE: (H) (703) 944-3630
ADDRESS: 2524 Walnut Leaf Lane    CITY: Herndon    STATE: Virginia    ZIP: 20171

**RESPONDENT:**

NAME: BT Americas Inc.                      PHONE: (703) 716-8876
ADDRESS: 11440 Commerce Park Drive    CITY: Reston    STATE: Virginia    ZIP: 20191

**CLASSIFICATION OF COMPLAINT:**

| ISSUE | BASIS | |
|---|---|---|
| ☐Credit Facilities | ☐Age (Over 40) | ☒Sex |
| ☐Education | ☐Color | ☐Race |
| ]Employment | ☐Marital Status | ☒Disability |
| ☐Housing | ☐Religion | ☐Familial Status |
| ☐Public Accommodations | ☒National Origin | ☐Other |
| | ☐Retaliation | _____ |

Please state the nature of your complaint:

I am a female originally from India with a disability.  In March 2007, I began working with the respondent as a consultant. In March 2008, I became a permanent employee with the respondent in the position of senior project manager.  I worked without incident throughout 2008 and 2009. However, issues began to arise in the third quarter of 2010. On April 2, 2011, the respondent terminated my employment. I believe I was discriminated against because of my disability, national origin (Indian), and sex (Female) for the following reasons:

1. Despite my qualifications, I was denied a promotion to principal project manager. I am aware of other, less qualified males, who are of non-Indian descent who were promoted into principal positions.

2. I availed myself to Mr. David Upton, manager as a processor to the client for whom I was assigned. Mr. Upton thanked me, and instead of putting me in a processing position, hired two non-Indian males for the position.

000089

Office of Human Rights and Equity Programs
12000 Government Center Parkway, Suite 318
Fairfax, Virginia 22035-0093
Phone: (703) 324-2953 ♦ Fax: (703) 324-3570
www.fairfaxcounty.gov/ohrep/

COMPLAINANT: <u>Ms. Nadine Ranade</u>
Page 2

3.  I suffer from a chronic episodic medical condition. When I had an episode of my condition in late 2010, I requested an accommodation. I was denied the accommodation I requested. The respondent did not offer an alternative accommodation. Instead, I was told by Ms. Jane Charlton, manager, and my immediate supervisor, I should, "Keep chugging along."

4.  In November 2010, I was placed on a PIP for allegedly not submitting status reports on time, issues with my time sheets, and poor communication. I did not agree with the decision, but made the best of the situation. I completed the PIP period successfully. I was assigned a new client, and the project was to last for ten weeks. I accomplished the project on time. Despite this, I was told on March 30, 2011 I was being terminated because I did not perform well. According to my manager, Ms. Charlton, the client said I did not prioritize well. I believe this is a result of my request for an accommodation.

For these reasons, I believe I am being discriminated against because of my sex, national origin, and disability.

RECEIVED
County of Fairfax
Office of Human Rights

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information, or belief.

FEB 1 0 2012

(Signature of Complainant)

Date received by
Human Rights Commission _____

NadineRanadeSCABRE.com

000090

# Exhibit 13

FILED

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

2012 SEP 18   P 1: 04

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| NADINE RANADE | ) |
| 2524 Walnut Leaf Lane | ) |
| Herndon, Virginia 20171 | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) |
| | ) |
| BT Americas, Inc. | ) |
| 11440 Commerce Park Drive | ) |
| Reston, Virginia 20191, | ) |
| | ) |
| Defendant | ) |
| | ) |
| Serve: | ) |
| Corporation Service Company | ) |
| Bank of America Center | ) |
| 16th Floor | ) |
| 1111 East Main Street | ) |
| Richmond, Virginia 23219, | ) |
| Registered Agent | ) |

Civil Action No. 1:12cv 1039
LO/TCB

## Complaint

Plaintiff Nadine Ranade, through her undersigned attorney, with knowledge as to

herself and upon information and belief as to all else, complains against Defendant as

follows:

### JURISDICTION

1.     This Complaint arises under federal law, to wit: the Family and Medical Leave

Act (hereafter "FMLA"), 29 U.S.C. § 2601, et. seq..

