# EXHIBIT

# 1

# Nadine Ranade Deposition

1          reporting to me on the project to make sure

2          these tasks get done so I would provide voice

3          services or data services to their various

4          sites.

5               Q.   Okay.  This was a -- was this a

6          technical project management position?

7               A.   Yeah.  Yeah.  Yeah.  Yeah.  It's all

8          technical.

9               Q.   And you did not have a sales role,

10         correct, --

11              A.   No.

12              Q.   -- in any way?

13              A.   No, sir.  No.

14              Q.   Okay.  And was there --

15              A.   Mm-hmm.

16              Q.   For example, when you were assigned to

17         the PepsiCo, --

18              A.   Mm-hmm.

19              Q.   -- project, is there a BT manager who

20         was responsible for the relationship --

21              A.   Yeah.

22              Q.   Let me finish.

23                   -- between Pepsi and BT?

24                   Yes?

25              A.   Yes.  There's a sales account manager.

Page 71

1        being an account manager, was Sepheri -- how do

2        you pronounce it?

3              A.    He -- he was --

4              Q.    How do -- how do you say his last

5        name?

6              A.    Sepheri.

7              Q.    Was Mr. Sepheri the account manager

8        for Unilever as far as --

9              A.    He's account director, actually,

10       Mr. Sepheri.  And he was directly responsible

11       and very active, actually.  He was very present

12       and, you know, around at meetings and stuff.

13              It was very unclear at Capital Group,

14       which was a very short-term, eight to ten-week

15       engagement with Capital Group, and there were

16       two managers there.  Um, I -- I hate myself

17       because I can't remember the other account

18       manager's name.  And David Upton was there, as

19       well, but the other person was also an account

20       manager.

21              Q.    Okay.  So there were two account

22       managers on Capital Group.  Is that what you're

23       saying?

24              A.    Yeah.  Yeah.

25              Q.    And --

1          Q.   Okay.  How would you describe or

2     characterize your relationship with Jayne

3     Charlton while you worked at BT?

4          A.   I had no issues in terms of my

5     relationship with Jayne up until summer of 2010.

6          Q.   Did you and Ms. Charlton ever interact

7     outside the office?

8          A.   Um, we just had professional lunch

9     maybe a couple of times.  She actually lived far

10    away, so sometimes I drove up halfway to meet

11    with her at some restaurant to discuss a few

12    things.  That's it.

13         Q.   Okay.  Since leaving BT, have you had

14    any contact with Ms. Charlton?

15         A.   Yes.  Um, it -- I was shocked,

16    actually.  I was unemployed after I was

17    dismissed from BT for almost a year -- a little

18    over a year maybe.  But then I was offered a

19    position at AT&T in Oakton, Virginia, and I

20    joined in early April, I believe.  I was offered

21    -- late March, early April.

22         Q.   Of 2013?

23         A.   2012.

24         Q.   2012?

25         A.   April of 2012.

1    do things, never gave advice in terms of what

2    the client is expecting.  He left it up to me to

3    figure that out and do the way -- things that I

4    would normally manage, as I have done in other

5    projects.

6             And, actually, the -- the way I

7    conducted the business, I completely delivered

8    the project within that 10 weeks --

9         Q.   My question to you --

10        A.   Mm-hmm.

11        Q.   -- was about your relationship with

12   David Upton.

13        A.   Yeah.  I -- I just felt that he was

14   not very straightforward.

15        Q.   Okay.  But I think you described him

16   as letting you do your -- whatever you would

17   normally do, --

18        A.   Mm-hmm.

19        Q.   -- correct?

20        A.   Yeah.  Yeah.  And he never made any

21   corrections.  And he actually said, yeah, that's

22   good.  You know, he never -- he looked at my

23   status reports, which were weekly.  I actually

24   conducted formal, in-person weekly meetings with

25   the client.  He attended all of those meetings.

1      Q.   -- how would you characterize or

2   describe your relationship with him while you

3   were employed at BT?

4      A.   Professional.  He was same as, you

5   know, any other manager -- account manager.

6      Q.   Okay.  Do you have any understanding

7   of how Mr. Sepheri viewed you or your

8   performance?

9      A.   He actually gave very good reviews.

10   He actually gave a very positive performance

11   review to Jayne about my performance, in

12   writing.  I believe so.

13      Q.   Okay.  Anything else?

14      A.   I don't recall anything.  It's been

15   some time.

16      Q.   Have you had any interactions -- any

17   communications whatsoever with Mr. Sepheri since

18   leaving BT?

19      A.   No.

20      Q.   The assignment that you worked on for

21   Mr. Sepheri, Procter & Gamble, --

22      A.   No.  Unilever.

23      Q.   I'm -- I apologize.  Unilever.  Is

24   that the only time you worked with him?

25      A.   Yes.

1          Q.    And Debra Gessell --

2          A.    Mm-hmm.

3          Q.    -- was also on the Unilever account;

4     is that right?

5          A.    Yes.

6          Q.    Okay.  And -- and what was your

7     relationship with her?

8          A.    She was doing -- she was responsible

9     for different projects than what I was working

10    on.

11         Q.    And how would you describe or

12    characterize your relationship with Ms. Gessell.

13         A.    It was just professional, you know,

14    day-to-day.  She -- she answered any questions

15    if I had any, but nothing -- nothing more.  I

16    mean --

17         Q.    Do you have any idea of how -- or

18    understanding of how she perceived your

19    performance?

20         A.    She never, um -- I -- I couldn't trust

21    her at times.  I felt that way.  I'll be honest

22    with you.

