**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

-------------------------------------------------------X

NADINE RANADE,

                                          Case No.: 1:12-cv-1039
                                          (LO)(TCB)

                     Plaintiff,

      v.                                             ECF

BT AMERICAS, INC.,

                     Defendant.

-------------------------------------------------------X

---

## DEFENDANT'S COUNTER-56.1 STATEMENT

---

       Plaintiff did not submit a counter-statement in response to Defendant's 56.1 Statement

of Undisputed Facts or her own 56.1 statement.  Rather, Plaintiff presented her "Statement of

Facts in Dispute Precluding Summary Judgment" in the body of her opposition brief.  None of

the facts were numbered or contained in numbered paragraphs in accordance with Local Rule

56(B).  Accordingly, and for ease of reference, Defendant interposed Plaintiff's Statement of

Facts, verbatim, into numbered paragraphs, to which it provides its responses, herein.


       1.      In this action, Ranade alleges that she was placed on a Performance
Improvement Plan ("PIP") and ultimately terminated as a result of her request for leave
protected by the FMLA:

       <u>**RESPONSE:**</u>  **Disputed.**  Statement is argumentative and inappropriate under Rule

       56.1.  It is undisputed that Plaintiff was placed on a PIP.  (Pearson Decl. Ex. G.)

2.      "[B]asically, I felt that I really needed some time off, I was suffering, and my manager denied [leave]. That's primary." Ranade at 260

**RESPONSE:  Disputed**.  Plaintiff's testimony contradicts the documentary evidence

which establishes that for the entire period Plaintiff was eligible for FMLA leave, her

request was accommodated with a four-hour work schedule.  (Pearson Decl. ¶ 23,

Exhibit K (BT 000285.))

3.      "When I started discussing with her about my health issues in August – July/August timeframe and I need to cut down my hours, and I need time off or just do four hours . . . and she said Nadine, just juggle. Ranade at 262 Ranade simply was denied part time leave. Ranade at 262, 263

**RESPONSE:  Disputed** to the extent Plaintiff is attempting to allege that in

July/August 2010 BT was under a legal obligation to provide her with leave pursuant

to the FMLA.  It is undisputed that BT was not made aware of her need for FMLA

leave until September 13, 2010 and it is further undisputed that for the entire period

Plaintiff was eligible for FMLA leave, her request was accommodated.  (Pearson Decl.

¶ 23, Exhibit K (BT 000254, 285.))

4.      "I gave her notification starting in August that I have – my doctor's told me to do some physical therapy." Ranade at 269

**RESPONSE:  Undisputed** for purposes of summary judgment only.

5.      "When she downgraded – started downgrading my reviews, and – she even said – first she told me to juggle my time while I went for therapy." Ranade at 266

**RESPONSE:  Disputed** to the extent Plaintiff is attempting to allege that Defendant's

"downgrade" of her performance was somehow related to her request for FMLA leave,

as the record evidence clearly shows that her performance ratings declined well-before

the July/August 2010 timeframe.  (Guerrasio Decl. Ex. 7.)

6.      Ranade further described the termination, as being because of her illness, "It's just that she's seeing that I couldn't -- I asked for leave, I'm a sick person and I won't be able to perform, maybe I'll get sick again and – and I would be – I won't be able to perform like I have in past. Ranade at 263, 266

**RESPONSE:  Disputed**.  Statement is based on unintelligible speculation which is

insufficient to create a fact dispute.

7.      While Defendant does not dispute that Ranade was entitled to the protections of the FMLA, (Pearson at 13, 14), Defendant asserts that Ranade was terminated for being asked to leave three projects (P&G at Mehoopany, Unilever, and Capital Group) prematurely. However, the evidence in this case does not support Defendant's version of events. Specifically, as demonstrated below, Ranade was not asked, and did not leave any project prematurely, and instead received compliments on her performance from each of these clients. Further, Defendant confirms that her supervisor, Jayne Charlton, simply stopped looking for additional assignments to enable Ranade to continue her employment at the time of her formal request for FMLA leave. The evidence further shows that Ranade was forced to rescind her request for FMLA leave in fear of losing her job.

**RESPONSE:  Disputed**.  (1) Plaintiff does not provide record citations for any of the

statements in the paragraph beyond the first sentence, in violation of Local Rule 56.1;

(2) Statements within the paragraph are argumentative, which is inappropriate for a

statement of facts, and to which no response is required; (3) the record evidence clearly

demonstrates that Ms. Ranade was requested to leave three client accounts early.  (*See*

Guerrasio Decl. Exs. 9, 10, 11; Pearson Decl. ¶ 19 (Ex. G, BT 000165), Pl. Opp. Ex. 2,

BT 000139-150); (4) Plaintiff provides no record citations for the alleged

"compliments" she received from clients based on her performance; (5) Plaintiff

mischaracterizes the testimony of Vance Pearson, BT Human Resources Manager.  As

the deposition transcript makes clear, Ms. Pearson did not confirm that Ms. Charlton

stopped looking for additional assignments for Ms. Ranade after she requested FMLA

leave.  On the contrary, the testimony of Ms. Pearson is that she "d[id] not know"

whether Ms. Charlton made any efforts to secure a new project for Ms. Ranade.

(Pearson Tr. 81:17-20, 87:19-88:3.); (6) Ms. Ranade never "rescinded" her FMLA

request.  Rather, Ms. Ranade submitted a second doctor's note lifting the four-hour

work restriction as of October 6, 2010.  (Pearson Decl. Ex. N.)  Defendant does not

dispute that for the 15 days Plaintiff's physician certified her as needing to work a

four-hour per day schedule, Plaintiff qualified for leave pursuant to the FMLA.

(Pearson Decl. Ex. N; Guerrasio Decl. Ex. 11.)

8.      As more fully demonstrated below, Defendant's assertions that Ranade was
performing poorly and was asked to be removed from three projects is contradicted by the
evidence in the case.

**RESPONSE:  Disputed**.  Statement provides no citations in violation of Local Rule

56 and is argumentative, which is inappropriate for a statement of facts and to which

no response is required.

Background:

9.      Prior to her requests in July/August for leave, Ranade was regarded as a
superior performer:

**RESPONSE:  Disputed**.  No citation provided and contradicted by Plaintiff's

testimony and documentary evidence.  (*See* Pl. Tr. 148:4-149:9; Guerrasio Decl. Exs.

8, 9.)

10.     "Nadine is an incredible performer who is constantly seeking out how she can
add value, grow the business or enhance her technical or soft skills to benefit the business. . . .
She has one of the most ambitious, willing, positive attitudes I have ever seen. She was sought
after by P&G as their number one choice for a PM. Nadine is the real deal, and she consistently
shines with her clients and her peers!" Performance Document – Annual PR Manager Review
3/31/09, Author Jayne Charlton BT doc # 203, 204

**RESPONSE:  Disputed**.  Irrelevant for purposes of summary judgment.  Quote is

from March 2009, more than seven months *before* Ms. Ranade's poor performance on

P&G account and premature removal.  (*See* Guerrasio Decl. Exs. 8, 9; Pearson Decl.

Ex. G, BT 000165)

11.    On March 26, 2010, prior to Nadine's request for F MLA leave her experience with P&G is described as "Nadine has had a good year working diligently to overcome some challenges in Oct/Nov on the P&G account and with the two deferments of principal title promotion. Nadine is highly intelligent and works exhaustively to meet high client demands while consistently increasing her knowledge education and certs."
On P&G Nadine worked on the transformation team working on LAN/WAN/IPT and wireless transformation projects. She worked on transforming one of the most critical and largest P & G sites in Mehoopany. In addition to that she was given the lead role for site decommissioning globally for the transformation team."  BT doc # 205, 206

**RESPONSE:  Disputed**.  As to the first sentence, the quoted language does not

exclusively pertain to the P&G account.  As to the third and fourth sentences,

Plaintiff's characterization that she "was regarded as a superior performer" is false.

