

FILED
OCT 28 2013
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| NADINE RANADE,<br><br>　　　　　　Plaintiff,<br><br>　-v-<br><br>BT AMERICAS, INC.,<br><br>　　　　　　Defendant. | Civil Action No. 1:12-CV-01039 |

## MEMORANDUM OPINION

### I. Overview

Before the Court is Defendant's motion for summary judgment (Dkt. No. 23). Plaintiff opposed the motion (Dkt. Nos. 32, 33) and Defendant replied (Dkt. No. 36). The Court heard oral argument on October 11, 2013. After reviewing the pleadings and exhibits submitted by the parties, for the reasons stated in open court and those set forth below, the Court now issues this order granting Defendant's motion for summary judgment and dismissing Plaintiff's complaint with prejudice.

### II. Background

Defendant BT Americas, Inc. ("BT") is a technology services firm in Northern Virginia. In March 2008, BT Americas hired Plaintiff Nadine Ranade as a consultant at a salary of $120,000 annually. Ranade worked for BT Americas continuously until March 31, 2011, when she was informed that she was being terminated for poor performance. Ranade maintains that BT Americas violated the Family and Medical Leave Act ("FMLA") by denying her request for FMLA leave in September 2010, giving her negative performance evaluations, placing her on a Performance Improvement Plan ("PIP"), and ultimately terminating her in March 2011. Ranade

1

filed this one-count complaint on September 18, 2012 (Dkt. No. 1), alleging a non-specific "willful violation" of the FMLA, 29 U.S.C. § 2611. BT Americas filed a motion for summary judgment on August 20, 2013 (Dkt. No. 23).

## III. Analysis

Summary judgment should be granted where the evidence in the record "show[s] that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court explained, "this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A dispute over an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Finally, in making a summary judgment determination, the court must view the facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. v. Zenith Radio*, 475 U.S. 574, 587–88 (1986).

As a starting point, Plaintiff has failed to file a Rule 56.1 statement of disputed facts as required by the local rules. E.D. Va. Local Civ. R. 56(B). Because of this failure, it is difficult to identify the disputed issues of fact in this case, and the Court is entitled to "assume that facts identified by the moving party in its listing of material facts are admitted." *Id.* Furthermore, this Court agrees with Defendant that the recitation of facts in Plaintiff's opposition brief does not fully comply with Federal Rule of Civil Procedure 56(c), which requires that a party asserting a genuinely disputed fact "support that assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c). Notwithstanding these failures, this Court has considered all of

2

Plaintiff's factual allegations, along with Plaintiff's exhibits, and still finds that Plaintiff has not created a genuine issue of material fact for trial in this case.

Under the FMLA, an eligible employee suffering from a "serious health condition that makes [her] unable to perform the functions of the position" is entitled to twelve workweeks of leave during any twelve-month period. 29 U.S.C. § 2612(a)(1)(D). When the need for leave arises out of a serious medical condition under Section 2612(a)(1)(D), an employee's leave may be taken intermittently or on a reduced work schedule when medically necessary. *Id.* § 2612(b)(1). However, the statute does not require that an employer accommodate *any* schedule demanded by the employee. Rather, the statute requires that the employee and employer "work out a schedule for such leave that meets the employee's needs *without unduly disrupting the employer's operations.*" 29 C.F.R. § 825.302(f) (emphasis added).

Although Plaintiff's complaint did not plead more specifically than to allege a "willful violation" of the FMLA, this Court will analyze the two possible claims Plaintiff could bring under the FMLA—interference (29 U.S.C. § 2615(a)(1)) and retaliation (29 U.S.C. § 2615(a)(2)).