2.     This Court has jurisdiction to hear and determine this matter pursuant to 28

U.S.C. §1331 (federal question).



3.      The Defendants reside in this judicial district and all of the events or omissions giving rise to the claim occurred in this judicial district.  Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

4.      Plaintiff Nadine Ranade is a resident of the Commonwealth of Virginia, and had worked full time for BT Americas for more than 12 months at all times relevant hereto.

5.      Defendant BT Americas had more than 50 employees at all times relevant to this action, and maintained an office and was doing business in this judicial district. BT Americas was Ranade's employer within the meaning of the FMLA.

6.      Ranade first began working for BT Americas as an information systems consultant in March, 2007 and was hired as a permanent, full time employee in March 2008. Ranade was terminated from her employment on March 31, 2011.

7.      At all times during her employment, Ranade performed the duties of her position in a manner that reasonably met or exceeded her employer's legitimate business expectations.

8.      Beginning in June/July, 2010, Ranade began to experience severe neck and lower back pain related to a previously diagnosed herniated disc in her neck. Ranade sought treatment from a physician and advised her employer of her medical difficulties and course of treatment in the July/August, 2011 timeframe.

9.      On or about September 21, 2010, Ranade submitted a request for intermittent leave/part time scheduling to BT Americas on account of her health condition. Ranade submitted her physician's certification as required by her employer, indicating that it was medically necessary for her to work a reduced schedule of 4 hours per day between September 20 - December 15, and that she was expected to require medical treatment for

2

her condition on an average of two times per week between September and December, 2010.

10.     Ranade's request for a reduced work schedule under the FMLA was denied and Ranade was advised to simply continue working her regular schedule.

11.     At this same time, Ranade's quarterly performance evaluation was downgraded, and Ranade was placed on a Performance Improvement Plan to extend through January, 2011.

12.     Ranade successfully completed her Performance Improvement Plan in January, 2011, and was then given a 10 week project assignment.

13.     Ranade's assignment was completed successfully on or about March 30, 2011, however instead of being assigned a new project, Ranade was advised that she was terminated on April 2, 2011 for poor performance. BT America further alleged that Ranade had been dismissed from the project, however, the assignment had simply terminated, and instead Ranade had brought the project to a successful completion.

14.     BT America's allegations of poor performance were false, and began after her supervisor was advised of Ranade's ongoing health condition and request for a reduced schedule FMLA. Such allegations of poor performance further stand in sharp contrast to the glowing comments and praise of her previous performance evaluations.

## FMLA Violation

15.     Ms. Ranade suffered from a serious medical condition as that term is defined in 29 U.S.C. § 2611 and was entitled to claim the protections and benefits of the FMLA.

16.     BT America's denial of leave, the negative performance evaluations, the placement of Ranade on a Performance Improvement Program, and the termination of her employment constituted a willful violation of the FMLA.

WHEREFORE, Plaintiff Nadine Ranade demands judgment against Defendant for monetary and other damages suffered by her in amounts to be determined in a hearing of this matter, and further, Ranade seeks judgment and an award of damages for lost wages and benefits of employment, both past and into the future, reinstatement of employment or front-pay in lieu thereof, liquidated or statutory damages, declaratory and injunctive relief, pre-judgment interest, attorneys fees, costs of litigation including expert fees and any other relief to which she may be entitled.

## JURY DEMAND

Ranade demands a trial by jury.

RESPECTFULLY SUBMITTED

Nadine Ranade
By Counsel

Annette Kay Rubin
VSB # 34677
18 Liberty Street, SW
Leesburg, Virginia  20175
(703) 777-0034 (voice)
(703) 771-1753 (fax)
akr@annetterubin.com


Counsel for Nadine Ranade

4