23         Q.    My question to you --

24         A.    Mm-hmm.  No, she never gave me any

25    direct feedback or negative feedback about

Page 83

1    anything.

2          Q.   Did she give you any positive

3    feedback?

4          A.   She was never part of my project or

5    meetings.

6          Q.   I'm sorry.  This is going to really go

7    too long if you're not answering my questions.

8          A.   Right.

9          Q.   The question was, --

10         A.   Yeah.

11         Q.   -- did she --

12         A.   Give any feed --

13         Q.   -- give you -- do you have any

14   understanding of how she perceived you or your

15   performance?

16         A.   I didn't --

17         Q.   And if you do, you do; if you don't,

18   you don't.  But you can't answer other

19   questions.

20         A.   I don't recall having any direct

21   feedback from Debra myself.

22         Q.   Any indirect feedback from her?

23         A.   I don't remember.  No.

24         Q.   Okay.  You also referenced someone

25   named Len?

1          Q.    Anything else?

2          A.    Presentation stuff that I --

3          Q.    Any e-mails?

4          A.    Oh, no.  I don't have that.  Because

5    they took my laptop, and I have no way to back

6    that up.

7          Q.    The PowerPoint that you presented --

8          A.    Mm-hmm.

9          Q.    -- that you put together on soft

10   skills, --

11         A.    Mm-hmm.

12         Q.    -- did you present that training?

13         A.    Yes.  Yes.  It was very well-attended.

14         Q.    And what were the deficits in soft

15   skills, or what was the area that Jayne Charlton

16   told you you needed to improve in terms of soft

17   skills?

18         A.    She never gave me any particular

19   feedback or -- or nailed down on a particular,

20   um, thing about soft skills.

21              In general -- for example, like, you

22   know, about P&G, I mentioned the person's name

23   Barbara.  She was the program manager.  And had

24   some interaction with Barbara.  Barbara, I felt,

25   was a bit insecure.  And she somehow felt -- you

1     know, she -- there were just negative vibes.  I

2     tried very hard to build a relationship with

3     Barbara because, with certain client and program

4     management relationship, sometimes you build a

5     relationship with that individual to make them

6     comfortable in terms of them trusting you, you

7     know, professionally and stuff.  And so -- so I

8     would -- I even went to the length of asking

9     her, do you want to have lunch and let's talk

10    and stuff.  You know, and I wasn't very good at

11    those things because I felt I have to do my

12    work, deliver the project, and be done with it.

13         Q.   So when you say you were not good at

14    those things, what are the things that you were

15    referring to that you were not good at?

16         A.   I would say, like, relationship

17    building in terms of, like, you know, being

18    a little more political in terms of, you know

19    -- so I tried, and it didn't work with Barbara.

20    But then I came back, and -- and I told my

21    colleagues the whole story, and they said it

22    would have never worked with Barbara, because

23    they had some other experiences.

24         Q.   Who else had similar experiences with

25    Barbara?

```
 1              Q.   So in your view, --

 2              A.   I wasn't --

 3              Q.   Let me finish, please.

 4              A.   Mm-hmm.

 5              Q.   Your view is that the project

 6    naturally expired and that you moved on to

 7    another project?

 8              A.   No.   Barbara asked Steve, who was

 9    the -- I don't know his title.   Barbara went to

10    Steve, and he says, no, I want someone else to

11    join.

12              Q.   Okay.   Were you kicked off the

13    project?

14              A.   I wasn't renewed on the project.   The

15    reason I'm -- I'm going to say that is because

16    each contract is annual, and it was my year-end

17    about to happen.   I wasn't renewed on the

18    project, and --

19              Q.   Is that a -- a positive or a negative

20    thing for your career, to not be renewed on a

21    project that you had been on?

22              A.   Neither.

23              Q.   Your -- is it your view today --

24              A.   Mm-hmm.

25              Q.   -- that your not being renewed on
```

1    this project was neutral in terms of your -- a

2    comment on your job performance?

3         A.    Um, it's not viewed negatively

4    in -- in consulting profession, because there

5    are turnarounds quite significantly.

6         Q.    Was it viewed negatively by BT?

7         A.    By Jayne?

8         Q.    Yeah.

9         A.    Jayne, yeah.  Because she came back

10   and told me about doing this workshop on soft

11   skills, based on what Barbara said.

12        Q.    No.  I'm asking -- and I appreciate

13   that, but I'm asking you about being -- not

14   being renewed -- that's your language -- on this

15   project.

16        A.    Mm-hmm.

17        Q.    Did Jayne view that as a -- as a

18   negative reflection on your job performance?

19        A.    She never came across and said that

20   -- that this doesn't --

21        Q.    You don't know that to be true, that

22   Jayne and other managers at BT viewed your being

23   pulled off the Procter & Gamble assignment as

24   being a very significant negative to your job

25   performance?

1              MS. RUBIN:  Objection.  Assumes facts

2        not in evidence.

3        BY MR. BROWN:

4              Q.   Is -- is -- is my -- is my saying that

5        the first time you're ever hearing that?

6              A.   I -- I did not -- personally, I didn't

7        view it, because I was on --

8              Q.   I understand that you didn't view

9        that.

10             A.   Yeah.

11             Q.   I understand that.  My question is, --

12             A.   Mm-hmm.

13             Q.   -- did management at BT, Jayne, Terry

14        or others, --

15             A.   Mm-hmm.

16             Q.   -- is it your understanding --

17             A.   They never came across and -- and made

18        it clear to me --

19             Q.   Okay.

20             A.   -- that this --

21             Q.   But did you have an understanding

22        that they viewed it as negative -- a negative

23        reflection on your job performance to be not

24        renewed on this Procter & Gamble assignment?