The document itself states that the quoted language "was pasted by Jayne Charlton on

behalf of Nadine Ranade."  (Pl. Opp. Ex. 2, BT 000205)

12.    That same evaluation notes: "She has excellent communication skills, demonstrates her strong passion for quality and is committed to her projects she takes time to listen to the customer and adjusts according to their requests. Nadine has a great attitude and it comes across immediately when meeting with her. She is a true pleasure to work with and represents BT very well ." at 210

**RESPONSE:  Disputed**.  Quoted language is irrelevant for purposes of summary

judgment as it is not associated with any of the accounts Ms. Ranade had performance

issues on (*see* Pl. Opp. Ex. 2, P 00020, quoted language pertains to the "Prudential Site

decommissioning" project) and is date August 2009, which preceded Ms. Ranade's

removal from the P&G account in November 2010 by 15 months. (Guerrasio Decl.

Exs. 8, 9)

13.    See also Ranade's  Principal Consultant Documentation 9/10/09 Ranade doc #1-36, Endorsements at 18-24

**RESPONSE:  Disputed**.  Irrelevant for purposes of summary judgment.  None of the

statements in the Principal Consultant Document concern the three accounts Ms.

Ranade had performance issues on, P&G Mehoopany, Unilever or Capital Group.

Many of the statements precede the relevant time period and before Ms. Ranade's

performance issues came to light in August 2009.  (*See* Guerrasio Decl. Exs. 7, 8, 9,

11; Pearson Decl. Ex. G (BT 000165); Pl. Opp. Ex. 2 BT 000139-147.)

## BT's Criticisms of Ranade's  Performance - Overview:

14.     Ranade's job was a technical position, however, BT's only criticisms of her
performance are of vaguely defined "soft skills" See job description BT doc # 25, 26, Pearson
at 36, 72, and "The majority of the areas that she needed improvement were her soft skills."
Pearson at 29

**RESPONSE:  Disputed**.  Blanket characterization is not supported by citations and is

contradicted by Plaintiff's own testimony.  (*See* D. 56.1 46: Plaintiff admittedly

"wasn't very good" with soft skills, including "relationship building," and acting

"politically savvy" with clients (Guerrasio Decl. Ex. 1 (Pl. Tr. 101-9-17; 103:21-9)),

skills that were, "always relevant in [her] profession because [she did] interact with the

customers and other colleagues."  (Guerrasio Decl. Ex. 1 (Pl. Tr. 107:20-108:3)).

15.     However, Charlton "never gave me any particular feedback or – or nailed down
on a particular thing about soft skills." Ranade at 100 Furthermore, such criticisms are without
regard to whether she meets her production goals and makes good on her deliverables, or
whether her team meets revenue goals. Pearson at 36, 37

**RESPONSE:  Disputed**.  First sentence is disputed by PIP which outlines all coaching

sessions Ms. Ranade and Ms. Charlton conducted, including Ms. Ranade's own

description of how the PIP and coaching sessions helped her succeed.  (Pearson Decl.

Ex. 19, BT 000165, 170.)

16.     And despite the fact that Ranade's job was "all technical" (Ranade at 63), the record is devoid of any criticism of her technical abilities, quality or quantity of her actual work, timeliness, accuracy or any other possible aspect of her performance in this highly technical job, beyond "soft skills" --  "But her technical skills, no, that was not a problem." Pearson at 36

**RESPONSE:  Disputed**.  *See Response to Paragraph 14.*  Further, as the documents

illustrate, BT found the "quality" of Plaintiff's work with respect to the P&G

Mehoopany Project, Unilever Account and Capital Group Account to be

unsatisfactory.  (*See* Guerrasio Decl. Exs. 7, 8, 9, 11; Pearson Decl. Ex. G (BT

000165); Pl. Opp. Ex. 2 BT 000139-147.)

17.     Defendant claims that Ranade was terminated specifically due to her performance and client dissatisfaction on three projects. The evidence is as follows:

**RESPONSE:  Undisputed** to the extent it is a statement of fact.

**P&G:**

18.     The only issue mentioned concerning P&G is with Mehoopany project – which was only one of several that Ranade was working on contemporaneously. Numerous other P&G projects went very well. see, Principal Consultant Documentation, September 10, 2009, Ranade doc #31-36

**RESPONSE:  Disputed** to the extent Plaintiff's work on other P&G projects is

described as "very well."  The document cited (and specifically the pages cited therein)

contain *Plaintiff's* own descriptions of her work (*see* Pl. Op. Ex. 3, pg 000031-36),

which cannot create a dispute of fact for purposes of summary judgment.  By way of

further response, statements are immaterial for purposes of summary judgment.

19.     Most importantly, however, is that any issues with the Mehoopany project had occurred nearly one year prior to her being placed on the PIP and BT had not indicated any significant negative issues resulting from the project at that time.

**RESPONSE:  Disputed**. (1) No record citation provided.  (2) Plaintiff's removal

from the Mehoopany project occurred in November 2009, nine months prior to her

placement on the PIP (Guerrasio Decl. Exs. 8, 9; Pearson Decl. Ex. G).  (3) Plaintiff

was not promoted to Principal, in part, because of her performance issues on the P&G

Mehoopany project.  (Pearson ¶¶ 10, 11.)  (4) Plaintiff's "Annual Performance

Review" dated 3/26/10, explicitly references the "challenges in Oct/Nov on P&G

account" that Ms. Ranade faced, as well as the "few items relating to soft skills and

communication and relationship building that [Plaintiff]'s Mgr would like her to take

to consider, self-analyze, accept and apply to ensure more solid case for Principal

promotion, in addition to working a more strategic global program." (Pl. Opp. Ex. 3,

P000061.)

20.    Prior to Ranade's request for leave, the issue had been known and addressed by
BT. Ranade's performance evaluation occurring shortly after the Mehoopany issue rated her
performance at "Good" and that she had a "good year"   See Performance Document Author:
Jayne Charlton, Last updated 4/30/2010. Ranade doc # 60-66, "Nadine has had a good year,
working diligently to overcome some challenges in Oct/Nov on P&G account and with the 2
deferrments of Principle title promotion." Ranade doc #61

**RESPONSE:  Disputed**.  *See* Def.'s Response to Paragraph 19.

21.    In that same evaluation, there is a lengthy reference to the Mehoopany project,
but there is no mention of anything negative. And in that review, Ranade received several
scores of Very Good, and one score of Outstanding, although her overall rating was "Good".
See Evaluation at Ranade doc # 66

**RESPONSE:  Disputed**.  Statements in paragraph are inaccurate.  The lengthy

reference to the "Mehoopany project" was inserted by Ms. Ranade, <u>not</u> Jayne Charlton.