Interference – 29 U.S.C. § 2615(a)(1)

In order to survive summary judgment on an FMLA interference claim, Plaintiff must establish that 1) she was an eligible employee, 2) BT was a qualified "employer" under the FMLA, 3) she was entitled to leave under the FMLA, 4) she notified her employer of her intent to take leave, and 5) BT denied FMLA benefits to which she was entitled. *Ainsworth v. Loudon Cnty. Sch. Bd.*, 851 F. Supp. 2d 963, 975 (E. D. Va. 2012). In addition, Plaintiff must demonstrate that the denial of FMLA benefits prejudiced her in some way. *Anderson v. Discovery Commc'ns, LLC*, No. 11-2195, 2013 WL 1364345, at *6 (4th Cir. May 3, 2013).

3

Taking the facts of this case in the light most favorable to the Plaintiff, this Court is unable to say that a reasonable jury could find that BT Americas denied Ranade the benefits of the FMLA. Ranade notified BT of her need for FMLA leave and submitted the required documentation on September 22, 2010. The documentation from her health care provider stated that Plaintiff could work no more than four hours per day, five days per week, effective immediately. Human Resources accommodated Plaintiff by restructuring her hours to a part-time schedule of 8am-12pm, beginning September 23, 2010. On October 6, 2010, Ranade's eligibility for FMLA leave ceased when she provided BT with documentation from her doctor clearing her to return to work full-time. It is not disputed that throughout the nine-day period that Ranade qualified for a reduced work schedule under the FMLA, BT accommodated her. Nor is it disputed that after October 6, 2010, she returned to a full-time schedule with the same salary and benefits she had prior to taking leave, and BT accommodated her ongoing physical therapy.

Ranade argues that BT denied her the benefits of the FMLA by 1) denying her the 20 hour per week "flex time" schedule that she preferred, and instead requiring a 20 hour "block" schedule, and 2) informing her on October 5, 2010 that it could no longer accommodate her reduced work schedule and instead offering her other options. Neither of these arguments are availing because, assuming both are true, neither would demonstrate that BT failed to fulfill its obligations under the FMLA. Under the FMLA, BT was required to offer an employee with a serious medical condition continuous full time leave, or a mutually agreed upon reduced work schedule. *See* 29 C.F.R. § 825.117 (stating that employees must attempt schedule part-time leave "so as not to disrupt the employer's operations" and allowing employers to "assign an employee to an alternative position with equivalent pay and benefits that better accommodates the employee's . . . reduced leave schedule").

Based on the 20 hour per week limitation imposed by Ranade's doctor, BT offered Ranade a schedule of 8am-12pm, five days a week, which she accepted. Problems arose with this schedule because Ranade's client, Unilever, needed Ranade to be available on a more flexible basis to meet its needs. Although BT and Unilever attempted to come to an agreement on Ranade's schedule, they ultimately could not agree on a reduced work schedule.[1] On October 5, 2010, BT informed Ranade of her options: 1) take continuous FMLA leave as permitted by the statute, or 2) return to work full time, if her doctor determined that her condition permitted it. Plaintiff also testified that she could have gone "on the bench," Def.'s Exh. 2, at 72 (Ranade Deposition at 294), retaining the same position with full pay and benefits, until BT could find a suitable part-time assignment for her. Given these uncontroverted options, Plaintiff's claim that she was "advised repeatedly and in no uncertain terms that BT could not accommodate her request for leave under the FMLA," Opp. at 14, is incorrect.

The options offered by BT fulfilled its obligations under the FMLA and were entirely reasonable in light of BT's policy and need to manage its employees. Because Ranade worked from home, BT's determination that a schedule of four hours "haphazard[] . . . flex time per day" was "not manageable for the business" was reasonable given BT's need to track Ranade's time, ensure compliance with the FMLA, and limit its own liability. Plaintiff's Exh. 2, BT Doc. 273.[2] Indeed, Ranade's own admission that she misled BT about her observation of the four hour limit