25             A.   They should have communicated that to

1        Q.    I said fall of 2009.

2        A.    I don't remember the exact time

3   frames, yeah.

4        Q.    Okay.  But do you remember in --

5        A.    Jayne did.

6        Q.    -- in or around the --

7        A.    Yeah.

8        Q.    -- towards the end of 2009 being given

9   30 days' notice that you were going to be

10  removed from the project?

11       A.    Jayne said, yeah, we are going to

12  -- you know, we are going to take you off P&G,

13  you're not going to be renewed on that, and

14  you're going to move on to Unilever account.

15       Q.    Okay.  And did -- and was it ever

16  reflected to you -- relayed to you, I should

17  say, that the reason for your removal and not

18  being renewed on the project was because of

19  personality conflicts between you and the

20  Procter & Gamble site manager?

21       A.    No.  No.  It was Barbara.  It was

22  communicated as personality issue -- I mean,

23  relationship issue with Barbara.

24       Q.    After you were notified --

25       A.    Mm-hmm.

1      invite them to my kickoff calls.  If I missed

2      someone accidentally, it is not by purpose.

3           Q.    Right.  And I'm not asking -- and I

4      just want to be clear --

5           A.    Mm-hmm.

6           Q.    -- whether you believed this to be

7      justified or not, but is it your understanding

8      that Procter & Gamble was not pleased your

9      performance?  Whether you think that was right

10     or not, is it your understanding that Procter &

11     Gamble didn't want you on their account any

12     longer?

13          A.    I disagree with that --

14          Q.    Okay.

15          A.    -- strongly.

16          Q.    You don't have any understanding that

17     Procter & Gamble wanted you off their account?

18          A.    Only on this project.  I worked on

19     several projects with Procter & Gamble.  So

20     making a blatant statement like Proctor & Gamble

21     was unhappy, because I have a director and

22     manager from Procter & Gamble, who actually gave

23     me great reviews in writing, --

24          Q.    I'm talking about -- fair point.  I'm

25     talking about this project, the Mehoopany

1      The reason being, I never received any

2      communication from Procter & Gamble directly

3      giving me that feedback.

4          Q.   Did anyone give you that feedback,

5      like Jayne, that Procter & Gamble didn't want

6      you on the account anymore?

7          A.   No.  Jayne -- Jayne did not tell me

8      specifically that Procter & Gamble didn't want

9      me on the account.  It's that Barbara didn't

10     want me on the account.

11         Q.   Barbara didn't want you on the

12     account, correct?

13         A.   Right.  And Barbara is responsible.

14     She can remove people and pick people.  She's

15     project manager for Procter -- for BT.

16         Q.   Are you aware -- are you aware of her

17     removing anyone else, other than you --

18         A.   Yes.  I don't know the names because

19     I --

20         Q.   -- from projects based on -- let me

21     finish -- based on -- on her perception of their

22     job performance?

23         A.   She turned around several project

24     managers --

25         Q.   Who?  Who?

Page 141

1           A.    I don't remember anyone's names.  But

2      if you do research, I'm sure you can find --

3           Q.    Can you describe who they are?  Were

4      they men?  Were they women?  Were they -- who --

5      who were they?

6           A.    I -- honestly, I -- I mean, there were

7      many men and there were many women.  So I cannot

8      say it's gender-related.  But -- but one -- but

9      I do want to point out one thing, though, that

10     this discussion about P&G because -- came up

11     during my board presentation in March, you know,

12     when I was a principal.  Because this was the

13     only issue that they kept telling me to wait, so

14     I brought it out and open for discussion with

15     the board members.  And I said, here's what

16     happened.  This is what transpired.  And this

17     direction came from Barbara Dodd to remove me

18     from the account based on these things.

19           So one of the board members laughed

20     and resonated with me and says, I'm not

21     surprised.  Barbara has personality issues.

22           Q.    You weren't promoted, right?

23           A.    No.

24           Q.    The board didn't recommend your

25     promotion?

```
 1        give --
 2                    MR. BROWN:  Can I have the question --
 3                    THE REPORTER:  Sure.
 4                    MR. BROWN:  -- and the answer, please?
 5                    THE REPORTER:  Sure.
 6                    (Referred-to testimony read back.)
 7        BY MR. BROWN:
 8             Q.    All right.  So Capital Investment
 9        Group is one?
10             A.    Asset Group.
11             Q.    Okay.  Capital Asset Group.
12             A.    I think so.  I'm not sure about the
13        name -- full name.
14             Q.    But that's one you were kicked off for
15        poor job performance?
16             A.    Not poor job performance.  I completed
17        the engagement, and then I was not renewed on
18        the account, even though I was expecting.  They
19        placed another program manager on the account.
20             Q.    Was that -- were you replaced --
21             A.    No, not replaced.  The engagement
22        ended.  I completed the term of the engagement,
23        and -- and then the client was so happy with our
24        work that they came back, gave return business
25        to -- to BT.  And I was expecting in my mind
```

Page 156

1    that I would get -- go back to that account,

2    and, whatever transpired, they had put a more

3    senior program manager there.

4         Q.   Okay.  So you don't know that you were

5    kicked off the Capital Asset account?

6         A.   It was not -- it was a 10-week

7    engagement, per Jayne, in writing.

8         Q.   Okay.  What about Unilever?  Are you

9    aware that Unilever had asked you to be removed

10   from the project?

11        A.   Um, Debra Gessell had -- she actually

12   informed Jayne to take me off, and that happened

13   due to my sick leave.