The document explicitly states, "Info below was pasted by Jayne Charlton on behalf of

Nadine Ranade."  Furthermore, Ms. Charlton did include statements in Ms. Ranade's

review concerning the Mehoopany Project, such as: 'Nadine has had a good year,

working diligently to overcome some challenges in Oct/Nov. on P&G account and

with the 2 deferments of Principal title promotion. Nadine is highly intelligent and

works exhaustively to meet high client demands while consistently increasing her

knowledge, education and certs … There are a few items relating to soft skills with

communication and relationship building that Nadine's Mgr would like her to take to

consider, self-analyze, accept and apply to ensure more solid case for Principal

promotion …"  (Pl. Opp. Ex. 3, P00066)

22.    With respect to the Mehoopany project, Ranade described a situation where she
had a conflict with one individual who had problems working with several other project
managers:  "So I tried, and it didn't work with Barbara. But then I came back, and – I told my
colleagues the whole story, and they said it would never have worked with Barbara, because
they had some other experiences." Ranade at 101

RESPONSE:  **Undisputed** for summary judgment purposes only.  Statements are

immaterial to Defendant's motion for summary judgment.

23.    Barbara had "turned around several project managers" Ranade at 140, and
indeed it well may have been Barbara Dodd who had personality issues, according to a
comment made by one of the promotion board review panel members. Ranade at 141

RESPONSE:  **Undisputed** for summary judgment purposes only.  Statements are

immaterial to Defendant's motion for summary judgment.

24.    Furthermore, Ranade was not "kicked off" the Mehoopany project, she was
simply not renewed at the end of the year. Ranade at 119 Not being renewed on a project
should not have been viewed negatively because there are turnarounds quite significantly.
Ranade at 120, 127 Moreover, Ranade continued to work successfully on several other projects
for P&G  Ranade at 138

RESPONSE:  **Disputed**.  Statements are contradicted by contemporaneous business

records which explicitly state that Plaintiff's work on the Mehoopany project was

"**discontinued effective immediately.**"  (Guerrasio Decl. Ex. 9)(emphasis in original).

*See also* Pearson Decl. ¶ 14, BT000065; Guerrasio Decl. Ex's 8, 9).  Statements are

also contradicted by Plaintiff's own testimony in which she admitted she was

"removed" from the account and that the client was "unhappy" with her performance.

(Pl. Tr. 139:9-16; *see also* Pl. Tr. 148:4-149:9.)  Defendant does not dispute whether

"Ranade continued to work successfully on several other projects for P&G" as this

statement is immaterial for purposes of this motion.

25.     At the time, neither Charlton or others in management did not deem the non-renewal at P&G as a negative reflection of her job performance. "They never came across and made it clear to me." Ranade at 120, 121

**RESPONSE:  Disputed**.  Statements are contradicted by contemporaneous business

records, including PIP which was precipitated, in part, by Plaintiff's removal from

Mehoopany Project.  (*See* Guerrasio Decl. Ex's. 6, 8, 9.)  Statements are based on

Plaintiff's speculation and therefore insufficient to defeat summary judgment; Plaintiff

can't possibly know whether Charlton or other members of management deemed her

removal from the Mehoopany project as a negative reflection on her job performance.

Statements are also contradicted by Plaintiff's own testimony that her removal from the

Mehoopany Project was "a big deal" and "very upsetting" to her.  (Pl. Tr. 131:13-15.)

26.     This neutral assessment of a project manager not being renewed for projects is consistent with Defendant's testimony that project managers do not always get renewed on every contract and that people are swapped around among different projects over the course of their careers. Pearson at 57

**RESPONSE:  Disputed** to the extent this paragraph attempts to characterize Ms.

Ranade's removal from the Mehoopany Project as "neutral."  (*See* Response to

Paragraph 25.)  Statement is otherwise undisputed for purposes of summary judgment.

27.     Accordingly, the evidence shows that at the time of Ranade's non-renewal, BT did not regard the events at Mehoopany as negative, noting that Ranade had a "good year" that year. It was only after Ranade requested leave that the Mehoopany issue was recharacterized as being prematurely terminated from P&G and used as grounds to place Ranade on a PIP and to terminate her employment.

**RESPONSE: Disputed.** No citations to the record. Statement is argumentative,

which is inappropriate for a statement of facts and to which no response is required.

*See* Def.'s Responses to Paragraphs 24, 25 and 26.

**Unilever:**

28.     Defendant claims that Ranade was similarly asked to leave a Unilever project prematurely. However, Ranade simply was not asked to leave project prematurely, and in fact was complimented by the client on her efforts, and asked back for additional work. Ranade actually left the project in December, 2010, as scheduled. Ranade at 186. see also 10/19/10 Quarterly Performance Review, Author: Jayne Charlton "Nadine is on track for meeting all req'ts as a Sr. consultant billing FT on Unilever for Q1 and rec'd a 6 month ext thru Dec." Ranade doc # 58

**RESPONSE: Disputed**. Insufficient citations to the record. Statements are

argumentative, which is inappropriate for a statement of facts and to which no response

is required. Statements are contradicted by the record. *See*, Guerrasio Decl. Ex. 6, pg

3; Guerrasio Reply Decl. Ex. 3); Pearson Tr. 38:7-18). Plaintiff provides no citations

for the alleged "compliments received by the client" and allegedly being "asked back

for additional work." Citation to 10/19/10 performance review does not support

statement it is cited for. As stated in performance review, quoted language was "added

from 01 Apr 2010 to 30 Jun 2010." Defendant does not dispute that Plaintiff remained

on the Unilever account until December 2010, but notes that that the client's decision

to keep her on the account rather than follow-through with her requested removal (in

August 2010) was due to the needs of the business and the upcoming deadline.

(Pearson Decl. ¶ 19 (BT 000165.))

29.     There was an issue raised concerning Unilever in August, 2010 about Ranade's conversion to part time and uncertainty about her "end date," but the email traffic at the time does not reference any negative comments about Ranade or a request to be prematurely removed from the project. Instead, the email traffic shows only that Ranade would be reduced to 50% after September, 2010 consistent with the needs of the contract, as the primary project

she was working on (Latam OneVoice) was winding down and future work projected a need for her services at 50%. See Email 9/1/10 Gessell, "As of September 10, we can cut back to at most 50% for Nadine. . . . The remainder of the Latam OneVoice work should not keep Nadine fully occupied and there is a risk when she is assigned to another non-Unilever project." BT doc # 145 see also email from Kerr to Sepehri and Charlton, "Thank you, this clarifies a bit. So after 9/10 she'll be at 50% for the term of her engagement, correct?" BT doc #144, See also:

**RESPONSE:  Disputed.**  Plaintiff has no personal knowledge of the conversation that occurred in the referenced email chain.  Her speculation as to what the BT managers discussed with regard to her "conversion to part time and uncertainty about her 'end date'" is insufficient to defeat summary judgment.  BT's contemporaneous business records show that on August 26, 2010, Unilever requested Ms. Ranade's early removal due to her poor performance.  (Pearson Decl. ¶ 19, BT 000165.)  That same day, given Unilever's notification of the early removal, Ms. Charlton sent an email to Afshin Sepheri and Desmond Kerr to inquire about Ms. Ranade's transition off the account and end date.  (Pl. Opp. Ex. 2, BT 000144-145).  On September 8, 2010, the client determined that given the fast-approaching deadline, they would retain Ms. Ranade on the project at 50% until its completion in December, rather than proceed with her early removal.  (*Id.*; *see also* Guerrasio Reply Decl. Ex. 3).

30.     Email from Gessel 9/1/10 "there is a risk when she is assigned to another non-Unilever project. Unilever just needs to finalize the 4 countries that we already presented" BT doc # 145

**RESPONSE:  Disputed** to the extent Plaintiff's inclusion of the quoted statement is meant to substantiate her theory of the case, as Plaintiff has no personal knowledge of the context of circumstances of the above-cited quote and her interpretation is based on speculation.  Statement is immaterial for purposes of summary judgment.