---

[1] Plaintiff suggests that BT changed its position on Ranade's "flex time" request at the last minute but concealed this change of heart from Ranade. The email traffic from October 5 and 6 does not support that interpretation. Jayne Charlton did state in an October 6 email to Jan Escalante that despite her strong preference against it, the 20 hour flex time schedule might ultimately be possible. Plaintiff's Exh. 2, BT Docs. 292-293. However, Escalante's response one hour later clearly indicates that despite Ms. Charlton's attempt to be flexible, the flex time schedule remained unworkable for BT's Human Resources department. *Id.*

[2] Plaintiff's argument that BT's written Family and Medical Leave Act policy did not specifically address the guidelines for reduced work schedules is fruitless. Most importantly, because the FMLA does not require BT to accommodate *any* proposed schedule (rather, reduced work schedules must be reasonable in light of the employer's business needs), the absence of a more specific policy from BT's corporate documents is not a bar to BT's argument that it could not accommodate a "flex time" schedule. Furthermore, BT's written policy *does* state that employees seeking a reduced work schedule "must not disrupt unduly BT's business operations." Plaintiff's Exh. 2, at 6.

between September 23 and October 5 underscores BT's concerns about her ability to comply with her reduced work schedule while working from home. Def.'s Exh. 2, at 73–74 (Ranade Deposition at 308, 326). Plaintiff's decision to schedule an appointment with her doctor, and her doctor's subsequent approval of her return to full-time, was her choice in light of the other options presented by BT. Plaintiff can point to no evidence in the record that BT threatened her job (explicitly or implicitly) or required her to come back full time, as opposed to taking continuous FMLA leave or moving to the "bench." Rather, the email traffic from October 5 and 6 clearly demonstrates that Ranade simply chose one of several options available to her at the time. BT's obligations under the FMLA lapsed when Ranade's doctor officially cleared her to return full-time, with no restrictions. Because it is undisputed that BT accommodated Ranade's request for a reduced schedule on each and every day that she qualified for FMLA leave, a reasonable jury could not conclude that BT interfered with Ranade's rights under the FMLA.

Retaliation – 29 U.S.C. § 2615(a)(2)

Although Plaintiff did not explicitly make a retaliation claim in her complaint, this Court will consider Plaintiff's argument that she was terminated as a result of exercising her rights under the FMLA. To state a retaliation claim under the FMLA, Plaintiff must show that 1) she engaged in a protected activity, 2) her employer took an adverse employment action against her, and 3) the adverse employment action was causally connected to her protected activity. *Ainsworth*, 851 F. Supp. 2d at 976 (*citing Yashenki v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006). Here, there is no dispute that Ranade engaged in a protected activity when she requested leave under the FMLA. Nor is there any dispute that on March 31, 2011, Ranade was terminated, constituting an adverse employment action. Plaintiff, however, has not presented

evidence creating a genuine issue of material fact on the third element of her retaliation claim—causal connection—and her claim therefore fails.

As the Fourth Circuit held in *Yashenko v. Harrah's N.C. Casino Co.*, retaliation claims under the FMLA are evaluated using the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–06 (1973). 446 F.3d at 551. Therefore, once BT offers a non-discriminatory explanation for Ranade's placement on the PIP and termination, which it has, Ranade bears the burden of establishing "that the employer's proffered explanation is pretext for FMLA retaliation." *Id.* After considering the pleadings, Plaintiff's exhibits, and the arguments made before this Court, the Court is unable to conclude that Ranade has met this burden of production.

As an at-will employee, Ranade was subject to termination by BT for any reason not in violation of her statutory or constitutional rights. The evidence in the record provides ample support for the non-discriminatory explanation that BT has proffered—that Ranade was placed on a PIP and ultimately terminated because of her poor performance on a number of client accounts. BT need not prove each and every instance of Plaintiff's poor performance to prevail on summary judgment. The evidence in the record, including the emails between Jayne Charlton and Plaintiff and the detailed PIP, meets BT's burden of establishing a legitimate, non-discriminatory explanation for the actions taken against Ranade. The burden therefore shifts to Ranade to create a genuine issue of material fact tending to show that BT's explanation was pretextual, and Ranade has not met that burden.