14        Q.   You believe that had to do with your

15   sick leave --

16        A.   Yes.

17        Q.   -- and not Unilever being dissatisfied

18   with your performance?

19        A.   That's right.  I have never received

20   any communication from Unilever.

21        Q.   But forget communication from

22   Unilever.  What about from BT --

23        A.   Yeah.  It was --

24        Q.   -- that Unilever was dissatisfied with

25   your performance?

```
1        ranking --
2             A.   Mm-hmm.
3             Q.   -- of development needed.  Do you see
4        that?
5             A.   Yes.
6             Q.   Okay.  That's below achieved
7        standards, right?
8             A.   Yes.
9             Q.   And that's below good?
10            A.   Mm-hmm.
11            Q.   Yes?
12            A.   Mm-hmm.
13            Q.   Yes?  Please say yes.
14            A.   Yes.
15            Q.   Okay.  Do you have any understanding
16       of what development needed meant?
17            A.   I had requested for leave.  I -- I
18       really got sick that summer.
19            Q.   No.  No.  No.
20            A.   Mm-hmm.
21            Q.   My question to you is, --
22            A.   Mm-hmm.
23            Q.   -- do you know what development needed
24       meant?
25            A.   No.  My manager never explained to
```

1      me.  I asked her specifically what type of

2      development are you referring to and I disagree

3      with you.  I actually wrote it down on my

4      performance review that I disagreed with this

5      rating and review.  I specifically communicated

6      to her.  And she said, no, don't worry about it.

7      This will be all good for you.  Take it

8      positively and constructive -- as a constructive

9      feedback.

10             I said, okay.  And I -- I kind of

11     felt really more personally bad because I had

12     recently asked her for leave.

13             Q.   All right.  Do you have any

14     understanding of what development needed meant?

15             A.   That means you are lacking in

16     something and you need some development, that

17     your manager should advise you that you need to

18     develop in this area -- specific area.

19             Q.   Is it the lowest rating you could

20     possibly get?

21             A.   No.

22             Q.   What's the lowest rating you could

23     get?

24             A.   Unsatisfactory.

25             Q.   Okay.  Is this the rating right above

Page 172

1      their perception?  I'm not asking you whether

2      you agree.

3            A.    Mm-hmm.

4            Q.    My question to you is, do you recall

5      that Unilever --

6            A.    Mm-hmm.

7            Q.    -- wanted you removed from the account

8      prior to the end of the contract period because

9      they perceived you negatively?

10           A.    She might have mentioned that to

11     me, --

12           Q.    Okay.

13           A.    -- mm-hmm.

14                 It has to be if you're being removed

15     from some account.  Could be something that they

16     don't like.

17           Q.    Mm-hmm.

18                 What was it that they didn't like

19     about your performance?

20           A.    They didn't want me to work part

21     time on the account.  They needed -- they

22     specifically stated they want full time -- the

23     account manager, which is Debra.  There was a

24     conference call done between me, Jayne Charlton

25     and Debra.  And I -- my doctor had advised me to

1          Q.    But maybe -- and I'm happy to show it

2     to you.

3          A.    Mm-hmm.

4          Q.    Maybe this refreshes your recollection

5     that your PIP started September 14th of 2010.

6                Does this help you in any way recall

7     that time frame, Ms. Ranade?

8          A.    Yeah.  She -- she messed up with me

9     on -- I think -- okay.  December 14th, okay.

10         Q.    Do you recall now -- I'll take that

11    back.

12         A.    Mm-hmm.

13         Q.    Do you recall now that your

14    Performance Improvement Plan started in or

15    around mid-September of 2010?

16         A.    After seeing this document, I recall

17    the date.

18         Q.    Yeah.  Do you recall that prior -- or

19    weeks prior to being put on the PIP --

20         A.    Mm-hmm.

21         Q.    -- having conversations with Jayne

22    Charlton about how Unilever and others were not

23    satisfied with your performance?

24         A.    No.  No.  She never -- she never

25    mentioned anything that would be very alarming

1    or anything that would be of great deal concern;

2    however, --

3        Q.    The PIP --

4        A.    -- I had requested her, starting

5    July/August time frame, verbally, to cut down my

6    hours, because I'm not --

7        Q.    I don't know what you're talking

8    about.  I don't know what question you're

9    answering.

10        A.    I'm just --

11            MS. RUBIN:  She's explaining to you

12    the time frame.

13    BY MR. BROWN:

14        Q.    My question to you was, prior -- well,

15    prior to receiving the PIP, did Jayne Charlton

16    talk to you about Unilever and other clients --

17    and others, I'm sorry, being dissatisfied with

18    your performance?

19        A.    I don't -- I don't recall.  Yeah.

20    Whatever you have discussed right now, that's

21    all I know.