31.     9/8/10 Nadine was already projected to go on 50% time between 10/1/10 – 12/31/10 BT doc # 134

**RESPONSE:  Disputed**.  Record citation does not provide support for Plaintiff's

statement that she "was *already* projected to go on 50% time between 10/1/10 –

12/31/10." (emphasis added)

32.     9/27/10 – Email from Gessel "At this time there are only approved SRs for 50%
of a PM's time through November 30th. BT doc #142

**RESPONSE:  Undisputed**.  Document speaks for itself and is immaterial for purposes

of summary judgment.

33.     There is simply no mention in any of this email traffic about any displeasure
with Ranade's work, nor a request that she exit the project prematurely.

**RESPONSE:  Disputed**.  No record citation provided.  *See* Def.'s Response to

Paragraph 29.

34.     In fact, Charlton characterized the move from Unilever as an "internal swap-
out." See email from Charlton, 8/26/10 "We typically get 4 weeks of notice for internal project
swap outs." BT doc # 146 Internal swap outs are defined by defendant as "That is just taking
one consultant to another, from one client to another. Swapping people." with the decisions
made based upon the skill set. Pearson at 54, 55

**RESPONSE:  Undisputed**.  When Unilever requested Ms. Ranade's removal, BT had

to replace her with another BT project manager, a swap-out.  (Pl. Opp. Ex. 2, BT

00146; Pearson Tr. 54:18-55:1.)

35.     Further contrary to Defendant's representations regarding the client's perception
of Ranade's performance is the following:

**RESPONSE**:  Statement is argumentative which his inappropriate for a statement of

facts.  No response is required.

36.     Ashfin Sepheri gave very good reviews and gave a very positive performance
review to Jayne about my performance, in writing, I believe so. Ranade at 81

**RESPONSE:  Disputed**.  Statement is based on Plaintiff's speculation, which is insufficient to defeat summary judgment, and is not associated with any time period or project.  It is immaterial for purposes of summary judgment.

37.     Ranade did not recall receiving negative comments about her performance from anyone but Jayne. Not clients, nor any other BT manager or colleague. Ranade at 188

**RESPONSE:  Disputed**.  BT's contemporaneous records show that David Upton spoke with Plaintiff in January 2011 about her performance issues with respect to the Capital Group Account.  (Pl. Opp. Ex. 2, BT 000155).  Ms. Charlton was Plaintiff's immediate supervisor.  (Pearson Decl. ¶ 5.)  It is immaterial for purposes of summary judgment who delivered the negative feedback to Plaintiff concerning her performance.

38.     Email from Ashfin Sepehri 1/25/10 "Your performance has been good so far. You are enthusiastic about learning the account and take initiative to drive projects." BT doc #87-88

**RESPONSE:  Undisputed**.  By way of further response, the email from Afshin Sepheri was in response to Ms. Ranade's request for feedback for her performance review.  The entirety of Mr. Sepheri's response is as follows:  "Your performance has been good so far. You are enthusiastic about learning the account and take initiative to drive projects.  As you know, I am tied up in a number of a [sic] major projects related to BAU and Janus and so to be perfectly honest and with many apologies I cannot devote more time in filling out a complete assessment.  Let's plan to do this next time when you have more time under your belt with Unilever." (Pl. Opp. Ex. 2, BT 000087-88).

39.     In her quarterly review for the period ending December 31, 2010 appears the following quote from Afshin Sepheri: "Nadine did an excellent job in analysis on this complex project and presenting it to the customer" dated 9/10 Ranade Doc # 49

**RESPONSE: Undisputed**.  By way of further response, after Ms. Ranade was placed

on the PIP in September 2010, her performance improved which resulted in the

completion of her PIP and continued BT employment.  (Pearson Decl. ¶ 19, BT

000162-173)

40.     In Ranade's Quarterly Review Author Jayne Charlton 10/19/10 writes: "Nadine did an outstanding job on a BT OneVoice project for Latam that was very complicated and reportedly worked beyond her PM responsibilities."

**RESPONSE: Disputed**.  No citation to the record is provided.

41.     Debra Gessell likewise never gave Ranade any direct feedback or negative feedback about anything. Ranade at 82, 83

**RESPONSE: Undisputed.**  Statement is immaterial for purposes of summary

judgment.

42.     As to the allegation that Ranade was prematurely asked to leave at Unilever, such request would have come from Afshin Sepheri. And he would have gotten his request from his contact at the Unilever account. Pearson at 38, 39

**RESPONSE: Undisputed**.  By way of further response, Desmond Kerr, Managing

Director for the Unilever account, reported to Mr. Sepheri, Account Director.  Mr. Kerr

is the individual who reported Unilever's removal request to Ms. Charlton.  (Pl. Tr.

186:1-10; Pl. Opp. Ex. 2, BT 000146).

43.     As demonstrated, however, there is absolutely no email traffic containing such a request. Instead, as noted above, Ranade was credited with doing an "outstanding" job on the project, Sepheri provided a compliment to Ranade as noted in her Self Evaluation, and Ranade was asked back for more work. In fact, all of the negative references in Defendant's Motion for Summary Judgment and statement of facts are to the PIP itself (authored by Jayne Charlton).

**RESPONSE:  Disputed**.  No record citation provided.  *See* Pl. Opp. Ex. 2, BT

000146, Guerrasio Reply Decl. Ex. 3.  *See also* Pearson Tr. 38:7-18.

44.     In fact, Ranade was asked back on the Unilever project as of Jan 6, 2011. BT
doc #305, 306

**RESPONSE:  Disputed**.  Request for return to Unilever was to Unilever I project.

(Pl. Opp. Ex. 2, BT 000305).

**<u>Capital Group:</u>**

45.     Ranade delivered an extensive project in a short period of time, and gave a
proposal for new business, which was accepted. Ranade at 232, 233. Ranade's work on the
project ended by February 8 or 10th. Ranade at 229, 230 even though the project was originally
intended to end 12/30/10 <u>see</u> Ranade evaluation (Author Nadine Ranade) Ranade doc # 46-49

**RESPONSE:  Disputed**.  Record citation does not support first statement of

paragraph.  By way of further response, Plaintiff's opinion as to her own performance

is immaterial for summary judgment purposes and insufficient to create a dispute of

material fact.

46.     Although Ranade successfully delivered the product and had earned return
business for BT, Capital  Group said they were looking for a more senior program manager for
the follow-on work. Ranade at 232, 233  Contrary to Defendant's assertion, Ranade simply was
not "kicked off" the Capital Group project. The engagement ended and she completed the term
of the engagement, and the client was so happy with our work that they came back, gave return
business to BT.  They had put a more senior program manager there. " Ranade at 155,  156
Ranade's deliverables were achieved and on time, and she had completed the project. Pearson
at 70,71, Ranade completely delivered the project within the 10 weeks of her assignment.
Ranade at 79

**RESPONSE:  Disputed**.  Statement that Plaintiff "had earned return business for BT"

from Capital Group is based on her own beliefs and speculation and is contradicted by

record evidence which clearly states that Capital Group would only give BT more

business if Ms. Ranade was not assigned to work on any future Capital Group projects.

(Pearson Tr. 70:19-71:8; Guerrasio Decl. Ex. 10.)  Defendant does not dispute that Ms.

Ranade remained on the engagement until its completion, but disputes Ms. Ranade's characterization of the *client's* impression of her work, "the client was so happy with our work," as her statement is not based on personal knowledge and the record evidence clearly proves otherwise. (Pearson Tr. 70:19-71:8; Guerrasio Decl. Ex. 10.)