Plaintiff makes three observations aimed at discrediting BT's proffered explanation: 1) Ranade received a number of positive performance evaluations, 2) Ranade consistently excelled at the more technical aspects of her job, and 3) Jayne Charlton stopped looking for work for Ranade after her FMLA leave. None is sufficient to call into question the evidence supporting

7

BT's explanation of their motives. Ranade was undoubtedly a strong employee at BT at the beginning of her career, and it is undisputed that she received mostly positive annual reviews in March 2009 and March 2010 (although the March 2010 review did note Ranade's issues on the Proctor & Gamble account in Fall 2009). However, these reviews do not undermine the voluminous evidence indicating that Ranade was asked to leave multiple client accounts due to her poor performance. For example, Plaintiff's own belief that "[Capitol Group] was so happy with our work," Opp. at 9, does not overcome the contemporaneous emails in the record stating that Plaintiff's "[w]ork effort was inconsistent" and that "the client specifically asked . . . not to bring her back for the ongoing project work." Def.'s Exh. 2, at 128.

Furthermore, while Ranade's job certainly had a significant technical component, her role as a Project Manager required her to frequently interface with clients. There is no reason to conclude that BT's consistent concerns about her communication and "soft" skills are a smokescreen for FMLA retaliation; rather, they were a reasonable requirement of Ranade's position. Finally, Ranade's claim that there was no work sought for her after her FMLA leave is directly contradicted by her placement on the Capitol Group account, which she was assigned to in November 2010 and continued on until just before her termination.

Plaintiff's attempt to create a causal connection between her FMLA leave in September 2010 and her termination on March 31, 2011 is also undermined by her inability to present *any* direct evidence linking the two events.[3] It is undisputed that BT did not mention Plaintiff's FMLA leave or medical condition at the time she was terminated (or, for that matter, at any time after she returned full-time), except to accommodate her physical therapy schedule. To the

---

[3] Under Fourth Circuit precedent, the nearly six month gap between the end of Plaintiff's FMLA leave and her termination is not prima facie evidence of a causal connection in the absence of other evidence. In fact, this Circuit has repeatedly held that time gaps even shorter than six months militate *against* a causal relationship. *See, e.g., King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (finding a delay of less than three months in an FMLA retaliation claim "sufficiently long as to weaken significantly the inference of causation between the two events").

8

contrary, all reasonable inferences from the evidence in the record point in the opposite direction, supporting BT's explanation that it did everything it could to help Ranade improve her performance but ultimately terminated her when those efforts were unsuccessful.[4] Ranade has not introduced evidence from which a jury could find that BT's legitimate, non-discriminatory reason for terminating her was pretextual, and she has therefore not made out a prima facie claim of FMLA retaliation.

IV. **Conclusion**

Despite Plaintiff's efforts to demonstrate a causal relationship between her nine-day FMLA leave in September 2010 and her termination six months later, this Court is unable to find that a reasonable jury could conclude that such a relationship exists. Nor has Plaintiff demonstrated that BT interfered with her rights under the FMLA; to the contrary, BT fully accommodated her request for a reduced work schedule until she was cleared by her doctor to return to full-time. Finding no genuine issues of material fact for trial, for the reasons stated herein, the Defendant's motion for summary judgment is granted. An order will follow.

October 28, 2013
Alexandria, Virginia

/s/ 
Liam O'Grady
United States District Judge

---

[4] For example, in December 2010 when Jayne Charlton extended Ranade's Performance Improvement Plan by several weeks due to holidays and missed mentoring sessions, there was no indication that BT was retaliating against Ranade for the FMLA leave she had taken two months earlier. Rather, Charlton stated, "I view [the PIP] as an *investment in your future* that is worth making the time for through completion." Plaintiff's Exh. 2, at 59 (emphasis added).