22        Q.    So whatever I show you is what you

23    remember.  You don't remember independently that

24    prior to getting the PIP in September -- on

25    September 14th that Jayne Charlton had --

```
1        perception -- a negative perception.
2                 So I asked her, can you please be
3        specific who, when, what, so I can work with
4        that individual.  That was never clarified to
5        me.
6             Q.   Okay.  And that conversation took
7        place when?
8             A.   I don't remember the time frame of
9        that conversation.
10            Q.   Was that conversation in or around
11       August of 2010?
12            A.   It's possible.
13            Q.   Okay.  When you received the PIP, --
14            A.   Mm-hmm.
15            Q.   -- that wasn't a -- you had been told
16       it was coming.  Isn't that also correct?
17            A.   No.
18            Q.   It was a surprise to you?
19            A.   It was a surprise to me.  She called
20       me in the conference room --
21            Q.   Mm-hmm?
22            A.   -- and she says, here's what it is.
23       I'm going to put you on this.  And I said,
24       Jayne, I don't -- I don't understand.  I have
25       delivered more projects on any of the accounts.
```

```
1          If you cumulatively take a look at other
2     consultants and my delivery record, it
3     specifically stands out.
4               And she says, no, Nadine.  It's going
5     to help you with your perception, and it's going
6     to help you with your soft skills.
7          Q.    What do you think the PIP was about?
8     Why -- why do you think you were put on a PIP?
9          A.    I -- she -- she put me --
10         Q.    You've read it, right?
11         A.    Yeah.  And I totally disagreed with
12    her.  And that was done right after -- while I
13    was going through medical treatment and I
14    requested for leave and I requested to cut down
15    my hours and she put me on PIP.
16         Q.    You remember, do you not, in September
17    of '09, receiving coaching, right?
18         A.    About?
19         Q.    Around -- in response to the principal
20    review board decision of deferment?
21         A.    Not from Jayne.
22         Q.    I didn't -- do you recall receiving
23    coaching?
24         A.    Around September of --
25         Q.    Of '09.
```

Page 186

1      Q.   Do you remember in August, and in
2   particular, August 26, 2010, that there was a
3   conference call addressing negative feedback
4   from Dez Kerr, K-e-r-r, and Dez is D-e-z, a
5   Unilever managing consultant, and Afshin?  Do
6   you remember that in August of 2010?

7      A.   I don't remember.  I'll be
8   honest with you.  I'll have to -- there was a
9   conference call.  I do recall the name Dez,
10  but I don't remember the context of it.

11     Q.   Do you remember that it -- it may have
12  related to your being exited from Unilever four
13  months prior to the expiration of the term?

14     A.   I don't recall that, because I
15  actually left Unilever in, I believe, December.

16     Q.   Yeah.  I'm talking about August, end
17  of August.  And I'm telling you that Unilever
18  wanted you off the account in August.

19     A.   I -- this is around the same time I
20  was requesting to --

21     Q.   No, it isn't.

22     A.   Yes, it is.  It is.

23     Q.   Okay.  All right.

24     A.   It is.

25     Q.   If that's your recollection, then

1     understand and evaluate yourself --

2         A.   Mm-hmm.

3         Q.   -- and how you're perceived by others.

4     Do you remember this?

5         A.   I -- I don't remember.  But now I'm

6     seeing it in writing.  Except for receiving

7     these comments from Jayne, particularly, I

8     have never received any other comment from

9     neither of my clients, nor any other BT manager

10    or colleague.  So Jayne was the only person who

11    had been, you know, writing these sorts of

12    things.

13        Q.   And she was your direct supervisor,

14    right?

15        A.   I understand.  But -- but there's

16    communication between other people, as well.  An

17    -- an -- an account manager --

18        Q.   Well, this was relaying --

19        A.   Account manager is supposed to get

20    feedback and they can give it back to me, as

21    well.

22        Q.   But isn't she relating -- relating to

23    you here, and other -- and at other times, that

24    Unilever wasn't satisfied with your performance.

25        A.   I -- I'm not sure if she has

1          phone call I got a week before she dismissed me

2          from HR that do you -- are you still suffering

3          from any kind of pain?  And I, like an idiot,

4          said, no.  And they dismissed me the following

5          week.

6                    I was never contacted by any HRMC

7          during those 90 to 120 days.

8               Q.   The next bullet says, Nadine

9          is focused on her technical and professional

10         development and certifications and extending

11         that info to others via delivering KQs.

12                   Do you see that?

13              A.   Yes.

14              Q.   Was that addressed with you, as

15         well, that you were focused and technically

16         proficient?

17              A.   Yeah.

18              Q.   Is that accurate?

19              A.   That statement is.

20              Q.   Yeah.  So that part is accurate, but

21         the one before it is not, right?

22              A.   I never got a call.  I don't even know

23         who was HRMC who communicated with me.

24              Q.   My question was, this bullet is

25         accurate, but the one before it is not, right?

Page 229

1          Q.    Okay.  I'm sorry.  Mid-January of

2     2011, right?  You were put on the PIP --

3          A.    No.  I was --

4          Q.    -- in September --

5          A.    In September of 2010, and the --

6          Q.    Right.  And the PIP ended in --

7          A.    First or second week of June.

8          Q.    Of 2011?

9          A.    Yes.

10         Q.    Okay.  Were there any negative

11    performance critiques from your manager or any

12    other supervisors at BT, or clients of BT, about

13    your performance?

14         A.    No.

15         Q.    No?

16         A.    No, not that I recall.  I wasn't --

17         Q.    Okay.  You've answered the question.

18               You -- when did you begin working on

19    the Capital Group account?

20         A.    November.

21         Q.    November of 2010?

22         A.    Yes.

23         Q.    Okay.

24         A.    And the engagement was eight to ten

25    weeks, so it ended by February 8th or February

```
1        10th.
2              Q.   Of 2011?
3              A.   Of 2011, yes.
4              Q.   I'll show you an e-mail from Jayne
5        Charlton to you --
6              A.   Mm-hmm.
7              Q.   -- dated March 14th, 2011.
8                   (Deposition Exhibit No. 13, an e-mail
9        from Jayne Charlton Nadine Ranade dated March
10       14, 2011, was marked.)
11                  THE REPORTER:  Oh, I'm sorry.  That
12       was Number 13.
13       BY MR. BROWN:
14             Q.   Looking at what has been marked
15       for identification -- identification as Company
16       13, which is an e-mail from Jayne Charlton to
17       yourself dated March 14th, 2011, at 2:52 p.m.
18       Now, will you take a moment and review this and
19       tell me if you recall receiving this?
20             A.   Yeah, I did -- I kind of remember this
21       one, yeah.
22             Q.   Mm-hmm.  And what, if any -- did you
23       -- did you have any -- well, tell me what you
24       recall about the phone conversation, if
25       anything, before you got this e-mail.
```

Page 232

1      document here, she must have called me.