47. Further, there is nothing in writing from Capital Group that references Ranade not being asked to do other follow on work. Pearson at 71

**RESPONSE: Disputed**. *See* Guerrasio Decl. Ex. 10, ("As a follow-up to our phone conversation today re: feedback from David Upton and the client (Capital Group) on your PM delivery performance…); also note, comments are written in third person referring to Ms. Ranade as "Nadine" rather than "you.") By way of further response, this statement is immaterial for purposes of summary judgment.

48. While there was some criticism from David Upton in an email dated January 10, 2011, such criticism was characterized as "minor" 1/10/11 BT doc #155 More importantly, there are no further emails from Upton regarding Ranade's performance after the January 10 email. Indeed, Ranade was deemed to have successfully completed her PIP after receiving this communication from Upton.

**RESPONSE: Disputed**. Inadequate citations to the record. First sentence is a misquote of record evidence. Upton stated, "Actually … I have some concern … But I *hope* it is minor at this point." (emphasis added) (Pl. Opp. Ex. 2 BT 000155). By way of further response, feedback received from David Upton and client was communicated to Ms. Charlton, who in-turn, communicated the feedback to Ms. Ranade via email. (Guerrasio Decl. Ex. 10, ("As a follow-up to our phone conversation today re: feedback from David Upton and the client (Capital Group) on your PM delivery performance…)). Whether or not there were any further email

communications from David Upton after January 10, 2011 is immaterial for purposes

of summary judgment.

49.     In addition, Upton was one of two account managers at Capital Group, (Ranade
at 71) and standing in contrast to Upton's criticisms is an email from Evan Paul on the Capital
Group project describing Ranade as "capable and skilled" and noting that he would be pleased
to work with her again in the future. 12/29/10 BT doc # 305, 306

> **RESPONSE:  Disputed**.  Citation does not support first sentence, as Ms. Ranade
>
> testified that there were "two managers" but was unable to identify second manager,
>
> email correspondence cited by Plaintiff does not identify Mr. Paul as an account
>
> manager for Capital Group and includes a third individual, Hani Shouga. (Pl. Opp. Ex.
>
> 2 000305-306.)  By way of further response, the 1/10/11 email from Upton post-dates
>
> 12/29/10 email from Evan.  (Pl. Opp. Ex. 2 BT 000155, BT 000305.)   Both emails
>
> were in response to Charlton's request for feedback on Plaintiff's performance.  (Pl.
>
> Opp. Ex. 2 BT 000305).

50.     This compliment from the Capital Group was never mentioned in any of
Ranade's performance evaluations or in her PIP.

> **RESPONSE:  Undisputed**.  By way of further response, no record citation is provided
>
> and the statement is immaterial for purposes of Defendant's summary judgment
>
> motion.

**PIP:**

51.     Ranade's placement on a PIP was a surprise to her as she had delivered more
projects on any of the accounts, and her delivery record stood out. Ranade at 182, 183 Prior to
being placed on PIP Charlton "never mentioned anything that would be very alarming or
anything that would be of great deal [of] concern. I had requested her, starting July/August
timeframe, verbally to cut down my hours. Ranade at 178, 179

> **RESPONSE:  Disputed** as far as Plaintiff states she was unaware of negative
>
> feedback on her performance.  *See* Pl. Tr. 131:13-15, 148:4-149:9 (Plaintiff

characterized email notifying her of removal from P&G as a "big deal" and "very

upsetting" to her); *see also* Guerrasio Decl. Exs. 8, 9). By way of further response,

Plaintiff's perception of the feedback she received from Ms. Charlton is immaterial for

purposes of summary judgment. Plaintiff did not formally notify BT of her need for

FMLA leave until September 13, 2010. (Guerrasio Decl. Ex. 5; Pearson Decl. ¶ 22,

BT 000254; Pl. Tr. 338:4-11.)

52.     Conversely, Defendant asserts that at the time the PIP was instituted, Ranade
had been asked to be removed from two contracts, Mehoopany and Unilever. Pearson at 42
However, as set forth above, Ranade had not been asked to be removed from either project.
The P&G Mehoopany project had concluded nearly a year previously and Ranade had been
evaluated as "having a good year" during that time. As further set forth above, Ranade had
simply not been asked to be removed four months prematurely from Unilever.

**RESPONSE:  Disputed**.  Statement that "Plaintiff had not been asked to be removed

from either project" is contradicted by the record.  *See* Def.'s Response to Paragraphs

24, 28, 29.

53.     Nonetheless, Charlton chose the maximum length of time allowed for scrutiny
under the PIP Pearson at 24 Further the PIP was extended "because of the time Ms. Ranade
was out. . . . So they gave her the longest amount of time, and then they extended it because
she had been out on leave." Pearson at 25[1]

**RESPONSE:  Disputed** to the extent Plaintiff states she was "scrutinized" under the

PIP and placed on the PIP for 90 days to allow for a longer period of such "scrutiny."

As testified by Ms. Pearson, the 90 days represented a "monitoring period" which

"they felt was enough time for [Ms. Ranade] to be able to turn her performance around

and be successful."  (Pearson Tr. 24:16-25:15.)

---

[1] The PIP was not extended because of FMLA, but for holidays, schedule delays from client
travel.  *See* email Charlton 12/02/10, BT doc # 149, 150.  Further, the PIP was extended a
month – not the mere 2 weeks of part time work.

54.     As Ranade testified, the criticisms of her performance and the downgrading of her review occurred in the July/August timeframe, when she began asking for leave and prior to the imposition of the PIP. Ranade started inquiring about leave in July, 2010, "Just starting that time frame a few times, you know, I conversed with her, but no other. Ranade at 339, 340

**RESPONSE:  Disputed**.  Citation is inadequate and does not provide support for all

statements in paragraph.  Statement concerning "downgrading of her review" is

contradicted by record evidence.  (*See* Guerrasio Decl. Exs 5, 6.)  By way of further

response, Plaintiff did not request leave pursuant to the FMLA until September 22,

2010.  (Pearson Decl. ¶22, BT 000258.)

55.     Ranade's potential use of FMLA leave was clearly anticipated however, at the time the PIP was imposed: "If you go out on FMLA or STD, then the PIP goes on hold and restarts when you return from leave. Once you receive the documented approval from your Dr., then I will adjust the dates." Email from Jayne Charlton 9/14/10, BT doc # 104, see also, Case Notes Detail, BT doc # 254

**RESPONSE:  Disputed**.  Statements misrepresent the record evidence.  In the 9/14/10

email Charlton stated, "Attached is the revised PIP our discussion.  Also, if you go out

on FMLA or STD, then the PIP goes on hold and restarts when you return from

leave…" (Pl. Opp. Ex. 2, BT 000104).  The document speaks for itself and does not

support any inference that Ms. Charlton "clearly anticipated" Ms. Ranade's need for

FMLA leave.

56.     In addition, and as described more fully above, Ranade's problematic issue with Unilever surrounded her need to go part time because of her back problems, see PIP note re: 7/30 - "feedback rec'd about PT, back issue, communication protocol and DMV letter she had Tivo write while I was on vacation." BT doc # 108 This is consistent with Ranade's recollection, "They didn't want me to work part time on the account. Ranade at 172

**RESPONSE:  Disputed**.  Statements are based on speculation as to what the quoted

language was referring to.  Plaintiff, who did not author the PIP, cannot now insert her

own meaning into the quote to support her "theory" of the case.  Statements are also

based on Plaintiff's own beliefs as to the "problematic issue" with Unilever, which is

contradicted by the record.  (Pearson Tr. 39:8-13.)