2              Q.   Okay.  Do you recall reaching out to

3      or communicating with David Upton about this

4      feedback?

5              A.   I didn't have enough time because they

6      dismissed me right away.

7              Q.   Okay.  You were dismissed right after

8      this, correct?

9              A.   Mm-hmm.

10             Q.   Okay.  I'm sorry.  Just for the

11     record, yes?

12             A.   Yes.  They -- they dismissed me right

13     after.

14             Q.   Okay.  Do you recall being advised

15     that Capital Group didn't want you working with

16     them any longer?

17             A.   Yeah.  Jayne told me that they don't

18     want you as a PM --

19             Q.   Mm-hmm.

20             A.   -- over there; however, our

21     engagement had terminated by February 10th.

22     So I successfully completed and delivered the

23     project, and then they had returned business.

24     Because of my work, BT got an extensive project

25     with Capital Group.

1         Q.   Do you think that you were successful

2    in working with this client?

3         A.   I delivered the product.

4         Q.   Mm-hmm.

5         A.   And as --

6         Q.   But do you believe you were successful

7    in working with this client?

8         A.   For the job I did, yes; however, they

9    were looking for a more senior program manager

10   when they gave return business to BT.  So they

11   specifically said we don't want this PM.

12        Q.   And that -- the PM that they

13   specifically didn't want was you?

14        A.   That's what it says in here.

15        Q.   I know it's what it says in there,

16   but do you recall that being communicated to

17   you, that the client wanted to continue working

18   with BT but just not you?

19        A.   That's what Jayne came and told me, --

20        Q.   Mm-hmm.

21        A.   -- that they don't want me --

22        Q.   Do you --

23        A.   -- back.

24        Q.   Was it communicated -- but you -- but

25   you still view your performance with this client

Page 236

```
 1          takes a long time to build a solid relationship
 2          with any client.
 3               Q.   You understand, don't you, after
 4          reading this, --
 5               A.   Mm-hmm.
 6               Q.   -- and maybe your memory is refreshed
 7          on this, --
 8               A.   Mm-hmm.
 9               Q.   -- that they no longer wanted you
10          working with them, --
11               A.   That's correct.
12               Q.   -- right?
13               A.   Yeah.
14               Q.   Okay.  And how soon after this was
15          communicated to you, what were -- what we're
16          talking about right now with Capital Group, were
17          you --
18               A.   Mm-hmm.
19               Q.   I'm not done.
20                    -- were you fired?
21               A.   They let me go within a -- they told
22          -- they informed me by March 28th or 27th -- I
23          don't remember exact date, but it was between a
24          week, ten days.
25               Q.   Okay.  Now, between the time period
```

Page 237

1          that you're no longer working on the Capital

2          account --

3                  A.   Mm-hmm.   Mm-hmm.

4                  Q.   -- and the termination of your

5          employment, --

6                  A.   Yes.

7                  Q.   -- you had been placed on the bench;

8          is that right?

9                  A.   Yes.

10                 Q.   And what does being on the bench mean?

11                 A.   That you -- that your manager is

12         finding another project for you during that time

13         frame.

14                 Q.   You don't have a -- an assignment at

15         that point?

16                 A.   You don't have an assignment.

17                 Q.   Okay.   And are you being paid at that

18         time?

19                 A.   Yes.

20                 Q.   Okay.   When you were benched, --

21                 A.   Mm-hmm.

22                 Q.   -- or, I should say, prior to being

23         benched, --

24                 A.   Mm-hmm.

25                 Q.   -- do you recall Jayne Charlton

1            (Deposition Exhibit No. 16, a document

2      titled complaint, was marked.)

3            THE REPORTER:   Number 16.

4      BY MR. BROWN:

5            Q.   Why are you suing BT?

6            A.   Two reasons:   I mean, the current one

7      is, basically, I felt that I really needed some

8      time off, I was suffering, and my manager denied

9      leaving.   That's primary.

10           Secondly, as soon as I presented my

11     principal management case, they started dinging

12     me from every way possible they could.

13           And, thirdly, when I perceived

14     that -- she talks about perception, my manager,

15     all the communication is only one individual,

16     which is Jayne Charlton, when I tried, my

17     colleagues advised me, Nadine, there is so many

18     other groups and managers here, go and talk to

19     someone.

20           And when I tried to do that, if you

21     see, she has blatantly written in here about

22     trust and violating trust, because she -- she

23     probably found out that I asked somebody else

24     about career opportunities or she's too out

25     -- open about discussing career opportunities.

Page 262

1      question.

2           A.    Mm-hmm.

3           Q.    You -- are you alleging that the basis

4      for your -- the termination of your employment

5      is based on anything other than your having

6      requested leave?

7           A.    I'm basing that when I started

8      discussing with her about my health issues in

9      August -- July/August time frame and I need to

10     cut down my hours, and I -- and I said I need

11     time off or just do four hours, you know, a day,

12     and she said -- and my -- I had to go to

13     physical therapy two, three times a week.  And

14     she goes, oh, Nadine, just juggle.  Just juggle

15     your hours.  That was -- as administrative

16     manager, I would never advise any employee to do

17     that, because it's not productive on a project.