57.     Notably, Defendant acknowledged that the "PT" reference could mean Personal Time, or Part Time or Physical Therapy, and the corporate deponent had no idea what was meant by "back issue" Pearson at 51 – 53

**RESPONSE:  Disputed** to the extent Ms. Pearson never testified that "PT" stood for

"part time" as inaccurately indicated by Plaintiff.  (Pearson Tr. 51:12-52:4.)

58.     Further, Charlton extended the PIP an additional 30 days" This is not a reflection on her progress to date, and is just a result of needing more time to compensate for schedule challenges." BT doc # 150 Indeed, Charlton made no mention of any problems with Unilever or Capital Group accounts in regard to extending the PIP.

**RESPONSE:  Undisputed**.

59.     Ranade successfully completed the PIP Jan 14, 2011 BT doc # 161. At the time Ranade was released from the PIP, Ranade had completed her project for Unilever (with the compliments to her as noted above) and was nearly finished with the Capital Group project. In the release from the PIP, Charlton made no mention of problems with Unilever or Capital Group accounts.

**RESPONSE:  Disputed** as to the statement that Unilever provided Ms. Ranade with

compliments.  *See* Def.'s Response to Paragraphs 7, 28, 43.  Ms. Ranade completed the

Capital Group project in February of 2011.  (Guerrasio Decl. Ex. 10.)

**Ranade's formal FMLA request:**

60.     The conflict regarding the FMLA request was whether Ranade could work a flexible schedule to average 20 hours per week as the client (Unilever) had requested, or whether she had to work a static schedule to comply with "policy." Case Notes, BT docs 264, 266, and Email from Escalante ro Ranade re: Documentation of Phone call 10/5/10 8:15 am, "Unfortunately BT's policy is that you work continuous hours if under restricted hours. Ultimately we still cannot accommodate your restricted duty beginning 10/6/10.  BT doc # 293 Alternatives presented by BT were to take an unpaid leave of absence, to request short term disability, or to remove work restrictions.

**RESPONSE:  Disputed** to the extent BT's response to Plaintiff's FMLA request is

characterized as a "conflict." "BT's policy is that [the employee] work continuous

hours if under restricted hours," (Pearson Decl. Ex. J (BT 000294, 297.) which

Plaintiff was made aware of. (*Id.*)  Once BT determined that Ms. Ranade's schedule

could no longer be accommodated, she was offered several alternative options,

including continuous, fulltime leave and returning to work without any restrictions.

(Pearson Decl. Ex. J (BT 000294).)  BT accommodated Plaintiff's FMLA request for

the entire period in which she was certified as needing a reduced schedule.  (*See*

Pearson Decl. Ex. J, BT 000285.)

61.    As to BT's policy regarding a static block of time, no such policy is set forth in BT's FMLA policy documents.  See BT company policy BT doc # 27-44

**RESPONSE:  Undisputed** to the extent BT's written policy does not contain a

requirement of a "static" schedule.  *But see* Pearson Decl. Ex. J (BT 000294, 297)

("BT's policy is that you work continuous hours if under restricted hours.")

62.    As to the alternatives presented to Ranade, "due to the financial situation, I would not have been able to go unpaid completely. And I cannot take full leave because I'm able to function part time. My doctor said you are able to work part time, so it made no sense for me to take a full leave." Ranade at 289, 290

**RESPONSE:  Undisputed** to the extent the testimony speaks for itself.  By way of

further response, Plaintiff was aware that a third option existed with respect to her need

for a reduced work schedule, which was to go on the bench until a new project became

available which could have accommodated her reduced schedule.  (Pl. Tr. 294:17-24.)

63.    Further, the static schedule demanded by Charlton was not feasible, not only for the client (Unilever) but also for Ranade, "The block time, I would have lost my job, she – she blatantly said, because I don't have any other account for you to work on."  A consultant can only stay on the bench for 30-60 days, then you are fired. Ranade at 294  See also:

**RESPONSE:  Disputed**.  The static schedule was pursuant to BT policy, not

"demanded" by Ms. Charlton.  *See* Pearson Decl. Ex. J (BT 000294, 297) ("BT's

policy is that you work continuous hours if under restricted hours."). The statement by
Ms. Ranade that, "The block time, I would have lost my job, she – she blatantly said,
because I don't have any other account for you to work on" contradicts the record
evidence which demonstrates that she was offered to take fulltime, continuous leave
(Pearson Decl. Ex. J, BT 000292-293), or could have been placed on the bench until
another project, which could accommodate the four-hour restriction, became available.
(Pl. Tr. 294:17-24.) Undisputed to the extent the client felt they needed to have Ms.
Ranade available "when they needed her for as long as they needed her, and they could
not guarantee that they would only need her for four hours on a given day." (Pearson
Tr. 78:18-21.)

64.   Email from Gessell 9/27/10 "Only working 8am to noon each day is not
sufficient coverage for the activities through November 30th." BT doc # 33

**RESPONSE:** **Undisputed** to the extent the document speaks for itself and is
immaterial for purposes of summary judgment, as the record shows BT accommodated
Plaintiff's FMLA request for the entire period in which she was certified as needing a
reduced schedule. (*See* Pearson Decl. Ex. J, BT 000285.)

65.   Email from Charlton: "I am NOT okay with you working 4 hrs per day
haphazardly as flex time per day. This is not manageable for the business, PT, FMLA, or for
your Dr. care. Case Notes  BT doc # 273

**RESPONSE**: **Undisputed** to the extent the document speaks for itself and is
immaterial for purposes of summary judgment as the record shows BT accommodated
Plaintiff's FMLA request for the entire period in which she was certified as needing a
reduced schedule. (*See* Pearson Decl. Ex. J, BT 000285.) By way of further response,
the quoted language does not contain the entirety of Ms. Charlton's statements.

66.     Client requested flexible schedule, "My proposed schedule is an average 20hrs per week spent during scheduled customer meetings…." Case notes, BT doc # 275

**RESPONSE**:  **Undisputed** to the extent the document speaks for itself and is immaterial for purposes of summary judgment as the record shows BT accommodated Plaintiff's FMLA request for the entire period in which she was certified as needing a reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)  By way of further response, the quoted language does not contain the entirety of Debra Gessel's statements.

67.     Email from Charlton 9/28/10 – "I received an email last night from Nadine's project team, Debra Gessel, that the proposed schedule does not work for their client." BT doc # 129

**RESPONSE**:  **Undisputed** to the extent the document speaks for itself and is immaterial for purposes of summary judgment as the record shows BT accommodated Plaintiff's FMLA request for the entire period in which she was certified as needing a reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)  By way of further response, the quoted language does not contain the entirety of Ms. Charlton's statements.

68.     "I suspect that Nadine worked at least 20 hrs and actually probably worked about 28hrs last week. This is why I need her to be committed to a set 4 hrs per day consistently per week with only pre-approved 'rare' exception Case notes Email from Charlton 9/30/10, BT doc # 277

**RESPONSE**:  **Undisputed** to the extent the document speaks for itself and is immaterial for purposes of summary judgment as the record shows BT accommodated Plaintiff's FMLA request for the entire period in which she was certified as needing a reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)  By way of further response, the quoted language does not contain the entirety of Ms. Charlton's statements and further supports BT's policy that Plaintiff maintain a static four-hour schedule so that

the Company could ensure compliance with the restrictions imposed by her physician.

(Pearson Decl. Ex. J, BT 000294, 297.)

69.    Email from Charlton: I understand your needs, but "This requires that she sets and maintains a consistent 4 hr per day work schedule, … " Case Notes, BT doc #274

**RESPONSE:  Undisputed** to the extent the document speaks for itself and is

immaterial for purposes of summary judgment as the record shows BT accommodated

Plaintiff's FMLA request for the entire period in which she was certified as needing a

reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)  By way of further response,

the quoted language does not contain the entirety of Ms. Charlton's statements.