18                She should have -- when -- when an

19     application was submitted for leave, she should

20     have taken me off this account, because you knew

21     we were -- Deb said they said we want somebody

22     full time on this account.  And she should have

23     taken me off that account and placed someone

24     else and given me part-time leave.

25          Q.    Do you --

Page 263

```
 1              A.   She denied that.
 2              Q.   -- believe that you were discriminated
 3     against in any manner during your employment
 4     with BT based on your gender?
 5              A.   That's -- I believe --
 6              Q.   It's a -- it's a -- I don't know
 7     what you're about to say, but it's kind of a
 8     straightforward question.  It's either a yes or
 9     a no.
10              MS. RUBIN:  Well, you asked her what
11     she believes, and she was just saying, I
12     believe.
13              MR. BROWN:  Does she believe it.
14     BY MR. BROWN:
15              Q.   Okay.  What do you believe?  Do you
16     believe you were discriminated based on your
17     gender?
18              A.   I believe because of my illness.
19              Q.   Oh, so not based on your gender?
20              A.   I don't know.  It could be.  It could
21     be anything, because I -- I -- I -- based on
22     gender I was denied promotion also.  Because
23     there was another group member, Mark, who was
24     much less educated and inexperienced, and a
25     number of years less senior to me, who was given
```

1          Q.    Do you know why Jayne wanted to
2    terminate -- terminate your employment?
3          A.    It's just she's seeing that I couldn't
4    -- I asked for leave, I'm a sick person, and I
5    won't be able to perform, maybe I'll get sick
6    again, and -- and I would be -- I won't be able
7    to perform like I have in past.
8          Q.    Did she ever say that to you?
9          A.    Nobody would say something blatantly
10   like that.
11         Q.    Okay.  But you're -- you believe that
12   that was that was her motivation?
13         A.    That's -- the paper trail shows
14   -- demonstrates that to me.
15         Q.    And what paper trail are you referring
16   to?
17         A.    When she downgraded -- started
18   downgrading my reviews, and -- she even said
19   -- first she told me to juggle my time while I
20   went for therapy, and then she puts down on the
21   PIP that I'm not allowed to take any sick leave.
22         Q.    Let's talk about gender discrimination
23   for a moment.
24         A.    Mm-hmm.
25         Q.    In what way do you believe that Jayne

```
 1            A.    No.   Um, I believe I presented -- when

 2      I went to doctor's office first time, I gave my

 3      manager notification about that.   And I also

 4      gave her notification starting in August that I

 5      have -- my doctor's told me to do some physical

 6      therapy.   I'm suffering.

 7            Q.    Okay.  So let me be -- be clear in my

 8      question.

 9            A.    Mm-hmm.

10            Q.    The doctors don't -- that I'm

11      referring to dated September 23rd, 2010, --

12            A.    Mm-hmm.

13            Q.    -- was that the first doctor's note

14      that you had presented to BT of -- requesting

15      that you be --

16            A.    Leave.

17            Q.    Requesting leave and that you

18      accommodated in any way?

19            A.    Yes.

20            Q.    Okay.  And -- and what was the request

21      for the accommodation?

22            A.    To cut down my hours and put me on

23      part-time leave.

24            Q.    Okay.  And, in particular, --

25            A.    Mm-hmm.
```

Page 289

1    opposed to a part-time schedule, which is what

2    your doctor had proposed.

3         A.    Um, I really don't know all the rules

4    and regulations about that, so I really don't --

5         Q.    So you're testifying.  I'm not.

6         A.    Yeah.

7         Q.    So let me -- but I do want to ask you

8    about this.

9         A.    Mm-hmm.

10         Q.    So does -- does this refresh your

11    memory in any way that, while BT would not give

12    you the flex time, the four hours' flex time,

13    the alternatives were presented to you that you

14    could either go out and not get paid at all, --

15         A.    Mm-hmm.

16         Q.    -- you could -- you could request

17    short-term disability, you can go out on

18    short-term disability or, if medically

19    certified, could you come back to work?

20              Did anyone ever say that to you?  Do

21    you remember that at all?

22         A.    I'm seeing this right now, --

23         Q.    Mm-hmm.

24         A.    -- but, honestly, I don't recall,

25    right?  However, but due to the financial

Page 290

1       situation, I would not have been able to go

2       unpaid completely.  And I -- I cannot take full

3       leave because I'm able to function part time.

4       My doctor said you are able to work part time,

5       so it made no sense for me to take a full

6       leave, --

7              Q.   Okay.

8              A.   -- when I only requested that, you

9       know, I just need to cut my hours.

10             Q.   Okay.  So let me show you --

11                  (Deposition Exhibit No. 20, an e-mail

12      from Jan Escalante to Ms. Ranade dated October

13      6th, 2010, was marked.)

14      BY MR. BROWN:

15             Q.   I'm showing you a document --

16             A.   Mm-hmm.

17             Q.   -- marked Company Exhibit 20?

18             A.   Mm-hmm.

19             Q.   All right.  It's an e-mail from Jan

20      Escalante to you, dated October 6th, 2010.

21             A.   Mm-hmm.

22             Q.   And it says, it was nice speaking to

23      you this afternoon.  You advised that you have a

24      doctor appointment this afternoon --

25             A.   Mm-hmm.

1          constraint about working four hours was as a

2          result of a denial of me working four hours

3          flextime, which was not -- my client was not

4          accommodating that, neither was my manager.  She

5          had turned it down.

6     BY MR. BROWN:

7          Q.    The flex time?

8          A.    Yeah.  She --

9          Q.    But the block time, --

10         A.    The block time, I would have lost my

11    job, she -- she blatantly said, because I don't

12    have any other account for you to work on.