70.    The corporate designee similarly testified that the static schedule was necessary because, "In order to be able to manage the accommodation so that she wouldn't get pulled into having worked more than four hours, so that she had a start and finish and her manager could go through and make sure that she would only work those four hours. So we stayed within the terms and conditions of her accommodation." Pearson at 77 "The client said they were not able to accommodate that (the static schedule) because they had previously asked that she be removed (Pearson at 78) and further said they needed her when they needed her and could not guarantee her only four hours a day. Pearson at 81

**RESPONSE:  Undisputed**.

71.    As noted above, Unilever had not asked Ranade to be removed from their project, and furthermore, regardless of whether Ranade worked a static schedule or not she was always subject to being pulled into work beyond her 20 hour per week limitation.

**RESPONSE:  Disputed**.  Statements contain no record citations and are

argumentative, in violation of Local Rule 56.  *See* Def.'s Response to

Paragraph 28.

72.    Alternatively, BT stated as of 10/6/10 that it still could not accommodate the FMLA leave request because of concerns for its own liability, and offered Ranade the options of taking an unpaid personal leave of absence, unnecessarily taking 5 continuous days off to qualify for STD – but still would have to work the 4 continuous hours, or returning to work with no restrictions.

**RESPONSE:  Disputed**.  No citation to the record is provided in violation of Local

Rule 56.  By way of further response, BT policy required that Plaintiff maintain a static

four-hour work schedule because it was the only option that was "manageable for the

business, PT FMLA and [her] Dr. care."  (Pearson Decl. Ex. J (BT 000273).)  BT

accommodated Plaintiff's FMLA request for the entire period in which she was

certified as needing a reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)  When

the Company determined that it could no longer accommodate Plaintiff's four-hour

schedule, she was offered fulltime, continuous leave or to speak with her physician

about returning to work without any restrictions.  Plaintiff was also aware that she

could reapply for short term disability benefits (if she satisfied the waiting period)

and/or remain on the bench until Charlton was able to identify a project that could

accommodate her four-hour schedule.  (Pearson Decl. Ex. J (BT 000293-94); Pl. Tr.

294:17-24.)  Plaintiff returned to work the next day with a doctor's note lifting the

four-hour restriction.  (Pearson Decl. Ex. N.)

### Withdrawal of FMLA Request:

73.     Ranade was advised repeatedly and in no uncertain terms that BT could not
accommodate her request for leave under the FMLA, even after her managers changed their
minds and determined that a flexible schedule would be satisfactory. See 9/28/10 – 9:48am –
"Email from mgr advising EE's client cannot accommodate rx – decision was reversed and BT
decided that they could work with the flexible schedule. However, this reversal  was not
communicated to Ranade, Instead, later that same morning it is noted,

**RESPONSE:  Disputed**.  BT accommodated Plaintiff's FMLA request for the entire

period in which she was certified as needing a reduced schedule.  (*See* Pearson Decl.

Ex. J, BT 000285.)  By way of further response, regardless of whether Ms. Charlton

ultimately determined that she would be willing to accommodate a flexible four-hour

schedule for Ms. Ranade, BT's Company policy is that any restricted leave schedule be

in a static block of time.  (*See* Pearson Decl. Ex. J (BT 000294, 297) ("BT's policy is

that you work continuous hours if under restricted hours."))

74.     "Advised EE that her client cannot accommodate restrictions" Case Notes
10/06/10 10:30am BT doc # 292, 293

**RESPONSE:  Undisputed** to the extent the document speaks for itself and is

immaterial for purposes of summary judgment, as the record shows BT accommodated

Plaintiff's FMLA request for the entire period in which she was certified as needing a

reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)

75.     "The policy still stands" BT 293-294

**RESPONSE:  Undisputed** to the extent the document speaks for itself and is

immaterial for purposes of summary judgment, as the record shows BT accommodated

Plaintiff's FMLA request for the entire period in which she was certified as needing a

reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)

76.     Accordingly, later that day Ranade asked her physician to remove her
restrictions because her employer could not accommodate a part time schedule. See Note from
Dr. Gorle 10/6/10, BT doc # 148. See also

**RESPONSE:  Undisputed** to the extent BT is unaware of what Plaintiff said to her

doctor with respect to her FMLA leave.  By way of further response, it is undisputed

that BT accommodated Plaintiff's FMLA request for the entire period in which she

was certified as needing a reduced schedule.  (*See* Pearson Decl. Ex. J, BT 000285.)

77.     Nadine is heading back to her Dr. so more to come. 10/6/10 12:20 pm
BT doc # 295

**RESPONSE:  Undisputed**.  The document speaks for itself.  By way of further

response, that same day Plaintiff returned to BT with a note from her physician

removing the four-hour work restriction.  (Pearson Decl. Exs. J (BT 000302), N.)

78.     10/6/10 12:56pm "I spoke to Nadine after our call, and she is going back to her Dr. one more time today to see what she advises, and if she is either supportive of FT STD or will release her from restrictions" BT doc #302

**RESPONSE:  Undisputed**.  The document speaks for itself.  By way of further

response, that same day Plaintiff returned to BT with a note from her physician

removing the four-hour work restriction.  (Pearson Decl. Exs. J (BT 000302), N.)

79.     Ranade testified:  "It's possible that I went back after all this commotion and stress, that my manager had turned me down for not – cutting my hours down, and then she won't have any other job for me for some time. So I went back to my doctor's. It's possible I negotiated with her that allowed me to go back full time while I continued my therapy." Ranade at 312

**RESPONSE:  Disputed**.  Statements are unintelligible speculation which cannot

create an issue of fact for purposes of summary judgment.  By way of further response,

Ms. Charlton did not "turn[] [Plaintiff] down for  not – cutting [her] hours down," as

Plaintiff alleges.  To the contrary, Ms. Charlton ultimately determined she was willing

to support Plaintiff's four-hour flexible schedule (Pearson Decl. Ex. J (BT 000292.),

however, BT's policy required that Plaintiff's reduced schedule be a four-hour block

(*See* Pearson Decl. Ex. J (BT 000294, 297)).  This paragraph is undisputed to the

extent BT has no knowledge of the conversations that took place between Plaintiff and

her physician.

80.     Ranade's doctor strongly advised against working full time, but Ranade insisted that she needed to keep her job, so she had to return full time. Ranade at 328

**RESPONSE:  Undisputed** to the extent BT has no knowledge of the conversations

that took place between Plaintiff and her physician**.**  By way of further response,

statements are immaterial for purposes of summary judgment.  It is undisputed that BT

accommodated Plaintiff's FMLA request for the entire period in which she was

certified as needing a reduced schedule.  (See Pearson Decl. Ex. J, BT 000285.)

81.      Ranade pressed on after October 6 due to stress because she wanted to maintain
her job. Ranade at 313

**RESPONSE:  Disputed**.  There is no testimony that BT threatened to discharge

Plaintiff in response to her request for FMLA leave.  Plaintiff's speculation concerning

the stability of her position is insufficient to create an issue of material fact for

summary judgment.  By way of further response, on October 6, 2010, Plaintiff was

certified by her physician to return to work without any restrictions.  (Pearson Decl.

Ex. N.)  After October 6, 2010, Plaintiff's FMLA leave was never raised by herself of

anyone else at BT.  (Pl. Tr. 330:11-331:6; Pearson Decl. ¶12.)