13         Q.    But would you have been put on the

14    bench?

15         A.    The bench time is only, like, 30 to 60

16    days, and then you are fired.

17         Q.    So could you have been put on the

18    bench?

19         A.    Well, if I was put on -- yeah, I could

20    have -- she could have put me on bench.

21         Q.    And could there have been a position

22    that opened while you were on the bench that

23    could have accommodated a four-hour block?

24         A.    Yes.

25         Q.    Now, let me ask you this, --

Page 312

1    remember calling Cigna and understanding their

2    process of appeal.

3        Q.   Do you remember being denied

4    short-term disability by Cigna?  Not Jayne

5    Charlton, by Cigna the carrier?

6        A.   I didn't receive any correspondence

7    from them.  I really didn't.  I do remember

8    calling them, but I had -- I have nothing -- no

9    correspondence.

10       Q.   Seeing this e-mail, does it in any

11   way refresh your recollection as to whether your

12   doctor provided a note stating you can return to

13   eight hours per day effective October 6th?

14       A.   Um, it's possible that I went back

15   after all this commotion and stress, that my

16   manager had turned me down for not -- cutting my

17   hours down, and then she won't have any other

18   job for me for some time.  So I went back to my

19   doctor's.  It's possible I negotiated with her

20   that allowed me to go back full time while I

21   continued my therapy.

22       Q.   Okay.  So -- and -- and I know it's

23   possible that happened, right?

24       A.   Yes.

25       Q.   But do you remember that your doctor

Page 313

```
1          certified --
2               A.    It's possible.
3               Q.    -- you to return to work without any
4          restrictions as of October 6th?
5               A.    I don't recall paperwork, but it's
6          possible that I went back and -- and pressed on
7          it --
8               Q.    Okay.  So then after October 6th --
9               A.    -- due to stress because I wanted to
10         maintain my job.
11              Q.    Okay.  After October 6th, 2010, --
12              A.    Yeah.
13              Q.    -- is it fair to say you had no
14         medical restrictions whatsoever?
15              A.    No.  I did have medical restrictions.
16         I was --
17              Q.    And what were they?
18              A.    I still was going through therapy.  I
19         still was in pain.  But I was just --
20              Q.    So with regard to the therapy, what --
21         was that -- how much -- I mean, was that once a
22         week, once a month, twice a week, twice a month?
23              A.    I was supposed to go minimum twice a
24         week.
25              Q.    Twice a -- I'm sorry.  I missed what
```

1          A.    No.   There was no medical

2     certification, per se.   I -- she'll tell you I

3     was still suffering and she strongly advised me

4     not to do that.   But I said I need to keep my

5     job, so I have to return full time; however, I

6     will continue with BT, you know, and continue

7     with the treatment, and I'll come back in a

8     couple months.   And she advised me to go see

9     orthopedist, and that's it.   That's the facts.

10          Q.    I just want to look -- let's look at

11     the complaint for a moment.   Have I shown that

12     to you?   I don't believe so.

13               MS. RUBIN:   No.

14               MR. BROWN:   We're going to take a

15     break, because the video needs to change.

16               THE VIDEOGRAPHER:   This is the end of

17     Tape 3 in the videotape deposition of Nadine

18     Rana -- Ranade.

19               THE WITNESS:   Ranade.

20               THE VIDEOGRAPHER:   We're off the

21     record at 4:02.

22               (Recess taken.)

23               THE VIDEOGRAPHER:   Here begins Tape 4

24     in the videotape deposition of Nadine Ranade.

25     We are back on the record at 4:06.

1      um -- that was not the time Jayne was around, I

2      believe.  It was my previous manager.

3            Q.    What?   In 2008?

4            A.    Yeah.   Yeah.  I think it was 2008.  I

5      can't remember.  It was a -- and -- and -- and

6      -- and I explained, I said I might have to work

7      from home.  I'm okay, but I'm going to be lying

8      down, and I can still work on my computer.  And

9      I think they were okay with that, so I didn't

10     ask for any leave.

11           Q.    Was that related to your neck?

12           A.    No.   No.   It was just a personal

13     matter, gynecological issue.  And I actually

14     worked from home --

15           Q.    Mm-hmm.

16           A.    -- for a few weeks and worked full

17     time, and I was okay then.

18           Q.    Okay.  Other than the July 2010

19     conversation with Jayne where you talked about

20     your neck and she agreed with you, were there

21     any other conversations you had with Jayne about

22     your neck condition, your medical condition,

23     related to your neck?

24           A.    Just starting that time frame a few

25     times, you know, I conversed with her, but no

1       other.

2              Q.    Okay.  And the few times that you

3       conversed with her, what do you recall saying to

4       her and what do you recall her saying in

5       response?

6              A.    She said, okay.  She said, are you

7       going for physical therapy?  She asked me about

8       that.  I said yes.  And -- and I said -- that's

9       it.  I mean, there wasn't -- not much.

10             Q.    Mm-hmm.

11             A.    There was nothing much to talk about.

12             Q.    Okay.  And with Debra, --

13             A.    Mm-hmm.

14             Q.    -- other than the leave issue, had you

15      had any conversations with her --

16             A.    Yes.

17             Q.    -- about your medical condition?

18             A.    Yes.  Because when I used to go to

19      work, her cubicle was close to mine.  And I -- I

20      detailed her everything.  And, actually, I

21      stopped taking my medication that the doctor had

22      given me because one time I took it I was so

23      spaced out.  It was a muscle relaxer, and I

24      couldn't function.  So I told Debra the next

25      morning.  I said, Debra, I can't -- you know, I