82.      Ranade continued the physical therapy she had commenced in July through the
end of October: Jackson Clinic ledger, BT doc # 213-214, "Limited ability to balance work and
stress and symptom management for full recovery" Jackson Clinic note 10/11/10 BT doc # 242

**RESPONSE**.  **Disputed** to the extent the quotation is not fully portrayed.  In the

Jackson Clinic physical therapy notes for 10/11/10 Plaintiff's instructor commented

that he was "very frustrated that pt rarely has time for ther [sic] ex with need to get

back to work. … Limited ability to balance work and stress and symptom management

for full recovery."  (Guerrasio Reply Decl. Ex. 4, BT 000242.)  By way of further

response, in the notes from the following four physical therapy sessions on 10/13/10,

10/20/10, 10/25/10 and 10/27/10 (appointments all of which occurred during normal

business hours), Plaintiff is reported to be "feeling much better" with "decreased pain"

and "periods of time of no pain."  (Guerrasio Reply Decl. Ex. 4, BT 000242-253.)

There are no records of Plaintiff receiving any further treatment from the Jackson

clinic after 10/27/10.  (Pl. Opp. Ex. 2, BT 000213-214.)

## **Termination:**

83.     Defendant asserts that Ranade was terminated because three different clients
asked her to be removed from their accounts. Pearson at 23 Defendant further acknowledges
that the final decision maker with respect to terminating Ranade's employment was Jayne
Charlton. Pearson at 54

**RESPONSE:**  Statement is argumentative, in violation of Local Rule 56 and to which

no response is required.  By way of further response, Plaintiff's employment was

terminated after the third client requested her premature removal from their account.

(*See* Pearson Tr. 23:6-11).  Jayne Charlton was the final decision-maker with respect to

Ms. Ranade's termination.  (Pearson Tr. 54:13-17.)

84.     As described above, Ranade was not asked to be removed from three different
accounts, but instead had simply completed each of her assignments.

**RESPONSE:  Disputed**.  No citations to the record are provided and statements

contradict undisputed record evidence.  *See* Def.'s Responses to Paragraphs 24, 28, 47.

85.     Furthermore, although the termination was executed in March, 2011, Ranade
was on a trajectory headed for termination when she began asking for leave. As Ranade noted,
she had no issues with Charlton until the summer of 2010 Ranade at 76 This was the same time
that Ranade began physical therapy and began requesting leave.

**RESPONSE:  Disputed**.  Insufficient record citations provided.  In March 2010, as a

result of her poor performance on the P&G Mehoopany Project, Plaintiff's

performance review rating was downgraded from "Very Good" to "Good." (*See*

Guerrasio Decl. Ex. 7; Guerrasio Reply Decl. Ex. 5.)  By way of further response,

whether Ms. Ranade had "issues" with Ms. Charlton is immaterial for purposes of

summary judgment.

86.     The downgrade to "Development Needed" occurred after Ranade became ill
and requested leave. Ranade at 167 No explanation was given, "And I kind of felt really more
personally bad because I had recently asked her for leave." Ranade at 168[2]

**RESPONSE: Disputed.**  Plaintiff's performance ratings started to decline in March

2010, after her removal from the P&G Mehoopany Project.  (*See* Guerrasio Decl. Ex.

7; Guerrasio Reply Decl. Ex. 5.)  While BT does not dispute Ms. Ranade's personal

feelings, they are immaterial for purposes of summary judgment.

87.     Ranade was next placed on a PIP around the time her request for leave was
formalized, based upon the Mehoopany issue which had occurred nearly a year prior, and upon
which BT had already passed judgment; and upon the conflict with Unilever, which was
concerned primarily with her transition to part time.

**RESPONSE: Disputed.**  No record citations provided.  Ms. Charlton began preparing

Plaintiff's PIP on September 7, 2010.  Ms. Ranade was placed on the PIP because of

her requested removal from two client accounts within less than one year.  (Pearson

Decl. Ex. G (BT 000165)).  Ms. Ranade notified BT and Ms. Charlton of her need for

leave pursuant to the FMLA on September 13, 2010.  (Pearson Decl. Ex. J (BT

000254).  By way of further response, *see* Def.'s Response to Paragraphs 24, 29.

88.     Tellingly, Jayne Charlton made no effort to find another project that could
accommodate the FMLA intermittent leave request in September. Pearson at 81 In fact, no
effort was made to find Ranade another project in the October time frame either. Pearson at 87,
88,  despite Ranade's rescission of her formal FMLA request.

---

[2] The rating "Achieves Standards" was the equivalent of "Good" according to Charlton.
Ranade at 161.  Accordingly, Ranade was not downgraded in her review prior to her request for
leave.

**RESPONSE: Disputed.**  *See* Guerrasio Reply Decl. Ex. 5 which denotes both "Good" and
"Achieves Standards" ratings).

**RESPONSE:  Disputed**.  Plaintiff mischaracterizes the testimony of Ms. Pearson.  As

the deposition transcript makes clear, Ms. Pearson did not confirm that Ms. Charlton

stopped looking for additional assignments for Ms. Ranade after she requested FMLA

leave.  On the contrary, the testimony of Ms. Pearson is that she "d[id] not know"

whether Ms. Charlton made any efforts to secure a new project for Ms. Ranade.

(Pearson Tr. 81:17-20, 87:19-88:3.); (6) Ms. Ranade never "rescinded" her FMLA

request.  Rather, Ms. Ranade submitted a second doctor's note lifting the four-hour

work restriction as of October 6, 2010.  (Pearson Decl. Ex. N.)

89.    Indeed, it appears that as of October, 2010, Charlton stopped looking for
opportunities for Ranade to work altogether. Defendant acknowledged that Charlton did not
look for work for Ranade after her completion of the Capitol Group Pearson at 71 – 73 Instead,
Ranade was  benched and then terminated after the conclusion of her association with Capital
Group. Pearson at 73, Ranade at 236, 237

**RESPONSE:  Disputed**.  Plaintiff mischaracterizes the testimony of Ms. Pearson.  As

the deposition transcript makes clear, Ms. Pearson did not confirm that Ms. Charlton

stopped looking for additional assignments for Ms. Ranade after her requested removal

from Capital Group.  To the contrary, the testimony of Ms. Pearson is that while she

was "not aware" of any, she "d[id] not know" whether Ms. Charlton made any efforts

to secure a new project for Ms. Ranade.  (Pearson Tr. 71:19-22.).

90.    In addition, and despite the request from Unilever in January, 2011 Ranade was
not assigned any additional work for them.

**RESPONSE:  Disputed**.  No citation to the record is provided in violation of Local

Rule 56.

91.    Notably, Ranade got a call a week before she was dismissed inquiring about
whether she was still suffering from any kind of pain. Ranade at 193

**RESPONSE:**  **Undisputed** as BT has no knowledge of the alleged call.  By way of further response, statements are immaterial for purposes of summary judgment.

Dated:  September 19, 2013                    PROSKAUER ROSE LLP

By:  */s/ Connie Bertram* _____

Connie N. Bertram
Virginia State Bar No. 31713
Daniel J. Davis
Virginia State Bar No. 65385
1001 Pennsylvania Ave., N.W.,
Suite 400 South
Washington, DC  20004
Telephone:  (202) 416-6800
Fax:  (202) 416-6899
cbertram@proskauer.com
ddavis@proskauer.com

Edna D. Guerrasio (*pro hac vice*)
One Newark Center
Newark, New Jersey 07102
Telephone:  (973) 274-3000
Fax:  (973) 274-3299
eguerasio@proskauer.com

*Attorneys for Defendant*
*BT Americas Inc.*